1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Bianca Jimenez-Bencebi, et al.,          No. CV-23-02075-PHX-DWL

10          Plaintiffs,                      **ORDER**

11  v.

12  State of Arizona, et al.,

13          Defendants.

14

15          **INTRODUCTION**

16          Bianca Jimenez-Bencebi ("Jimenez-Bencebi") is the mother of L.J., K.J., K.A.J, and

17  J.A.J., as well as non-party J.M.J., and Jiaro Abrego Zavaleta ("Zavaleta") is the father of

18  K.A.J. and J.A.J.

19          At some point in September 2018, the Arizona Department of Child Services

20  ("DCS") filed a dependency petition to remove K.J. and J.M.J. from Jimenez-Bencebi's

21  care.  The petition was prompted by DCS's receipt of a hotline call accusing Jimenez-

22  Bencebi of being temporarily homeless, aggressive, and neglectful toward her children.

23  On September 14, 2018, DCS removed K.J. and J.M.J from Jimenez-Bencebi's care.  A

24  few months later, DCS filed a petition to sever Jimenez-Bencebi's parental rights to K.J.

25  and J.M.J.  As the severance proceedings were unfolding, Jimenez-Bencebi gave birth to

26  K.A.J.  DCS, in turn, removed K.A.J. from Jimenez-Bencebi's care and amended the

27  severance petition to include K.A.J.  As the amended severance proceedings were

28  unfolding, Jimenez-Bencebi gave birth to J.A.J.  DCS, in turn, removed J.A.J. from

1   Jimenez-Bencebi's care and amended the severance petition to include J.A.J. Finally, in

2   May 2022, the juvenile court ruled in large part against DCS in the severance proceedings,

3   ordering reunification as to K.J., K.A.J., and J.A.J. However, "DCS took no affirmative

4   steps toward implementing the reunification case plan until five months later." (Doc. 1-3

5   at 140 ¶ 40.)

6        These developments provide the backdrop for this case, in which Jimenez-Bencebi,

7   Zavaleta, L.J., K.J., K.A.J, and J.A.J. (together, "Plaintiffs") have asserted a sprawling array

8   of federal and state-law claims against the State of Arizona (the "State") and various state

9   employees (together, "Defendants"). Now pending before the Court is Defendants' motion

10  to dismiss. (Doc. 6.) For the following reasons, the motion is granted in part and denied

11  in part.

12                              **BACKGROUND**

13       The following facts, presumed true, are derived from Plaintiffs' operative pleading,

14  the First Amended Complaint ("FAC"). (Doc. 1-3 at 132-75.)

15  I.    <u>The Parties And Other Relevant Entities</u>

16       Jimenez-Bencebi is the mother of L.J., K.J., J.M.J., K.A.J., and J.A.J. (*Id.* at 134

17  ¶ 6; *id.* at 137 ¶ 21.) However, J.M.J. "is not a party to this lawsuit and no claims are being

18  brought on J.M.J.'s behalf." (Doc. 11 at 3 n.1.)

19       Zavaleta is Jimenez-Bencebi's husband and the biological father of K.A.J. and J.A.J.

20  (Doc. 1-3 at 134 ¶ 7; *id.* at 137 ¶ 22.)

21       Between 2018 and 2020, K.J., K.A.J., and J.A.J., as well as non-party J.M.J., were

22  removed from Jimenez-Bencebi's care. (*Id.* at 139 ¶¶ 38(d), (h); *id.* at 141 ¶ 48.)

23       The State of Arizona "is a government entity, operating through several agencies,

24  including [DCS]." (*Id.* at 134 ¶ 12.)

25       Carin Patchin was "an employee of the [State] through DCS." (*Id.* at 134-35 ¶ 13.)

26  She worked as Jimenez-Bencebi's caseworker "between October 2018 to March 2021."

27  (*Id.* at 140 ¶ 42.) She "is named herein in her individual capacity." (*Id.* at 135 ¶ 13.)

28       Tracy Del Fiacco is "an employee of the [State] through the DCS." (*Id.* at 135 ¶ 14.)

She replaced Patchin as the caseworker assigned to Jimenez-Bencebi after March or April 2021.  (*Id.* at 140 ¶ 43; *id.* at 147 ¶ 91.  *See also id.* at 185 n.1 [correcting the misspelling of Del Fiacco's first name in the FAC].)  She "is named herein in her individual capacity."  (*Id.* at 135 ¶ 14.)

Amanda Davisson is "an employee of the [State] through the DCS."  (*Id.* at 135 ¶ 15.)  She supervised Patchin and Del Fiacco.  (*Id.* at 140 ¶ 44.)  She "is named herein in her individual capacity."  (*Id.* at 135 ¶ 15.)[1]

Gregory McKay served as "Director of the DCS."  (*Id.* at 135 ¶ 17.)  As Director, "McKay was the official policymaker . . . for DCS."  (*Id.*)  "He is named herein in his individual and official capacity."  (*Id.*)

Michael Faust served as "Director of the DCS" after McKay.  (*Id.* at 135 ¶ 16.)  As Director, "Faust was the official policymaker for the DCS."  (*Id.*)  "He is named herein in his individual and official capacity."  (*Id.*)

II.   Relevant Factual Background

In 2016, Jimenez-Bencebi lived in Missouri with her children, L.J. and K.J.  (*Id.* at 137 ¶ 24.)

On November 30, 2016, Jimenez-Bencebi was raped and, as a result, conceived J.M.J.  (*Id.*)

On July 17, 2017, "L.J. was acting out and [Jimenez-Bencebi] allegedly hit and bit him.  L.J. called the police, and [Jimenez-Bencebi] was arrested."  (*Id.* at 137 ¶ 26.)  Jimenez-Bencebi "pled guilty to a misdemeanor charge of physically abusing L.J." and "served a 120-day jail sentence."  (*Id.* at 137 ¶ 27.)  While Jimenez-Bencebi was incarcerated, L.J. moved to Puerto Rico to live with his father and K.J. was placed in foster

---

[1]   The case caption lists Patchin, Del Fiacco, and Davisson "individually and as an employee with the State of Arizona Department of Child Safety."  (*Id.* at 132-33).  Because Plaintiffs later specify in the body of the FAC that Patchin, Del Fiacco, and Davisson are named in their individual capacities, the Court does not interpret the case caption as naming Patchin, Del Fiacco, and Davisson as parties in their official capacities.  5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1321 (4th ed. 2023) ("[T]he caption is not determinative as to the identity of the parties to the action . . . .").

care.  (*Id.* at 138 ¶ 29.)

On August 25, 2017, while incarcerated, Jimenez-Bencebi gave birth to J.M.J.  (*Id.*)  J.M.J. was placed in foster care.  (*Id.*)

In December 2017, "[t]he State of Missouri returned K.J. and J.M.J. to [Jimenez-Bencebi] . . . a few weeks after she was released from jail."  (*Id.* at 138 ¶ 31.)  L.J. continued to reside in Puerto Rico with his father.  (*Id.* at 138 ¶ 30.)  "[T]he Missouri social workers wrote many positive things about [Jimenez-Bencebi's] parenting, including the fact that L.J. was polite and well-educated and that K.J. was well-cared for and had a strong bond with her mother."  (*Id.* at 138 ¶ 32.)

In January 2018, Jimenez-Bencebi moved to Arizona with K.J. and J.M.J. and began living with Zavaleta and his sister.  (*Id.* at 138 ¶ 33.)

In late August 2018, Zavaleta's "sister threw [Jimenez-Bencebi] out of the house . . . . [Jimenez-Bencebi] was pregnant with K.A.J. at the time."  (*Id.* at 138 ¶ 35.)  Jimenez-Bencebi then "suffered a temporary period of housing instability which lasted only a few weeks" and "spent a few days in a homeless shelter, Gift of Mary Shelter," with K.J. and J.M.J.  (*Id.* at 138 ¶ 36.)

While at the shelter, someone stole money from Jimenez-Bencebi's purse.  (*Id.* at 141 ¶ 48(a).)[2]  "When she complained about the theft, [she] was asked to leave."  (*Id.* at 141 ¶ 48(b).)  "Later, a hotline call was made to DCS."  (*Id.* at 141 ¶ 48(c).)  With the information obtained from this call, "Patchin reported to the juvenile court that [Jimenez-Bencebi] threatened a person with a knife at the Gift of Mary Shelter, left J.M.J. in his car seat for extended times, prevented others from feeding J.M.J., and only paid attention to K.J."  (*Id.* at 141 ¶ 48(e).)

On September 6, 2018, Jimenez-Bencebi "brought J.M.J. to a medical appointment to keep his vaccinations up to date.  This medical professional and mandatory reporter noted nothing unusual about J.M.J. and did not report [Jimenez-Bencebi]."  (*Id.* at 138

---

[2]    The FAC does not provide a specific date for this event.  In Plaintiffs' response brief, Plaintiffs state these events occurred "[i]n September 2018."  (Doc. 11 at 3.)

¶ 37.)

At some point in September 2018, "[t]he first dependency petition was filed . . . as to K.J. and J.M.J."  (*Id.* at 139 ¶ 38(b).)[3]

On September 14, 2018, DCS removed K.J. and J.M.J. from Jimenez-Bencebi's care.  (*Id.* at 141 ¶ 48.)  Upon removal, K.J. and J.M.J. were taken to Phoenix Children's Hospital ("PCH") for a physical examination.  (*Id.* at 141 ¶ 52.)  The examination found "no issues . . . with K.J."  (*Id.* at 142 ¶ 53.)  "J.M.J. was admitted to PCH and found to have mild to moderate malnutrition."  (*Id.* at 142 ¶ 54.)  J.M.J.'s medical records from September 14, 2018 provided that:

> J.M.J. could sit on his own, pull to stand, and was active, crawling, playful and happy, and that he had a total of one small fine scratch (~3/4 inch), one small bruise (~1/4 inch) on his cheek, and three small bruises (~1/4 to 3/8 inch) on his right thigh.  Mongolian spots were found on his back and buttocks, as well as some areas of hyperpigmentation.  He had no bruising at all on his back; and the shape of J.M.J.'s head was normal, and not noted as flat.

(*Id.* at 142 ¶¶ 56-57, emphasis omitted.)   J.M.J. weighed "17.3 pounds when he was admitted to PCH."  (*Id.* at 142 ¶ 59.)

On September 20, 2018, J.M.J. was released from PCH "to his 'adoptive' mothers."  (*Id.* at 142 ¶¶ 55, 58.)

As of September 26, 2018, J.M.J. weighed 17.1 pounds.  (*Id.* at 142 ¶ 59.)

On January 24, 2019, "DCS filed a petition to terminate [Jimenez-Bencebi's] parental rights to K.J. and J.M.J." ("First Severance Petition").  (*Id.* at 139 ¶ 38(c).)  In the First Severance Petition, reports to the juvenile court, and testimony in the juvenile court proceedings, Patchin stated:

> [A.] [Jimenez-Bencebi] was homeless for several months in 2018; b. J.M.J. was so severely malnourished he was feeble and could barely sit up; c. J.M.J. had a flat head, distended stomach and non-accidental bruising all over his back; d. [Jimenez-Bencebi] did not like J.M.J. because [he] was a baby

---

[3]    The FAC does not provide a specific date for the filing of the dependency petition.

conceived by rape; e. K.J. had scratches on her face evidencing abuse; f. [Jimenez-Bencebi] was aggressive, as reported by a nameless witness at a homeless shelter; and g. [Jimenez-Bencebi] had been convicted of felonious child abuse in Missouri in 2017.

(*Id.* at 142-43 ¶ 63.) Patchin also stated "that [Jimenez-Bencebi] is an aggressive ex-felon who hates boys and is a danger to her children." (*Id.* at 143 ¶ 66.) Davisson, Patchin's supervisor at DCS, signed the report containing these statements. (*Id.* at 140 ¶ 46.) The First Severance Petition was filed after Jimenez-Bencebi "successfully completed parent aid services." (*Id.* at 144 ¶ 68.)

On March 5, 2019, Jimenez-Bencebi gave birth to K.A.J., and K.A.J. was later removed from Jimenez-Bencebi's care. (*Id.* at 139 ¶ 38(d).)

On August 28, 2019, Jimenez-Bencebi's therapist, Dr. Rossana Hanley, issued a report stating that "there is a good chance that [Jimenez-Bencebi] has completed what she needs to do for DCS." (*Id.* at 145 ¶ 73.) Dr. Hanley diagnosed Jimenez-Bencebi with "adjustment disorder with depressed mood." (*Id.* at 146 ¶ 85.)

In January 2020, the juvenile court granted the First Severance Petition and severed Jimenez-Bencebi's parental rights to K.J. and J.M.J. (*Id.* at 139 ¶ 38(f).) However, Jimenez-Bencebi "appealed the severance on procedural grounds. The severance was reversed, and [she] requested to have visits reinstated with her children." (*Id.* at 147 ¶ 90.)

On February 12, 2020, Jimenez-Bencebi gave birth to J.A.J., and J.A.J. was later removed from Jimenez-Bencebi's care. (*Id.* at 139 ¶ 38(h).) In "support [of] removing K.A.J. and J.A.J. and to keep all the children in State's care," Patchin made the following statements to the juvenile court:

[A.] on one occasion in July 2019 [Jimenez-Bencebi] allegedly shouted at her therapist, Dr. Hanley; b. on one occasion, while in labor in the hospital, [Jimenez-Bencebi] allegedly stated she would name J.A.J. "Motherfucker;" c. [Jimenez-Bencebi] allegedly has gender dysmorphic disorder; and d. [Jimenez-Bencebi] allegedly willfully neglected J.M.J. because she hates boys.

(*Id.* at 144-45 ¶ 71.)[4]  Davisson signed Patchin's report containing these statements.  (*Id.* at 140 ¶ 46.)

On December 14, 2020, DCS filed a petition to terminate the parent-child relationship as to K.J., J.M.J., and K.A.J. ("Second Severance Petition").  (*Id.* at 139 ¶ 38(g).)  Although Jimenez-Bencebi requested that her visits with K.J. and J.M.J. be reinstated following the reversal of the order granting the First Severance Petition, "DCS and its agents refused to re-intestate [sic] these visits, pending the final ruling on their [S]econd [S]everance [P]etition."  (*Id.* at 147 ¶ 90.)

In March or April 2021, "Del Fiacco took over the role of the State's DCS [c]aseworker."  (*Id.* at 147 ¶ 91.)

On May 20, 2021, "DCS amended the December 2020 severance petition to include J.A.J," such that the new petition ("Third Severance Petition") "was now for the termination of the parent-child relationship as to all four children (K.J., J.M.J., K.A.J., and J.A.J.)."  (*Id.* at 139 ¶ 38(i).)  Davisson signed Del Fiacco's reports submitted to the juvenile court.  (*Id.* at 140 ¶ 46.)

On January 10, 2022, the juvenile court held a hearing on the Third Severance Petition.  (*Id.* at 147 ¶ 94.)  At the hearing, "Del Fiacco testified that she had met with [Jimenez-Bencebi] only twice in the 10 to 11 months she had been on the case, and that she had never observed the parents during a visit with their children.  Still, Del Fiacco . . . alleged that [Jimenez-Bencebi] focused on the 'wrong things' during the visits."  (*Id.*)  "The parent supervisor at Cradles to Crayons, Christina Martinez, testified at trial that [Jimenez-Bencebi's] concerns about her daughter were accurate and reasonable."  (*Id.* at 147 ¶ 97.)  "When [Martinez] supported [Jimenez-Bencebi's] motion for increase[d] visits with her children at trial, the State" responded that:

> While the current service provider with Cradles to Crayons stated during trial
> proceedings that they do not see an issue with increasing visitations, their

---

[4]    The FAC does not identify the date these statements were made or specify whether they appeared in Patchin's report, a severance or dependency petition, and/or in Patchin's testimony.

report dated 05 November 2021 suggests otherwise.  [Martinez] and her [s]upervisor who both signed off on the report, stated, "*[Jimenez-Bencebi] is not self-aware of how her lack of impulse control is affecting her relationship with her children*."  This statement does not suggest [Jimenez-Bencebi] has addressed the behavioral concerns that brought the children into departmental care.

(*Id.* at 148 ¶ 98, emphasis in original.)  "Both [Martinez] and her supervisor later stated that the italicized statement above . . . was provided by the State through DCS at intake and was not reflective of their assessment of [Jimenez-Bencebi] on 05 November 2021."  (*Id.* at 148 ¶ 99.)

On February 4, 2022, "Carlos J. Vega, PSY.D. issued his report regarding [Jimenez-Bencebi's] psychological evaluation.  Dr. Vega found that the State and DCS were essential [sic] mistreating [Jimenez-Bencebi] rather than assisting her, re-victimizing her, [that she] struggl[ed] with depression due to the removal of her children, there was insufficient reason for the State and DCS to suspect any risk on the part of [Jimenez-Bencebi] and no basis that she would be unsafe with her children."  (*Id.* at 148 ¶ 102.)

On May 11, 2022, "the juvenile court ruled from the bench to sever[] [Jimenez-Bencebi's] rights as to J.M.J, based on neglect under A.R.S. § 8-533(B)(2).  At the same time, the juvenile court changed the case plan from severance to reunification for K.J[.], K.A.J., and J.A.J.  The court ordered DCS to have a meeting with [the] parents within 30 days of [the] 11 May 2022 ruling to start the reunification process."  (*Id.* at 140 ¶ 38(k).)

For six weeks following the juvenile court's May 2022 decision, "DCS cancelled all of [Jimenez-Bencebi and Zavaleta's] supervised visits with their children."  (*Id.* at 140 ¶ 39.)  "Since September 2018 until six weeks after the May 2022 order changing the case plan to reunification, [Jimenez-Bencebi] has had only limited and, at times, no access to K.J. and J.M.J."  (*Id.* at 149 ¶ 105.)  "DCS took no affirmative steps toward implementing the reunification case plan until more than five months later."  (*Id.* at 140 ¶ 40.)

On May 25, 2023, "the juvenile court dismissed the dependency action and ended the State, DCS and its agents' involvement."  (*Id.* at 140 ¶ 41.)  K.J., K.A.J., and J.A.J.

were returned to Jimenez-Bencebi and Zavaleta.  (*Id.*)

III.   Procedural History

On May 8, 2023, Plaintiffs filed a complaint in the Superior Court of the State of Arizona.  (*Id.* at 5-48.)

On September 1, 2023, Plaintiffs filed the FAC.  (*Id.* at 132-75.)  In the FAC, Plaintiffs assert 13 claims.

In Count One, Plaintiffs assert a § 1983 claim against Patchin, Del Fiacco, and Davisson "for violating Plaintiffs' Right to Freedom of Association under the First Amendment and Due Process under the Fourteenth and Fourth Amendments to the U.S. Constitution for unlawfully seizing and detaining K.J., J.M.J., J.A.J. and K.A.J."  (*Id.* at 151.)

In Count Two, Plaintiffs assert a § 1983 claim against Patchin, Del Fiacco, and Davisson "for violating Plaintiffs' right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth."  (*Id.* at 153-54.)

In Count Three, Plaintiffs assert a § 1983 claim against Patchin, Del Fiacco, and Davisson "for violating Plaintiffs['] right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship."  (*Id.* at 156.)

In Count Four, Plaintiffs assert a § 1983 claim against Patchin, Del Fiacco, Davisson, Faust, and McKay "for violating Plaintiffs['] right to Due Process under the Fourteenth Amendment to the U.S. Constitution to make medical decisions for E.F."  (*Id.* at 158.)

In Count Five, Plaintiffs assert a § 1983 claim against Patchin, Del Fiacco, Davisson, Faust, and McKay "for violating Plaintiffs['] right to Due Process Right under the Fourteenth Amendment to the U.S. Constitution to be with E.F. during medical

treatment." (*Id.* at 159.)[5]

In Count Six, Plaintiffs assert a state-law negligence per se claim against Patchin, Del Fiacco, Davisson, Faust, and McKay. (*Id.* at 160.)

In Count Seven, Plaintiffs assert a state-law claim for abuse of process against Patchin, Del Fiacco, and Davisson. (*Id.* at 162, 164.)[6]

In Count Eight, Plaintiffs assert a state-law claim against Patchin, Del Fiacco, Davisson, Faust, and McKay "for exercising gross negligence in carrying out their duty to protect the legal rights of children and families." (*Id.* at 164, capitalization omitted.)

In Count Nine, Plaintiffs assert a state-law claim against Patchin, Del Fiacco, Davisson, Faust, and McKay "for exercising gross negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship." (*Id.* at 165, capitalization omitted.)

In Count Ten, Plaintiffs assert a state-law claim against Faust and McKay "for the gross negligence exercised by Defendant employees of DCS in carrying out their duties." (*Id.* at 167, capitalization omitted.)

In Count Eleven, Plaintiffs assert a § 1983 claim against the State and DCS "for the unconstitutional acts of its employees which were committed pursuant to a policy and/or practice of DCS." (*Id.* at 168.)

In Count Twelve, Plaintiffs assert a state-law claim against Patchin, Del Fiacco,

---

[5]     Neither the FAC nor Plaintiffs' response identifies the "E.F." referenced in Counts Four and Five. It appears this may be an unintentional carryover from a pleading filed by Plaintiffs' counsel in a different lawsuit. That lawsuit, like this one, involved a sprawling array of claims arising from DCS's temporary removal of a child. *Fidler v. Arizona*, 2024 WL 1553703, *1 (9th Cir. 2024) ("Plaintiff-Appellant Jessica Fidler, on behalf of herself and her son, E.F., appeals the district court's order dismissing her third amended complaint against various defendants allegedly involved in the temporary removal of E.F. from her custody."). At any rate, Defendants acknowledge that "[t]his is a presumed typographical error. It is being interpreted as referencing the children in this action." (Doc. 16 at 6 n.4.) The Court will thus construe the reference to E.F. as meaning L.J., K.J., J.M.J., K.A.J., and J.A.J.

[6]     Although there are references to the State and DCS within the body of Count Seven, the caption of Count Seven makes clear that it is only being asserted against Patchin, Del Fiacco, and Davisson. (Doc. 1-3 at 162.) So does the final paragraph within this count. (*Id.* at 164 ¶ 213 ["Plaintiffs were directly and proximately irreparably harmed by Patchin, Del Fiacco, Davisson's abuse of process. Patchin, Del Fiacco, Davisson are liable for this harm."].)

1    Davisson, Faust, and McKay "for intentional infliction of emotional distress." (*Id.* at 171.)

2        In Count Thirteen, Plaintiffs assert a state-law claim against the State, DCS,

3    Davisson, Faust, and McKay for "negligent supervision, negligent training and negligent

4    retention." (*Id.* at 172, capitalization omitted.)

5        On October 3, 2023, Defendants removed this action to federal court.  (Doc. 1.)

6        On October 12, 2023, Defendants filed the pending motion to dismiss.  (Doc. 6.)

7        On November 9, 2023, Plaintiffs filed a response.  (Doc. 11.)

8        On November 20, 2023, Defendants filed a reply.  (Doc. 16.)  Nobody requested

9    oral argument.

10                                    **DISCUSSION**

11        Defendants argue that dismissal is appropriate under Rule 12(b)(6) for the following

12    reasons: "First, L.J. should be dismissed as a party because he has no standing to sue for

13    interference with familial association as a sibling.  Second, DCS requires dismissal as it is

14    a non-jural entity and cannot be sued; and the State requires dismissal from the federal

15    claim[s].  Third, all claims are barred by the statute of limitations, so all counts should be

16    dismissed with no leave to amend.  Fourth, all state claims are barred by an untimely notice

17    of claim, so counts 5-10, 12, and 13 should be dismissed with no leave to amend.  Fifth, all

18    § 1983 claims should be dismissed against Davisson, Faust, and McKay since they are

19    based solely on *respondeat superior* theory.  Sixth, qualified immunity attaches to all

20    federal claims.  Finally, issue and claim preclusion prevent this lawsuit from proceeding."

21    (Doc. 6 at 21.)

22        Each argument is discussed in further detail below, with the arguments reordered

23    for purposes of analytical clarity.

24    I.    Legal Standard

25        Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege 'sufficient

26    factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In*

27    *re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (citation omitted).  "A

28    claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1144-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 679-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.   <u>L.J.'s "Standing"</u>

A.   **The Parties' Arguments**

Defendants argue that "L.J. has no standing as a sibling and requires dismissal" because "[a]lthough the FAC is vague on the specific constitutional violations that L.J. asserts, it appears grounded in his relationship to his siblings, which does not constitute a viable cause of action."  (Doc. 6 at 5, capitalization omitted.)

In response, Plaintiffs clarify that "L.J.'s familial association claim is for the loss of his mother."  (Doc. 11 at 6.)

In reply, Defendants argue that even if "L.J.'s claims are based on DCS's interference in his relationship with [Jimenez-Bencebi]," L.J. still lacks "a viable cause of action," in part because "the FAC is devoid of facts supporting steps taken by [Defendants] to interfere in this familial relationship."  (Doc. 16 at 3, capitalization omitted.)  Defendants argue that "[t]he only plausible interpretation of these facts is that [Defendants] did not interfere with this relationship, only that [Jimenez-Bencebi] and L.J. 'feared' that they might.  [Defendants] cannot logically be found liable for actions not taken."  (*Id.* at 4.)

B.   **Analysis**

The parties' briefing sequence has complicated the task of analyzing Defendants' challenge to L.J.'s "standing."  The first problem is deciphering the nature of the challenge that Defendants seek to raise.  A challenge to a plaintiff's Article III standing is typically

raised via Rule 12(b)(1), because a lack of Article III standing implicates the Court's subject-matter jurisdiction. *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001) (explaining that the constitutional "standing inquiry focuses upon whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy") (cleaned up). However, Defendants move for dismissal under Rule 12(b)(6) and never mention Article III when challenging L.J.'s "standing" to pursue a familial association claim—to the contrary, Defendants simply assert that any claim "grounded in [L.J.'s] relationship to his siblings . . . does not constitute a viable cause of action." (Doc. 6 at 5.) In their reply, Defendants again clarify that they seek dismissal because "L.J. does not have a viable cause of action." (Doc. 16 at 3, capitalization omitted.) The Court thus construes Defendants' motion as bringing a Rule 12(b)(6) challenge to L.J.'s claims on the ground that he lacks statutory standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (distinguishing between a "lack of *statutory* standing [that] requires dismissal for failure to state a claim" and a "lack of *Article III* standing [that] requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)"). *See generally Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case."); *Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722, 736-37 (7th Cir. 2020) ("[I]t is not unusual for the distinction between standing and the merits to cause conceptual trouble when a plaintiff alleges the deprivation of a dubious property or liberty interest. Yet as we have explained before, to say that a claim is not worth anything is a determination that concerns the merits rather than jurisdiction. Otherwise every losing suit would be dismissed for lack of jurisdiction.") (cleaned up).[7]

---

[7] Of course, because "[s]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III . . . both the Supreme Court and [the Ninth Circuit] have held that whether or not the parties raise the issue, federal courts are required sua sponte to examine jurisdictional issues such as standing." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (cleaned up). The Court is satisfied that L.J. possesses Article III standing here. "[T]he irreducible constitutional minimum of standing

- 13 -

This clarification dovetails with the second problem posed by the parties' briefing sequence—the FAC fails to clearly indicate which of the 13 counts are being asserted by L.J.[8] and Defendants do not specify which counts they seek to dismiss. Although it perhaps might be possible for the Court to independently identify the elements of all 13 counts and then independently analyze whether each is "viable" as applied to L.J., the Court declines to do so. It was Defendants' burden, as the movants, to explain why L.J.'s claims are subject to dismissal under Rule 12(b)(6) and Defendants have failed to meet that burden. *Cf. Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021) ("The Court agrees that Defendants have failed to address the allegations and theories of liability relied upon by Plaintiff. On a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has failed to state a claim. Here, the first four arguments presented in Defendants' motion are arguments untethered to Plaintiff's specific theories of liability. Defendants provide summary arguments and analyses seeking dismissal of all causes of action without addressing how they apply to each cause of action. As such, these four arguments fail to meet Defendants' burden under Rule 12(b)(6) to prove that no claim has been presented for violations of the CLRA, UCL, negligent misrepresentation and breach of the implied

---

contains three elements": (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, L.J.'s asserted injury is a lack of familial association with his mother. Sidestepping, for a moment, whether L.J. has a viable cause of action to seek redress for that sort of injury, the injury itself is particularized and concrete. As for causation, the FAC alleges that "[b]ecause of the State and DCS's wrongful seizure and detention of K.J., J.M.J., J.A.J. and K.A.J., L.J. and [Jimenez-Bencebi] were reasonably afraid to have him return to live with his mother." (Doc. 1-3 at 153 ¶ 137.) This is sufficient to satisfy the "Article III causation threshold," which is "less rigorous" than proximate causation. *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008). *See also Maya*, 658 F.3d at 1070 ("To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a line of causation between defendants' action and their alleged harm that is more than attenuated. A causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.") (cleaned up); *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) ("[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause."). Finally, the FAC sufficiently establishes redressability, as L.J. seeks damages to compensate for the loss of familial association. (Doc. 1-3 at 174.)

[8]       It appears that L.J. is specifically identified as an aggrieved party only in Count One (Doc. 1-3 at 153 ¶ 138) and Count Six (*id.* at 161 ¶ 184), although many of the Counts seem to indicate they are being asserted by "Plaintiffs."

1    warranty of merchantability.") (citations and footnote omitted).

2    III.    The State, DCS, And Faust And McKay In Their Official Capacities

3          A.    **The Parties' Arguments**

4          Defendants argue that because "[n]either DCS nor the [State] are 'persons' under

5    42 U.S.C. § 1983," they cannot be sued under § 1983 and "it is appropriate to dismiss count

6    11 in its entirety." (Doc. 6 at 5-6.) Defendants also argue that "DCS is a non-jural entity

7    and cannot be sued at all, either under § 1983 or under state law." (*Id.* at 6.)

8          In response, Plaintiffs concede that "DCS is not a named Defendant in this

9    matter. . . . DCS is merely identified as an 'agency' through which the [State], who is a

10   party, is alleged to have acted." (Doc. 11 at 7.) However, Plaintiffs argue that their § 1983

11   claims against the State are viable under *Monell v. Dep't of Soc. Servs. of City of New York*,

12   436 U.S. 658 (1978). (*Id.* at 8-9.) Plaintiffs add that they "have sufficiently alleged facts

13   which would support a finding of liability against the [State]—by and through DCS

14   employees. Additionally, Plaintiffs can bring a state law claim against the [State] as § 1983

15   and it [sic] case law does not apply to state law claims." (*Id.* at 9.)

16         In reply, Defendants argue, for the first time, that the Eleventh Amendment bars

17   Count Thirteen against the State and that Faust and McKay cannot be sued in their official

18   capacities. (Doc. 16 at 5.) Defendants also distinguish Plaintiffs' cited cases on the ground

19   that they "involve lawsuits against municipalities and local governments, not against a

20   State." (*Id.*)

21         B.    **Analysis**

22              1.    DCS

23         The parties agree that DCS is not a party to this action and that "[i]t is appropriate

24   to dismiss DCS as a party." (Doc. 16 at 4, capitalization omitted; Doc. 11 at 7.)

25   Additionally, DCS is a non-jural entity that cannot be sued. *Neeley v. Arizona*, 2022 WL

26   44676, *7 (D. Ariz. 2022); *Nelson v. Ariz. Dep't of Economic Security*, 2021 WL 3472742,

27   *1 (D. Ariz. 2021). DCS is therefore dismissed without leave to amend.

28   *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (although

leave to amend should be freely granted, "a district court need not grant leave to amend where the amendment . . . is futile").

2.   42 U.S.C. § 1983 Claims Against The State And Faust And McKay In Their Official Capacities

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*Id.* "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983," although "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989) (citation omitted). *See also Marcotte v. Monroe Corrections Complex*, 394 F. Supp. 2d 1289, 1294 (W.D. Wash. 2005) ("'Persons' liable for damages under Section 1983 include state employees sued in their individual capacities. States and their agencies and state employees sued in their official capacities are not proper defendants under Section 1983 and therefore cannot be sued under the statute.") (citation omitted).

Counts Four and Five assert § 1983 claims against Faust and McKay, among other Defendants, and seek "general and special damages." (Doc. 1-3 at 159 ¶ 172 [Count Four]; *id.* at 160 ¶ 177 [Count Five].) Faust and McKay are sued in their official and individual capacities. (*Id.* at 135 ¶¶ 16, 17.)[9] Count Eleven asserts a § 1983 claim against the State and seeks "general and specific damages." (*Id.* at 171 ¶ 248.)

---

[9]   The Court acknowledges that Counts Four and Five refer to the Defendants named therein as "acting individually" (*id.* at 159-60 ¶¶ 171, 176), but does not interpret that language to override the earlier statement in the FAC that Faust and McKay are sued in both their official and individual capacities (*id.* at 135 ¶¶ 16, 17). The Court construes the complaint "liberally" and "afford[s] [Plaintiffs] the benefit of any doubt" at the motion to dismiss stage. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Because Faust and McKay in their official capacities are not "persons" under § 1983, the official-capacity claims against those Defendants in Counts Four and Five are dismissed without leave to amend.[10]  *Will*, 491 U.S. at 71 & n.10.  For the same reason, the claim against the State in Count Eleven is dismissed without leave to amend.  *Id.*  And because the only other defendant named in Count Eleven, DCS, has already been dismissed for other reasons, Count Eleven is dismissed in its entirety.  Plaintiffs' cited cases do not alter these conclusions because they concern municipalities or individuals employed by municipalities.  *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164-65 (1993) (§ 1983 suit against "local law enforcement officers"); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("[A] *city* can be liable under § 1983 for inadequate training of its employees . . . .") (emphasis added); *Monell*, 436 U.S. at 690 ("Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend *municipalities* and other *local* government units to be included among those persons to whom § 1983 applies.") (emphasis added); *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1236 (9th Cir. 2010), *overruled by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (§ 1983 suit against a county and county employees); *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 656 (9th Cir. 2007) (same); *Anderson v. Warner*, 451 F.3d 1063, 1065 (9th Cir. 2006) (same); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1104 (9th Cir. 2001) (same); *Trevino v. Gates*, 99 F.3d 911, 915-16 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) (§ 1983 suit against city and city employees); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1231-32 (9th Cir. 1989) (§ 1983 suit against a "municipal defendant").

[10]    Although Defendants did not raise, until their reply, the argument that Faust and McKay cannot be sued in their official capacities under § 1983, the Court declines to find that argument forfeited because it presents a purely legal question whose resolution is compelled by settled law.  *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1007 (9th Cir. 2008) (explaining that "[w]e have discretion . . . to overlook any waiver" and exercising that discretion in part "because the issue . . . is a purely legal question").  Indeed, the Supreme Court has suggested that a court may dismiss a § 1983 claim on the ground that the defendant is not a "person" even if the defendant did not raise that specific argument.  *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 617 (2002).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Count Thirteen

Defendants' final argument, raised for the first time in their reply, pertains to Count Thirteen, which is a state-law claim against the State, Davisson, Faust, and McKay.[11]  (Doc. 1-3 at 172.)  Defendants contend the Eleventh Amendment bars Plaintiffs from asserting this claim against the State.  (Doc. 16 at 5.)

On the one hand, under the Eleventh Amendment, states and state officials sued in their official capacities are immune from state-law claims brought in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).  On the other hand, "the Eleventh Amendment is not a true limitation upon the court's subject matter jurisdiction, but rather a personal privilege that a state may waive." *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 760 (9th Cir. 1999), *opinion amended on denial of reh'g,* 201 F.3d 1186 (9th Cir. 1999).

One way a state can waive its Eleventh Amendment immunity is by voluntarily removing an action from state court.  *Walden v. Nevada*, 945 F.3d 1088, 1092 (9th Cir. 2019).  However, "this general 'voluntary invocation' principle does not apply in all circumstances.  Many states statutorily waive their immunity from suit on state-law claims in state court.  The Supreme Court has held that, when a State that has enacted one of these statutes voluntarily removes a suit on state-law claims from state court to federal court, that State waives its Eleventh Amendment immunity from suit." *Id.* (citations omitted).  In contrast, "courts are divided on whether . . . a State defendant's removal to federal court waives its Eleventh Amendment immunity if the State has not waived its immunity to suit in state court." *Bodi v. Shingle Springs Bank of Miwok Indians*, 832 F.3d 1011, 1019 (9th Cir. 2016).  *See also id.* at 1019 n. 11 ("Although, in *Embury* [*v. King*, 361 F.3d 562, 566 (9th Cir. 2004)], we characterized *Lapides* broadly as setting forth a straightforward, easy-to-administer rule that removal waives Eleventh Amendment immunity, we did not explicitly consider whether it applied when a State defendant retained its immunity from

---

[11]   Count Thirteen is also asserted against DCS, but all claims against DCS have now been dismissed.

suit in state court, as it appears the State defendants there had not done.  We have since observed that the question whether *Lapides*'s rule applies when a State defendant has not consented to suit in its own courts remains unresolved in this circuit.") (cleaned up).

Unfortunately, due to the untimely manner in which Defendants raised their Eleventh Amendment challenge, neither side has briefed whether the State waived its immunity from suit on Count Thirteen in state court.  Nor have the parties briefed how the Court should proceed in the absence of such a state-court waiver—as noted, Ninth Circuit law appears to be unsettled on this issue.  Under these circumstances, the Court concludes that the State forfeited its Rule 12(b)(6) Eleventh Amendment challenge to Count Thirteen by raising that challenge for the first time in a reply brief.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").  This ruling is without prejudice to the State raising this issue again at a future stage of this case, at which time it can be properly briefed.

IV.    Issue And Claim Preclusion

     A.    **Issue Preclusion**

          1.    The Parties' Arguments

Defendants argue that the doctrine of issue preclusion (or collateral estoppel) "bar[s] this lawsuit" because (1) "Plaintiffs and Defendants are the same parties in the underlying state court dependency proceedings"; (2) the "[i]ssues were litigated and decided in state court/Plaintiffs had full and fair opportunity"; (3) the "[i]ssues [were] necessary to decide the merits"; and (4) "[t]he issues at stake in the two cases are identical: whether removal and retention of custody was appropriate.  There is no doubt the state court decided this issue on its merits."  (Doc. 6 at 17-20, capitalization omitted.)

In response, Plaintiffs argue that "Defendants cannot satisfy the elements for issue preclusion. . . .  [T]he issues at stake are not the same in this matter as those in the dependency proceeding. . . .  The issues at stake in this case . . . were not litigated and determined by the juvenile court dependency action.  Plaintiffs did not have a full and fair opportunity to litigate these issues and did not do so."  (Doc. 11 at 20-21.)

In reply, Defendants argue "that the [juvenile court] heard testimony and received exhibits on" the issues relevant to Counts One and Two. (Doc. 16 at 15-16.) Defendants further argue that the juvenile court addressed the issues relevant to Counts Three, Four, and Five because "Title 8 mandates the [juvenile court] review services, including contact with child, and make findings regarding reasonable efforts." (*Id.* at 16.) Defendants also argue that the juvenile court addressed issues relevant to Counts Six through Thirteen because "the parties were able to question witnesses regarding education, training, experience, and DCS policies and procedures and bring those alleged deficiencies to the [juvenile court's] attention in the dependency proceedings." (*Id.*) Further, Defendants argue that Count Seven "is continually reviewed by the [juvenile court] as that [c]ourt has authority to issue orders and made decisions relating to the litigation." (*Id.*)

> ### 2.   Analysis

"In determining the preclusive effect of a state-court judgment, this court must 'refer to the preclusion law of the State in which judgment was rendered.'" *Diruzza v. Cnty. of Tehama*, 323 F.3d 1147, 1152 (9th Cir. 2003) (citation omitted). In Arizona, "[c]ollateral estoppel, or issue preclusion, binds a party to a decision on an issue litigated in a previous lawsuit if the following factors are satisfied: (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was entered, (4) resolution of the issue was essential to the decision, and (5) there is common identity of the parties." *Campbell v. SZL Properties, Ltd.*, 62 P.3d 966, 968 (Ariz. Ct. App. 2003). "The fifth element is not required when a defendant asserts collateral estoppel." *Smith v. Barrow Neurological Inst. of St. Joseph's Hosp. & Med. Ctr.*, 2012 WL 3108811, *4 (D. Ariz. 2012), *aff'd sub nom. Smith v. Banner Health Sys.*, 621 F. App'x 876 (9th Cir. 2015); *accord Campbell*, 62 P.3d at 968.

Issue preclusion does not apply here. In large part, this is because the first element of issue preclusion (*i.e.*, whether the issue was actually litigated in the prior proceeding) is not satisfied. Defendants' argument to the contrary—that "[t]he issues at stake in the two

cases are identical: whether removal and retention of custody was appropriate"—is unavailing because, apart perhaps from Count One, it rests on an overly generalized description of the issues raised in this case and those raised in the dependency proceedings.

Beginning with Plaintiffs' federal claims (other than Count One), Plaintiffs assert § 1983 claims for judicial deception (Count Two), failure to take reasonable efforts to preserve the family relationship (Count Three), and denial of Jimenez-Bencebi's and Zavaleta's ability to make medical decisions for their children or to be present during medical treatments (Counts Four and Five).  (Doc. 1-3 at 153-60.)[12]  The FAC does not indicate that Plaintiffs raised any of these issues in the juvenile court proceedings, let alone that the court decided those issues.  The allegations in Counts Two and Three focus on the allegedly false statements Patchin and Del Fiacco made to the juvenile court to support the removal of K.J., J.M.J., K.A.J., and J.A.J.  The FAC does not allege that Plaintiffs raised the issues of Patchin's and Del Fiacco's alleged false statements during the juvenile court proceedings or that the falsity issue was actually litigated.  *Compare Dodson v. Cnty. of Los Angeles*, 2022 WL 3681307, *2 (9th Cir. 2022) ("[U]nder this prong, we do not consider, for example, whether the veracity of the witnesses was at issue, but whether the core alleged misrepresentations were actually litigated.  They were not.  The dependency court did not determine whether the deputies falsified certain statements in the incident report, even though it found that G. was injured during the altercation.") *with Grimes v. Ayerdis*, 2018 WL 3730314, *6 (N.D. Cal. 2018) ("It is evident that Grimes already challenged the removal of his three children from parental custody and the allegedly fabricated evidence by defendants Ayerdis and Mendoza.  The factual allegations on record forming the basis of Grimes' claims, which he continued to dispute at the hearing, are also identical to those made in the juvenile dependency proceedings.") *and Kasdan v. Cnty. of Los Angeles*, 2014 WL 6669354, *4 (C.D. Cal. 2014) ("As previously explained, during the juvenile dependency court's determination regarding the children's well-being, it was

---

[12]      Count Eleven is another § 1983 claim, but it has now been dismissed for the reasons stated earlier in this order.

necessary to assess credibility and resolve disputes over who was telling the truth. Additionally, as this Court's previous order identified, these issues of 'false and defamatory statements' were presented to that court.") (cleaned up).  Regarding Counts Four and Five, the FAC does not allege that Plaintiffs raised the issue of not being able to make medical decisions for their children or be present for their children's medical appointments, let alone that the juvenile court decided those issues.

Plaintiffs' state-law claims are for negligence in failing to preserve the familial relationship and rights of children and parents (Counts Six, Eight, and Nine), abuse of process (Count Seven), negligent hiring, training, supervision, and retention (Counts Ten and Thirteen), and intentional infliction of emotional distress (Count Twelve).  (Doc. 1-3 at 160-68, 171-74.)  Again, the FAC does not allege that Plaintiffs raised these issues, or that the juvenile court decided them, during the dependency and severance proceedings. Those proceedings concerned Jimenez-Bencebi and Zavaleta's fitness to retain custodial and parental rights over their children, whereas this case concerns the actions taken by DCS caseworkers and the State.  Although these issues may overlap in some ways, they are not the same.  *Compare Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 284 (9th Cir. 1997) ("It is obvious that the PACA issue was not litigated in the state action; there was no decision on the merits of the trust cause of action; the PACA claim was not essential to the determination of the contract claim; and there was no full and fair opportunity to litigate the PACA claim.") *with Crosby-Garbotz v. Fell in & for Cnty. of Pima*, 434 P.3d 143, 149 (Ariz. 2019) ("The precise issue here is whether Crosby abused C.C. on July 5, 2016, by shaking her, causing bleeding in C.C.'s brain and eyes.  This factual issue was adjudicated in the dependency proceeding against the State.  The same factual issue is the basis for the criminal charge.").

Because the first element of issue preclusion is not satisfied with respect to all of these claims, the Court need not address the remaining elements.

This leaves Count One, which is a § 1983 claim for unlawful seizure and detention. (Doc. 1-3 at 151.)  There is a stronger argument that an identity of issues exists as to this

claim because it, like the underlying juvenile court proceeding, ultimately turns on the propriety of the removal decision.  As Defendants note, the Ninth Circuit has affirmed the application of issue preclusion to similar claims.  *Smith*, 621 F. App'x at 880-81 ("The district court granted summary judgment after concluding, based on the juvenile court's findings as to Smith's treatment of CR, that the state had a compelling interest in CR's welfare that permitted it to lawfully interfere with Smith's custody of CR.  Consequently, the district court concluded that Smith had failed to establish that her constitutional right to custody of CR was violated by Banner.").  However, this case is distinguishable from *Smith* because the FAC alleges that "[t]he juvenile court finally recognized at the end of the second severance trial in May 2022, that the State, DCS and their agents' picture of [Jimenez-Bencebi] as an abuser and [Zavaleta] as a passive inept father was inaccurate" and thus "chang[ed] the case plan to reunification." (Doc. 1-3 at 148-49 ¶¶ 103, 105.)  This allegation suggests the juvenile court ultimately did not resolve the disputed issue in Defendants' favor.  Accordingly, Defendants are not entitled to the dismissal of Count One at this stage of the case based on issue preclusion.

## B. **Claim Preclusion**

### 1. The Parties' Arguments

Defendants argue that the doctrine of claim preclusion (or res judicata) "bar[s] this lawsuit" because (1) "a final judgment did issue in the state court proceeding on May 11, 2022"; (2) "the parties are identical in both proceedings"; (3) "both actions concern the behavior and acts of DCS and its employees"; and (4) there is a "common identify [sic] of the cause of action." (Doc. 6 at 17, 20-21, capitalization omitted.)

In response, Plaintiffs argue that "[c]laim preclusion is not applicable.  The claims in the juvenile dependency proceeding were different than the claims in this case, meaning there is no 'identity of claims,' as required for claim preclusion." (Doc. 11 at 21.) Specifically, Plaintiffs argue that "[t]he juvenile court's only involvement was to determine if [Jimenez-Bencebi and Zavaleta] were fit to parent their children.  There were no legal issues before the juvenile court regarding the violation of Plaintiffs' constitutional rights

1    under §1983." (*Id.*)

2         In reply, Defendants argue that claim preclusion applies because "final appealable

3    judgments were entered by a court of competent jurisdiction in January, 2020 and again on

4    May 11, 2022." (Doc. 16 at 17.)  Further, Defendants argue that "in order to prove this

5    civil rights case, Plaintiffs will utilize the exact same evidence as presented to the [state

6    court]. . . .  [J]ust because this is a constitutional violations case not a dependency

7    proceeding does not alter the analysis." (*Id.*)

8                              2.    <u>Analysis</u>

9         "[C]laim preclusion . . . bars litigation in a subsequent action of any claims that were

10   raised or could have been raised in the prior action." *W. Radio Servs. Co. v. Glickman*, 123

11   F.3d 1189, 1192 (9th Cir. 1997).  As with issue preclusion, the Court looks to Arizona law

12   to determine the preclusive effect of the state-court judgment.  *Diruzza*, 323 F.3d at 1152.

13   For claim preclusion to apply, there must be "(1) an identity of claims in the suit in which

14   a judgment was entered and the current litigation, (2) a final judgment on the merits in the

15   previous litigation, and (3) identity or privity between parties in the two suits." *Lawrence*

16   *T. v. Dep't of Child Safety*, 438 P.3d 259, 262 (Ariz. Ct. App. 2019) (citation omitted).

17        "Arizona courts apply the 'same evidence' test" to evaluate the first element of the

18   claim preclusion test.  *Id.* at 264.  *See also Huffman v. Magic Ranch Ests. Homeowners*

19   *Ass'n*, 2023 WL 3000820, *3 (Ariz. Ct. App. 2023) (unpub.) (acknowledging that the

20   Arizona Supreme Court continues to use the same-evidence test rather than the

21   transactional approach).  Under this approach, "[f]or an action to be barred, it must be based

22   on the same cause of action asserted in the prior proceeding.  Arizona has applied a rather

23   restrictive test to resolve this question: If no additional evidence is needed to prevail in the

24   second action than that needed in the first, then the second action is barred." *Phoenix*

25   *Newspapers, Inc. v. Dep't of Corr., State of Ariz.*, 934 P.2d 801, 804 (Ariz. Ct. App. 1997)

26   (citation omitted).  "Two causes of action which arise out of the same transaction or

27   occurrence are not the same for purposes of res judicata if proof of different or additional

28   facts will be required to establish them." *E.C. Garcia and Co., Inc. v. Ariz. Dep't of*

*Revenue*, 875 P.2d 169, 179 (Ariz. Ct. App. 1993).  "The 'same evidence' test is quite liberal, and permits a plaintiff to avoid preclusion 'merely by posturing the same claim as a new legal theory,' even if both theories rely on the same underlying occurrence."  *Power Rd.-Williams Field LLC v. Gilbert*, 14 F. Supp. 3d 1304, 1309 (D. Ariz. 2014) (citation omitted).

At this stage in the case, where the Court must limit its analysis to the face of the FAC, *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006), Defendants have not demonstrated that dismissal is warranted based on the doctrine of claim preclusion.

Although the actions underlying the issues in the juvenile court proceedings and this case are the same—the removal of K.J., J.M.J., J.A.J., and K.A.J. from Jimenez-Bencebi and Zavaleta—the claims asserted in each case are different.  The juvenile court's resolution of the dependency and severance actions did not resolve the constitutional and state-law claims at issue in this case.  The juvenile court proceedings concerned Jimenez-Bencebi's and Zavaleta's fitness to retain custodial and parental rights over their children. According to the FAC, Jimenez-Bencebi and Zavaleta provided the following evidence in support of their fitness to parent: testimony from Martinez "that [Jimenez-Bencebi's] concerns about her daughter were accurate and reasonable"; statements by Martinez and her supervisor that the State mischaracterized their assessment of Jimenez Bencebi; and a report by Dr. Vega that the State and DCS mistreated Jimenez-Bencebi and that she was not a danger to her children.  (Doc. 1-3 at 147-48 ¶¶ 97-99, 102.)  Plaintiffs must provide additional evidence regarding actions taken by the State, Patchin, Del Fiacco, Davisson, Faust, and McKay to establish the distinct elements of the claims here.  *Best v. Driggs Title Agency, Inc.*, 2019 WL 7182582, *2 (Ariz. Ct. App. 2019) (unpub.) ("In determining whether claims are precluded, courts consider whether the new cause of action requires the plaintiff to establish a *distinct element* through different or additional facts.") (emphasis in original).  *Cf. Huffman*, 2023 WL 3000820 at *4 ("But nuisance is a 'separate or distinct cause of action' from intentional infliction of emotional distress, fraud and misrepresentation, negligent infliction of emotional distress, negligence, and a 'derivative

action.'  The dismissal of those claims did not necessarily adjudicate the private nuisance action because none of those claims put at issue the question of interference with property. Evidence of interference with Huffman's property is needed to sustain the private nuisance claim, and, although alleged in the 2016 complaint, it was not necessary to support the claims in that complaint.") (cleaned up).

Because the first element of res judicata is not satisfied, the Court need not address the remaining elements.

V.    Additional Arguments Regarding § 1983 Claims

Defendants raise four arguments specific to Plaintiffs' § 1983 claims: (1) all of those claims are barred by the statute of limitations; (2) Counts One through Five must be dismissed against Davisson, Faust, and McKay for failure to state a claim, because those defendants are being sued under an impermissible *respondeat superior* theory of liability; (3) Counts Three through Five should be dismissed for failure to state a claim, because the FAC fails to establish the essential element of a lack of due process; and (4) Defendants are entitled to qualified immunity.  (Doc. 6 at 6-11, 13-17.)

A.    **Statute Of Limitations**

1.    The Parties' Arguments

Defendants argue that the § 1983 claims in Counts One, Two, Three, Four, and Five accrued more than two years before Plaintiffs filed the complaint on May 8, 2023, and therefore the "statute of limitations is expired."  (*Id.* at 7, capitalization omitted.)[13] Regarding Count One, Defendants argue that "Plaintiffs have not articulated any arguments demonstrating why they were not on notice of the injury at the time each child was removed, added to the dependency petition, and became a party to the underlying state court proceeding."  (*Id.* at 9.)  Regarding Count Two, Defendants argue that "Plaintiffs had notice of this alleged 'false narrative' no later than February 2020 because the claim is Patchin fabricated [certain] allegations to support removing K.A.J. and J.A.J. and to keep

---

[13]    Defendants do not offer a specific argument regarding Count Eleven, which has, at any rate, been dismissed for other reasons.

all the children in State's care." (*Id.*, cleaned up.)  Regarding Counts Three, Four, and Five, Defendants contend they "accrued on the date each individual child was removed" and "all 'discrete unlawful acts' occurring post-removal still accrue at removal." (*Id.* at 10-11.)  Defendants also argue that "[a]ny proposed arguments supporting application of the continual tort doctrine must be disregarded because this claim is controlled by federal law, not state law." (*Id.* at 9.)

In response, Plaintiffs argue that "Defendants are mistaken that the date of each removal is the accrual date for Plaintiffs' § 1983 claims." (Doc. 11 at 11.)  Relying on *McDonough v. Smith*, 588 U.S. 109 (2019), Plaintiffs argue that "where . . . a particular claim may not realistically be brought while a violation is ongoing, such claims may accrue later. . . .  The same reasoning and result apply here because of the [Defendants'] inordinate position of power over families caught within the dependency machinery." (*Id.* at 12-13, cleaned up.)  Plaintiffs argue that "the correct accrual date for [Jimenez-Bencebi's and Zavaleta's] claims is when the dependency proceedings terminated regaining full care and custody of their children on May 23, 2023." (*Id.* at 13.)[14]  Plaintiffs also argue that "[t]he doctrine of continuing torts applies here as it would have been impractical for [Jimenez-Bencebi and Zavaleta] to file a lawsuit every time they were injured by [Defendants'] unlawful interference with their family with each removal of one of their children." (*Id.*)  Finally, Plaintiffs argue that "Defendants have conceded that . . . the claims of minor Plaintiffs K.J., K.A.J., and J.A.J[.] are not time barred due to their status as minors.  L.J. is also a minor and his claims are not time barred pursuant [to] A.R.S. § 12-821.01(D)." (*Id.* at 11 n.2.)

In reply, Defendants attempt to distinguish *McDonough*: "First, *McDonough* is a criminal case, not a civil case.  Second, the identified tort in *McDonough* was malicious prosecution; not illegal seizure/detention, nor interference in familial association, nor even judicial deception.  Third it is well-settled that malicious prosecution claims require a judgment in defendant's favor, which is not an element in any of the torts alleged by

---

[14]     The FAC alleges this date as May 25, 2023.  (Doc. 1-3 at 140 ¶ 41.)

1    Plaintiffs."  (Doc. 16 at 8.)  Defendants then elaborate on their arguments regarding the

2    statute of limitations for § 1983 claims.  (*Id.* at 8-10.)

3          2.    Analysis

4          "[A]ll § 1983 suits must be brought within a State's statute of limitations for

5    personal-injury actions."  *Nance v. Ward*, 597 U.S. 159, 174 (2022).  *See also Klein v. City*

6    *of Beverly Hills*, 865 F.3d 1276, 1278 (9th Cir. 2017) ("For actions under 42 U.S.C. § 1983,

7    courts apply the forum state's statute of limitations for personal injury actions.") (cleaned

8    up).  In Arizona, the statute of limitations for personal injury actions is two years.  A.R.S.

9    § 12-542(1).  Accrual of § 1983 claims is governed by federal law.  *Wallace v. Kato*, 549

10   U.S. 384, 388 (2007).  Under federal law, a claim accrues when the plaintiff "knows or has

11   reason to know of the injury that is the basis of the action."  *Pouncil v. Tilton*, 704 F.3d

12   568, 574 (9th Cir. 2012).  "Thus, an action ordinarily accrues on the date of the injury."

13   *Belanus v. Clark*, 796 F.3d 1021, 1025 (9th Cir. 2015) (cleaned up).  "The discovery rule

14   requires the plaintiff to be diligent in discovering the critical facts of the case."  *Klein*, 865

15   F.3d at 1278.

16         "Dismissal on statute of limitations grounds can be granted pursuant to Fed. R. Civ.

17   P. 12(b)(6) only if the assertions of the complaint, read with the required liberality, would

18   not permit the plaintiff to prove that the statute was tolled."  *TwoRivers v. Lewis*, 174 F.3d

19   987, 991 (9th Cir. 1999) (cleaned up).  "When calculating whether a statute of limitations

20   bars a plaintiff's claim, federal courts apply the forum state's tolling laws so long as they

21   do not contradict federal law."  *Franco v. Mesa Pub. Sch.*, 2020 WL 7388489, *3 (D. Ariz.

22   2020), *aff'd sub nom. Franco v. Mesa Police Dep't*, 2022 WL 3136949 (9th Cir. 2022).

23         Because Plaintiffs filed the complaint on May 8, 2023, Plaintiffs' § 1983 claims

24   must have—absent the application of some tolling or delayed-accrual doctrine—accrued

25   on or after May 8, 2021 to be timely.

26         a.    **L.J., K.J., K.A.J., And J.A.J.**

27         Defendants' arguments are unavailing as to L.J., K.J., K.A.J., and J.A.J. because

28   "[in] Arizona . . . the statute of limitations is tolled until [the plaintiff] turns eighteen."

1    *Franco*, 2020 WL 7388489 at *3.  *See also* A.R.S. § 12-502.

2        b.    **Jimenez-Bencebi And Zavaleta: Counts One, Three, Four,**

3              **And Five**

4        The injuries underlying the claims in Counts One (unlawful seizure and detention),

5    Three (failure to make reasonable efforts to preserve the family relationship), Four

6    (violating a parent's right to make medical decisions for their child and a child's right to

7    have their parent make those decisions), and Five (violating a parent's right to be present

8    during their child's medical treatments and a child's right to have a parent present) are the

9    removals of K.J., J.M.J., J.A.J., and K.A.J. from Jimenez-Bencebi and Zavaleta's care,

10   which occurred on September 14, 2018, September 14, 2018, March 5, 2019, and February

11   12, 2020, respectively.  (Doc. 1-3 at 139 ¶¶ 38(d), (h); *id.* at 141 ¶ 48.)  *See Moore v. Cnty.*

12   *of Sacramento, Dep't of Child*, 2020 WL 2489736, *6-7 (E.D. Cal. 2020), *report and*

13   *recommendation adopted sub nom. Moore v. Cnty. of Sacramento, Dep't of Child, Fam. &*

14   *Adult Servs.*, 2020 WL 3542262 (E.D. Cal. 2020) (identifying the date of injury for a

15   familial-association claim as the alleged date the county removed the grandchildren from

16   plaintiffs' home).  Even if Plaintiffs' claims in Counts Four and Five accrued at the later

17   date that medical decisions or treatments occurred, the FAC only alleges that such

18   decisions and treatment occurred between September 14, 2018 and September 20, 2018,

19   when K.J. and J.M.J. were taken to PCH.  (Doc. 1-3 at 141 ¶ 52; *id.* at 142 ¶¶ 54-55.)

20       Thus, absent the application of some tolling or delayed-accrual doctrine, Jimenez-

21   Bencebi and Zavaleta were aware of the injuries giving rise to Counts One, Three, Four,

22   and Five before May 8, 2021, rendering those claims time-barred.

23       c.    **Jimenez-Bencebi And Zavaleta: Count Two**

24       The Ninth Circuit has held that judicial deception claims, unlike other Fourth

25   Amendment claims, do not "accrue at the time of the illegal act," and instead "[t]he

26   discovery rule requires that judicial deception claims begin accruing when the underlying

27   affidavit is reasonably available."  *Klein*, 865 F.3d at 1278-79.  "Only after examining the

28   underlying affidavit can the plaintiff identify the critical facts showing that" the defendants

1   made false statements.  *Id.* at 1279.  "To determine the timeliness of these claims, we must
2   determine whether [plaintiffs] have alleged 'discrete acts' that would violate the
3   Constitution that occurred within the limitations period."  *RK Ventures, Inc. v. City of*
4   *Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002).  "[I]n determining when an act occurs for
5   statute of limitations purposes, we look at when the 'operative decision' occurred, and
6   separate from the operative decisions those inevitable consequences that are not separately
7   actionable."  *Id.* (internal citation omitted).  "[T]he statute of limitations runs separately
8   from each discrete act."  *Id.* at 1061.

9                                    i.     <u>Patchin</u>

10          The FAC alleges that Patchin made false statements about Jimenez-Bencebi and her
11   children, and that Davisson signed the report including those statements, when the First
12   Severance Petition was filed on January 24, 2019.  (Doc. 1-3 at 154-55 ¶¶ 147(a)-(g)
13   [allegations of Patchin's alleged false statements in Count Two]; *id.* at 142-43 ¶¶ 62-63
14   [Patchin's statements in the First Severance Petition]; *id.* at 143 ¶ 62 ["None of these
15   allegations were true"]; *id.* at 155 ¶ 150 [Davisson signed the First Severance Petition].)
16   Although the FAC does not specifically allege when Jimenez-Bencebi and Zavaleta
17   became subjectively aware of those alleged false statements, the test under *Klein* is when
18   the offending statements became "reasonably available," and the Court has little trouble
19   concluding that the pleading filed to initiated dependency proceedings against Jimenez-
20   Bencebi and Zavaleta was reasonably available to them on or around the date of filing.

21          It is also reasonable to infer from the FAC that Jimenez-Bencebi and Zavaleta would
22   have immediately known that Patchin's statements were false, because the FAC alleges
23   that Jimenez-Bencebi did not act in the way Patchin described.  *Wood v. Kern Cnty. Child*
24   *Protective Servs.*, 2014 WL 1664885, *6 (E.D. Cal. 2014) ("On the other hand, it is not
25   disputed that at the time the social worker filed the petitions and social work reports,
26   Plaintiffs knew that what was being reported in these documents was false.  Thus, the
27   statute of limitations began running from the time Plaintiffs learned of the content of these
28   documents.  Notably, they don't dispute that they were aware that the social worker alleged

that they caused the children harm at the time these documents were filed and they knew that they had not done so; to the contrary they allege they were fully aware of the claims being made and vehemently denied the truth of these statements.  Therefore, they were aware of the injury and who caused it which necessitates the determination that the causes of action based upon this actions [sic] are barred by the statute of limitations.") (citation omitted).

Separately, the FAC alleges that Patchin made additional false statements about Jimenez-Bencebi "to support removing K.A.J. and J.A.J. and to keep all the children in State's care" and that Davisson signed the report including those statements.  (Doc. 1-3 at 155 ¶¶ 147(h)-(k) [allegations of Patchin's false statements in Count Two]; *id.* at 144-45 ¶ 71 [Patchin's statements made to the juvenile court]; *id.* at 155 ¶ 150 [Davisson signed the report containing those statements].)  The FAC does not specify the exact date Patchin communicated these statements to the juvenile court but indicates that the statements formed the basis for removing K.A.J. and J.A.J., which at the latest occurred on February 12, 2020.  It is also reasonable to infer from the FAC that Jimenez-Bencebi and Zavaleta knew Patchin's statements were false, because the FAC alleges that Jimenez-Bencebi did not act in the way Patchin described.  (Doc. 1-3 at 145 ¶ 72 ["None of these allegations were true"].)  *Stephens v. Arizona*, 2023 WL 4136607, *9 (D. Ariz. 2023) ("The FAC makes clear that Plaintiff should have known of her injury no later than April 9, 2020, when Judge Mitchell signed his order authorizing DCS to remove the children from Plaintiff and her father's custody based on Oglesby's declaration, which allegedly contained omissions material to the findings of probable cause.").  Thus, absent the application of some tolling or delayed accrual doctrine, claims related to Patchin's false statements, and Davisson signing the reports containing those false statements, accrued before May 8, 2021, rendering those claims time-barred.

ii.  Del Fiacco

The FAC alleges that Del Fiacco "reiterated Patchin's false narrative to the court in testimony and/or in reports to the juvenile court" and made false statements in a juvenile

court hearing on January 10, 2022.  (Doc. 1-3 at 155 ¶¶ 148, 150; *id.* at 147 ¶¶ 94-95.)  The FAC also alleges that Davisson signed Del Fiacco's false reports submitted to the juvenile court.  (Doc. 1-3 at 155 ¶ 150.)  Del Fiacco reiterating Patchin's statements is not a discrete act, but rather an inevitable consequence of replacing Patchin as the caseworker during the dependency and severance proceedings, so any claim based on such conduct is barred by the statute of limitations for the reasons explained above.  *Haldeman v. Golden*, 2006 WL 8436502, *3 (D. Haw. 2006) ("Plaintiffs do not allege that Duty and Cupp began fabricating new information that might have caused damage to them; just that they continued to provide the same purportedly 'false information' that they had been providing all along.  Notably, that information was provided because of an obligation to provide such information.  Consequently, even if false information were provided after December 28, 2003 (within two years of filing the Complaint), those acts merely were consequences of the operative decision that is at issue and, thus, are time-barred.").  Del Fiacco's statements during the January 2022 hearing, however, differ from Patchin's and were made after May 8, 2021.  (*Compare* Doc. 1-3 at 147 ¶ 94 [Del Fiacco's statements] *with id.* at 142-45 ¶¶ 62-63, 71 [Patchin's statements].)  Accordingly, the statute of limitations does not bar claims against Del Fiacco and Davisson with respect to the statements made at the January 2022 hearing.

                d.     ***McDonough*, The Continuing Torts Doctrine, And Tolling**

There is no merit to Plaintiffs' contention that the juvenile court's dismissal of the dependency action on May 25, 2023 sets the accrual date for this action.  First, Plaintiffs fail to explain how this dismissal was the development that somehow alerted them to K.J.'s, J.M.J.'s, K.A.J.'s, and J.A.J.'s removals or to Patchin's and Del Fiacco's alleged false statements.  Plaintiffs were obviously aware of those developments when they occurred.  *Moore*, 2020 WL 2489736 at *8 ("Plaintiffs had ample knowledge of the alleged wrong in 2014, when the grandchildren were removed from their home, and failed to bring their claims in the two years that followed."); *Wood*, 2014 WL 1664885 at *5 ("Here, when the children were removed from the home, Plaintiffs were aware of the injury—the forced

entry into the home and the wrongful removal of the children—and who inflicted the injury—those who entered and removed the children.  It is of no moment that Plaintiffs did not know all of the legal theories upon which they contended the entry and removal were wrongful; they knew they had not abused the child and knew that their other children were not at risk of abuse.  Thus, the cause of action accrued no later than mid-July 2007 and, because the complaint was not filed until April 2, 2014, the statute of limitations has expired.") (footnote omitted).  *Cf. Scoins v. Goddard*, 2007 WL 2807755, *5 (D. Ariz. 2007) ("We reject Scoins' argument that her cause of action did not accrue until CQ was released from the wardship of the court on August 17, 2004. . . .  Scoins realized that she had been injured by these defendants as soon as she lost custody of her children.").

Second, Plaintiffs' reliance on *McDonough* is misplaced.  There, the Supreme Court held that the defendant "could not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution."  *McDonough*, 588 U.S. at 117.  The Court explained that the "favorable-termination requirement is rooted in pragmatic concerns with *avoiding parallel criminal and civil litigation* over the same subject matter and the related possibility of *conflicting civil and criminal judgments*.  The requirement likewise avoids allowing collateral attacks on *criminal judgments* through civil litigation."  *Id.* at 117-18 (citations omitted and emphases added).  The principles animating *McDonough* are not present here, where the underlying proceeding was a civil dependency proceeding.  *Macias v. Kaplan-Siekmann*, 2024 WL 83448, *5 (D. Ariz. 2024) ("Here, Plaintiffs did not have to wait until the dependency proceedings terminated prior to filing their claims because Plaintiffs' § 1983 claims do not involve any allegations pertaining to unlawful criminal proceedings.  Therefore, Plaintiffs should have brought their claims forward once they knew that they were injured.").

Third, the continuing torts doctrine, even assuming it applies here,[15] does not delay

---

[15]    *Wostrel v. Arizona*, 2023 WL 2308417, *7 (D. Ariz. 2023), *on reconsideration in part*, 2023 WL 3022471 (D. Ariz. 2023), *and appeal dismissed sub nom. Wostrel v. Wright*, 2023 WL 9860830 (9th Cir. 2023) ("Plaintiffs argue that . . . the continuing tort doctrine get[s] around State Defendants' statute of limitations argument . . . [b]ut this doctrine, which concerns accrual of a claim, is neither here nor there: federal law alone determines

the start of the limitations period.  Under the continuing torts doctrine, "a tort claim based on a series of related wrongful acts is considered continuous, and accrual begins at the termination of the wrongdoing, rather than at the beginning." *Cruz v. City of Tucson*, 401 P.3d 1018, 1023 (Ariz. Ct. App. 2017).  The continuing torts doctrine or "[t]he continuing violation theory, which applies to § 1983 claims, allows a plaintiff to seek relief for events outside the limitations period.  In order to show a continuing violation, a plaintiff must state facts sufficient to support a determination that the alleged acts are related closely enough to constitute a continuing violation." *Reiss v. Arizona Dep't of Child Safety*, 2018 WL 6067258, *7 (D. Ariz. 2018) (cleaned up).  "However, [the Ninth Circuit] has repeatedly held that a 'mere continuing impact from past violations is not actionable.'" *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (cleaned up).

As for Counts One, Three, Four, and Five, Jimenez-Bencebi's and Zavaleta's loss of contact with their children and inability to make medical decisions for them or to accompany them during medical treatments were results of the continued impact of the initial removals.  *Knox*, 260 F.3d at 1014-15 ("Subsequent denials to requests to visit or correspond with inmates at CDC facilities, where the basis for the denials rests on the letter of permanent suspension, are nothing more than the delayed, but inevitable, consequence of the total and permanent suspension decision. . . .  Thus, rather than being punched several times, Knox's subsequent denials are more akin to developing problems as a natural consequence of the one and only punch, such as a bloody nose.  The subsequent denials were nothing more than a continuing impact of the permanent suspension, not new violations in and of themselves.") (footnote omitted); *Andrich v. Adel*, 2022 WL 574948, *3 (D. Ariz. 2022), *aff'd,* 2023 WL 6620294 (9th Cir. 2023) ("For statute-of-limitations purposes, accrual occurs when property is first taken, and does not continue to accrue while the property is still being held or until the property is eventually returned.  Defendants' alleged continued refusal to return Plaintiff's property did not inflict 'new and accumulated injury' upon Plaintiff so as to invoke the continuing violation doctrine.  Rather, each time

when a § 1983 claim accrues.").

Defendants ignored Plaintiff's requests, they simply reaffirmed their initial refusal to return the property.") (citation omitted); *Moore*, 2020 WL 2489736 at *8 ("More importantly, plaintiffs' argument that they (and their grandchildren) continue to suffer ill effects from the alleged Constitutional violations cannot save them from the statute of limitations.  Even if some of plaintiffs' conversations with the County supervisors occurred between 2017 and 2019, those complaints are rooted in the events that took place in 2014."); *Reiss*, 2018 WL 6067258 at *6 ("Here, Plaintiff's § 1983 claims are based on the initial deprivation of contact with his children stemming from the April 14, 2015 safety plan.  Plaintiff's continuing loss of contact with his children beyond April 21, 2015 was the result of an order by the family court overseeing his divorce, which Plaintiff alleges was 'in line with, if not wholly based on, DCS's safety plan.'  Accepting Plaintiff's allegation that the family court based its order on DCS's safety plan, the continuing loss of his constitutional right to the care and custody of his children was at most a continuing impact resulting from the initial deprivation of his children.  Since a continuing impact does not toll the statute of limitations, it remains that Plaintiff's § 1983 procedural due process claim against Santiago and Kash accrued on April 14, 2015, or at the latest, June 18, 2015, and is therefore time-barred.") (citation omitted).  Similarly, for Count Two, Jimenez-Bencebi's and Zavaleta's continued loss of their children was a consequence of Patchin's alleged false statements in 2019 and 2020 and Del Fiacco's alleged false statements in 2021.  *Haldeman*, 2006 WL 8436502 at *3.

Fourth, Plaintiffs have not identified any other basis to apply equitable or statutory tolling.  Plaintiffs argue that "[r]equiring parents to file a lawsuit against persons holding inordinate power over their visitation rights and when (or if) their children would be returned to them within two years of removal . . . is inconsistent with the purposes of § 1983 and its distinct significance in the child welfare context."  (Doc. 11 at 11-12.)  But this sort of policy argument does not supply a basis for applying equitable or statutory tolling.  *Holland v. United States*, 2022 WL 633408, *3 (D. Ariz. 2022), *appeal dismissed sub nom. Holland on behalf of D.M.W. v. United States*, 2022 WL 1801009 (9th Cir. 2022)

("Equitable tolling is to be used sparingly but may be applied when extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.") (cleaned up); *Franco*, 2020 WL 7388489 at *4 ("[Equitable tolling] is reserved for 'extreme cases' and is 'applied sparingly'") (citations omitted); *Porter v. Spader*, 239 P.3d 743, 746-47 (Ariz. Ct. App. 2010) ("Our legislature has provided for the suspension or tolling of a limitations period only in very limited and specified situations."). *See also Wostrel*, 2023 WL 2308417 at *7 (rejecting the argument that equitable estoppel applies in a § 1983 case involving child custody when the plaintiffs did not identify "specific promises, threats or inducements by the defendant that prevented the plaintiff from filing suit").

> B.   **Davisson, Faust, And McKay**
>
> 1.   The Parties' Arguments

Defendants argue that "[t]he FAC defectively alleges § 1983 claims against supervisors based on the supervisors only 'ratifying' their subordinates['] conduct." (Doc. 6 at 7.) More specifically, Defendants argue that Counts One through Five are "devoid of any allegations that Davisson knew the information was 'false' when she signed off on a court report or how she specifically was involved in the seizure of any of the children." (*Id.*) Defendants also argue that Counts Four and Five provide "[e]ven fewer factual details . . . regarding participation by Faust and McKay." (*Id.*) Defendants add that "[t]here is no mention regarding any specific appointments or medical decisions that Davisson, Faust, or McKay made on behalf of any child; therefore these limited facts are insufficient to state any plausible federal claim for relief—the language is conclusory at best." (*Id.*)

In response, Plaintiffs contend that Defendants' argument that "Plaintiffs must allege a supervisor 'set in motion a series of acts' that would cause others to inflict constitutional injury and to establish intent . . . is an incorrect statement of the law, particularly at the pleading stage." (Doc. 11 at 10.) Plaintiffs contend, in reliance on *Keates v. Koile*, 883 F. 3d 1228 (9th Cir. 2018), that "supervisory officials may be liable on the basis of their own acts or omissions," and "Plaintiffs here do allege the wrongful

act(s) committed by each state Defendant and how these acts give rise to the claimed violations of Plaintiffs' constitutional rights." (*Id.*, cleaned up.) Specifically, Plaintiffs contend that "[t]he claims against the supervisors and former directors here are for their own actions, or failures to act, and not simply in the manner of *respondeat superior*." (*Id.* at 11.) Plaintiffs also contend that they "have reason to believe that discovery will show that not only did these supervisors and former directors ratify their employees' wrongful conduct, but actually and actively directed the wrongful conduct." (*Id.*)

In reply, Defendants reiterate that "the FAC does not contain facts pertaining to the individual conduct of [Davisson, Faust, and McKay]." (Doc. 16 at 6.) Defendants then elaborate upon some of the arguments raised in their motion regarding the FAC's deficiencies. (*Id.* at 6-7.) Defendants also argue that Plaintiffs cannot establish that Davisson, Faust, and McKay "had knowledge of the unconstitutional conduct of their subordinates." (*Id.* at 7.) Defendants add that Plaintiffs' reliance on *Keates* is "misplaced" because "the Court specifically found that the complaint failed to allege that Director Carter (former DCS Director) had knowledge of the constitutional deprivations and acquiesced in them." (*Id.* at 8, emphasis omitted.)

### 2. Analysis

To state a claim under § 1983, Plaintiffs must allege that they suffered a specific injury as a result of a defendant's specific conduct and show an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976). "There is no respondeat superior liability under section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). *See also Iqbal*, 556 U.S. at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits . . . ."). A supervisor may be liable in an individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation omitted). A sufficient causal connection can be shown where a supervisor "set[s] in motion a series of acts by others" or "knowingly refus[es] to terminate a series

1    of acts by others, which the supervisor knew or reasonably should have known would cause

2    others to inflict a constitutional injury."  *Id.* at 1207-08 (cleaned up).

3          As an initial matter, there is no merit to Plaintiffs' assertion that dismissal is

4    unwarranted because discovery will show that the supervisors ratified and directed the

5    wrongful conduct.  Such an approach would seemingly allow plaintiffs to use the discovery

6    process to determine whether they can discover enough facts to assert a plausible claim for

7    relief, an approach that would undermine the purposes of Rule 12(b)(6).  *Rutman Wine Co.*

8    *v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Appellant argues that the

9    district court should not have dismissed its claims without permitting discovery. . . .  [This]

10   position is unsupported and defies common sense.  The purpose of [Rule] 12(b)(6) is to

11   enable defendants to challenge the legal sufficiency of complaints without subjecting

12   themselves to discovery. . . .  [I]f the allegations of the complaint fail to establish the

13   requisite elements of the cause of action, our requiring costly and time consuming

14   discovery and trial work would represent an abdication of our judicial responsibility.")

15   (cleaned up).

16          a.      **Count One: Davisson**

17          Count One alleges that Patchin, Del Fiacco, and Davisson, each in their individual

18   capacities, violated Plaintiffs' First, Fourth, and Fourteenth Amendment rights by

19   unlawfully seizing and detaining K.J., J.M.J., J.A.J., and K.A.J.  (Doc. 1-3 at 151.)  With

20   respect to Davisson, Plaintiffs' theory is that "Davisson failed to ensure Patchin's

21   investigation met the statutory requirements under A.R.S. § 8-456(C)(1)" (*id.* at 151

22   ¶ 123); that "[a]s Patchin and Del Fiacco's supervisor, Davisson substantially participated

23   in the unlawful seizure of J.A.J. and K.A.J. and detention of K.J., J.M.J, J.A.J. and K.A.J.

24   in State's care by authorizing Patchin and Del Fiacco's false filings and false [statements]"

25   (*id.* at 152 ¶ 129); and that "[p]rior to the relevant times when K.J., J.M.J., J.A.J. and K.A.J.

26   were seized and detained, the State and DCS agents, Patchin, Del Fiacco, and Davisson did

27   not first pursue reasonable avenues of investigation" (*id.* at 153 ¶ 134).

28          These unsupported and conclusory allegations are insufficient to plausibly establish

that Davisson personally participated in the deprivation of Plaintiffs' First, Fourth, and Fourteenth Amendment rights, set in motion the acts that led to the deprivation, or was aware of the deprivation and failed to act. *Fidler*, 2024 WL 1553703 at *2 ("These claims fail against Quigley and Kaplan-Siekmann because there are no plausible allegations that those defendants did anything to violate Fidler's or E.F.'s rights to familial association. The third amended complaint contains no allegations that Quigley personally participated in E.F.'s removal or placement with a foster family beyond supervising Burns.  And the nonconclusory allegations demonstrate only that Kaplan-Siekmann reviewed some documents and submitted a report to the Arizona Department of Child Safety.  This conduct does not constitute a plausible constitutional violation.") (citations omitted).  Accordingly, Plaintiffs have failed to state a claim against Davisson in Count One, and Davisson will be dismissed from that count.  The dismissal is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned defects.

### b.  **Count Two: Davisson**

Count Two alleges that Patchin, Del Fiacco, and Davisson violated Plaintiffs' Fourth and Fourteenth Amendment rights by "making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth."  (Doc. 1-3 at 153-54.)  The FAC alleges that "Davisson directed or ratified Patchin and Del Fiacco [sic] wrongful judicial deception" (*id.* at 155 ¶ 149) and that Patchin perpetrated false narratives under Davisson's supervision (*id.* at 142-45 ¶¶ 63, 69, 71).  Those allegations parrot legally conclusory language and are insufficient to state a claim against Davisson.  *Macias*, 2024 WL 83448 at *4 ("Defendant Hinckley's supervisory title is not enough to hold Defendant Hinckley liable for Plaintiffs' injuries."); *Jones v. Town of Quartzsite*, 2015 WL 12551172, *5 (D. Ariz. 2015), *aff'd*, 677 F. App'x 317 (9th Cir. 2017) ("These conclusory allegations that defendants Anderson and Orgeron 'participated in, or directed, the filing of' the zoning code complaint fall woefully short of alleging that either of them violated Plaintiff's constitutional rights.").

The remaining allegations in the FAC also fail to plausibly establish that Davisson

was personally involved in the alleged constitutional deprivations or had knowledge of the wrongfulness of the acts that would lead to those deprivations.  The FAC alleges that "Davisson signed Patchin and Del Fiacco's false reports filed with the juvenile court, in accordance with DCS policy" (Doc. 1-3 at 155 ¶ 150), but this alone does not establish that Davisson had knowledge of the false statements or ordered Patchin and Del Fiacco to submit false statements to the juvenile court.  *Fidler*, 2024 WL 1553703 at *2; *Wostrel*, 2023 WL 2308417 at *7 ("The sole specific, factual allegations against Long are that he 'approved' two progress reports that Plaintiffs allege contained false information or omitted material information.  Neither allegation suggests that Long knew or reasonably should have known that the report contained the false or omitted information or that the report's submission would cause a constitutional injury.  As such, both allegations against Long arise under a respondeat superior theory and cannot ground liability under § 1983.") (citation omitted).  Further, the allegation that K.A.J. and J.A.J's removal "was based on Patchin and Davisson's steadfast adherence to a malicious and distorted view that [Jimenez-Bencebi] is an aggressive ex-felon and that [Zavaleta] is too passive to protect his children from this menace" (Doc. 1-3 at 139-40 ¶¶ 38(e), (j)) is conclusory and unsupported by factual allegations of Davisson's knowledge of the falsity of the statements.

Accordingly, Plaintiffs have failed to state a claim against Davisson in Count Two, and Davisson will be dismissed from that count.  The dismissal is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned defects.

### c.  **Count Three: Davisson**

Count Three alleges that Patchin, Del Fiacco, and Davisson violated Plaintiffs' Fourth and Fourteenth Amendment rights by "failing to make reasonable efforts to preserve the family relationship." (*Id.* at 156.)  The FAC alleges Patchin, Del Fiacco, and Davisson "fail[ed] to complete a thorough investigation, as required by A.R.S. § 8-456(C)(1) and when, among other things, they (1) relied on false hearsay provided by a blame-shifting thief at the Gift of Mary Shelter; (2) failed to investigate the positive information from Missouri social workers; (3) failed to speak with L.J. who loves his mother very much;

(4) failed to consider that a [sic] J.M.J. was examined by a mandatory reporter only one week prior to the false DCS hotline call; (5) failed to review the medical records which showed that when J.M.J. was placed in foster care, weighed less than he did when he was in [Jimenez-Bencebi's] care; and (6) falsely asserted to the trial court that [Jimenez-Bencebi] wanted to name J.A.J. 'Motherfucker.'  (*Id.* at 157 ¶ 158.)  The FAC also alleges Patchin, Del Fiacco, and Davisson "fail[ed] to keep all the children together in one foster home" and "repeatedly den[ied] [Jimenez-Bencebi] visitation rights during the various dependency proceedings, and even after the case plan was changed to reunification in May 2022."  (*Id.* at 157 ¶¶ 161-62.)

The list of allegations against Davisson in Count Three is extensive but deceiving— there are no factual allegations in the FAC to support that Davisson personally committed any of those actions, set those actions in motion, or knowingly refused to stop those actions. Indeed, the FAC alleges *Patchin* reported the incident at the Gift of Mary Shelter and Jimenez-Bencebi's statement about naming J.A.J.  (*Id.* at 141 ¶ 48(e); *id.* at 155 ¶ 147(i).) As explained above with respect to Count One, the allegation that Davisson failed to investigate, without further factual support, is conclusory.  *Fidler*, 2024 WL 1553703 at *2.

The FAC's allegations that "DCS never reported th[e] positive information [from the Missouri social workers] to the juvenile court during any of the dependency proceedings" (Doc. 1-3 at 138 ¶ 32); that "[t]he State and DCS failed to interview her oldest son, L.J." (*id.* at 146 ¶ 82); that "[f]or the first six weeks after the 11 May 2022 order, DCS cancelled all of Plaintiffs' supervised visits with their children" (*id.* at 140 ¶ 39); and that "DCS and its agents refused to re-instate [Jimenez-Bencebi's] visits" with her children (*id.* at 147 ¶ 90) do not compel a different conclusion.  Those statements do not specify that Davisson personally participated in those actions or was aware of them.

Accordingly, Plaintiffs have failed to state a claim against Davisson in Count Three, and Davisson will be dismissed from that count.  The dismissal is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned defects.

1

      d.  **Counts Four And Five: Davisson, Faust, And McKay**

2    Counts Four and Five assert violations of the Fourteenth Amendment against

3  Patchin, Del Fiacco, Davisson, and Faust and McKay in their individual capacities[16] for

4  preventing Jimenez-Bencebi and Zavaleta from making medical decisions for their

5  children and violating Jimenez-Bencebi and Zavaleta's right to be present during their

6  children's medical treatments.  (Doc. 1-3 at 158-59.)  In Count Four, the FAC alleges that

7  "Patchin, Del Fiacco, Davisson, Faust, and McKay interfered with [Jimenez-Bencebi's and

8  Zavaleta's] constitutional right to make medical decisions for their seized and detained

9  children disallowing them from attending medical appointments while they were in State's

10  care."  (*Id.* at 159 ¶ 170.)  In Count Five, the FAC alleges that "Patchin, Del Fiacco,

11  Davisson, Faust, and McKay interfered with [Jimenez-Bencebi's and Zavaleta's]

12  constitutional right to be present during their seized and detained children's medical

13  appointments."  (*Id.* at 160 ¶ 175.)  The FAC provides no factual support for these

14  statements and does not otherwise allege that Davisson, Faust, and McKay were personally

15  involved in interfering with, or aware of interference with, Jimenez-Bencebi's and

16  Zavaleta's right to make medical decisions for their children or ability to be present during

17  their children's medical appointments.  Accordingly, Plaintiffs have failed to state a claim,

18  and Davisson, Faust, and McKay are dismissed from Counts Four and Five.  The dismissal

19  is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned

20  defects.

21   C.  **Due Process**

22    1.  <u>The Parties' Arguments</u>

23    Defendants argue that "counts 3-5 . . . fail because it is clear from the FAC's face

24  that the state court provided Plaintiffs with due process."  (Doc. 6 at 14-15.)  More

25  specifically, Defendants argue that "[t]he FAC is replete with examples of testimony and

26  exhibits considered by the [juvenile] court in two severance trials, and even reference

27

28  [16]  Counts Four and Five are also asserted against Faust and McKay in their official
capacities, but those claims have now been dismissed for other reasons.

appellate review.  Plaintiffs do not assert any restrictions on their ability to raise issues in the state court proceedings, thus due process was afforded to Plaintiffs and no constitutional violations occurred; therefore no valid claims exist."  (*Id.* at 15, citation omitted.)

In response, Plaintiffs argue that "Defendants incorrectly assert that parental rights are protected only by procedural due process.  Parents' rights are fundamental liberty interests, and the heightened protection of substantive due process applies."  (Doc. 11 at 16.)   At any rate, regarding procedural due process, Plaintiffs argue that "Defendants violated Plaintiffs' due process rights when they failed to reasonably investigate the anonymous hotline tip, and had they done so, they would have determined that the information was false.  However, that did not absolve [Defendants] from the requirement of fundamentally fair procedures as their allegations within the petitions were false and misleading."  (*Id.* at 17.)   Regarding substantive due process, Plaintiffs argue that "Defendants' conduct shocks the conscience and was in violation of Plaintiffs' substantive due process rights" because "Defendants [sic] acts were arbitrary, motivated by the employees' time pressures, workload, and unwillingness to fully investigate the allegations, rather than for the legitimate state interest of protecting children.  [Defendants] also knew, as would any reasonable DCS employee, that there was a substantial risk of serious harm if K.J., K.A.J., and [J.A.J.'s] removals were unwarranted."  (*Id.* at 18.)

In reply, Defendants argue that "Plaintiffs[] provided no convincing case law or additional facts to challenge the premise that they failed to receive procedural due process in the underlying dependency proceedings."  (Doc. 16 at 12.)   Defendants add that "Plaintiffs may dispute the thoroughness of the investigation, but simply asserting they would have come to a different conclusion is not enough."  (*Id.*)   Regarding substantive due process, Defendants argue that "Plaintiffs have not presented sufficient facts to support their position that any of [the] individual [Defendants] 'shocked the conscience' by their actions in not investigating more thoroughly, relying on the source, removing the children, filing a dependency proceeding, and filing alleged false information with the [juvenile

court]." (*Id.* at 13.)   Defendants argue that "there is no evidence [that Defendants] deliberately fabricated the information . . . .   Since it is also clear that Plaintiffs had the opportunity to challenge that information during the dependency proceedings, no constitutional violation occurred." (*Id.* at 14.)

2.   Analysis

This marks another instance where the briefing sequence has greatly complicated the task of analyzing Defendants' dismissal arguments.   Although Defendants seek dismissal of Counts Three, Four, and Five, the parties' briefs broadly discuss substantive and procedural due process without addressing the specific contours of the claims at issue. Indeed, both sides offer analysis and case law regarding familial association and judicial deception claims, but those are the claims raised in Counts One and Two.   Nevertheless, in the subparts that follow, the Court has endeavored to evaluate the sufficiency of Counts Three, Four, and Five.

a.   **Count Three**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

At first blush, Count Three seems to satisfy those requirements by alleging that Patchin and Del Fiacco[17] "are liable for violating Plaintiffs right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship." (Doc. 1-3 at 156.)   However, in the body of Count Three, Patchin and Del Fiacco are only accused of violating the Arizona constitution and various Arizona statutes. (*Id.* at 156-58.)   A § 1983 claim will not lie in this circumstance. *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981) ("Section 1983 protects against the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'   Only federal

---

[17]   Count Three is also asserted against Davisson, but that claim has now been dismissed for other reasons.

rights, privileges, or immunities are protected by the section.  Violations of state law alone are insufficient."); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").  Additionally, to the extent Count Three actually was— notwithstanding the FAC's references to violations of Arizona law—an attempt to hold Patchin and Del Fiacco responsible for federal constitutional violations related to the preservation of "the family relationship," any such claim would be duplicative of Plaintiffs' § 1983 claim against Patchin and Del Fiacco in Count One.  *Cf. Natividad v. Wells Fargo Bank, N.A.*, 2013 WL 2299601, *17 (N.D. Cal. 2013) (dismissing claim that was "duplicative and unnecessary").

Accordingly, Count Three is dismissed.  The dismissal is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned defects.

### b.   **Count Four**

"The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state."  *Wallis v. Spencer*, 202 F.3d 1126, 1141-42 (9th Cir. 2000).  To that end, "physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."  *Id.* (cleaned up).

In Count Four, the FAC alleges that Patchin and Del Fiacco[18] "interfered with [Jimenez-Bencebi's and Zavaleta's] constitutional right to make medical decisions for their seized and detained children disallowing them from attending medical appointments while they were in State's care."  (Doc. 1-3 at 159 ¶ 170.)  The only other references to medical decisions in the FAC are that K.J. and J.M.J. received physical examinations at PCH after

---

[18]    Count Four is also asserted against Davisson, Faust, and McKay, but those claims have now been dismissed for other reasons.

1    their removal on September 14, 2018, and that J.M.J. remained at PCH until September 20,

2    2018.  (*Id.* at 141 ¶ 52; *id.* at 142 ¶¶ 54-55.)  The FAC includes no additional allegations

3    about medical decisions regarding L.J., K.J., J.M.J., K.A.J., and J.A.J.

4           Because the FAC does not offer any allegation that Patchin and Del Fiacco

5    participated in the decision to prevent Jimenez-Bencebi and Zavaleta from making medical

6    decisions for K.J. and J.M.J., or even that any medical decisions were made on behalf of

7    L.J., K.A.J., and J.A.J, Plaintiffs have failed to state a claim against Patchin and Del Fiacco

8    in Count Four.  *Fidler*, 2024 WL 1553703 at *3 ("Claims Six and Seven allege violations

9    of Fidler's rights to direct and participate in E.F.'s medical care. . . .  The third amended

10   complaint includes no factual allegations that, if taken as true, show that Burns, Quigley,

11   Manjarrez, Saenz, or Edwards were responsible for (1) E.F. receiving medical

12   examinations (2) without notice to Fidler and (3) without permission for her to be present.

13   Fidler therefore did not state a plausible entitlement to relief in Claims Six and Seven.");

14   *Keates*, 883 F.3d at 1242 ("Because the complaint does not offer any plausible allegation

15   that any of these CPS employees participated in the decision to interfere with Keates's and

16   A.K.'s constitutional rights, the district court did not err in dismissing the claims against

17   them.").  The dismissal is with leave to amend because it may be possible for Plaintiffs to

18   cure the aforementioned defects.

19                              c.    **Count Five**

20          The Court reaches the same conclusion as to Count Five.  "[P]arents have a right

21   arising from the liberty interest in family association to be with their children while they

22   are receiving medical attention (or to be in a waiting room or other nearby area if there is

23   a valid reason for excluding them while all or a part of the medical procedure is being

24   conducted).  Likewise, children have a corresponding right to the love, comfort, and

25   reassurance of their parents while they are undergoing medical procedures, including

26   examinations—particularly those, such as here, that are invasive or upsetting." *Wallis*, 202

27   F.3d at 1142.

28          …

- 46 -

In Count Five, the FAC alleges in conclusory fashion that Patchin and Del Fiacco[19] "interfered with [Jimenez-Bencebi's and Zavaleta's] constitutional right to be present during their seized and detained children's medical appointments."  (Doc. 1-3 at 160 ¶ 175.)  But again, the totality of the FAC's factual allegations on this topic are that J.M.J. and K.J. received physical examinations on September 14, 2018 (*id.* at 141 ¶ 52) and that J.M.J. received treatment for malnutrition (*id.* at 142 ¶¶ 54-57).  Although it is plausible, based on those facts, to infer that Jimenez-Bencebi and Zavaleta were not present during K.J.'s and J.M.J.'s treatments, the FAC is silent on who (if anyone) prevented Jimenez-Bencebi and Zavaleta from being present and whether L.J., K.A.J., and J.A.J. underwent any medical treatments without their parents present.  Accordingly, Plaintiffs have failed to state a claim against Patchin and Del Fiacco in Count Five.  *Fidler*, 2024 WL 1553703 at *3; *Keates*, 883 F.3d at 1242.  The dismissal is with leave to amend because it may be possible for Plaintiffs to cure the aforementioned defects.

### D.   **Qualified Immunity**

#### 1.   The Parties' Arguments

Defendants argue they should be "afforded qualified immunity protections for the Section 1983 [c]laims" because Plaintiffs have not "show[n] there is clear precedent that would put an official on notice that what they were doing is unlawful."  (Doc. 6 at 15, capitalization omitted.)  More specifically, Defendants argue that "Plaintiffs provide no legal authority to support the proposition that relying on information received in a hotline report violates a constitutionally protected right," that "relying on hearsay during a DCS investigation does not violate a clearly established constitutional right," that "challenging the thoroughness of an investigation also fails to violate a clearly established right," and that "[t]he same holds true for any allegations that [Defendants] failed to include exculpatory evidence in 'records' provided to the Court."  (*Id.* at 15-16.)

In response, Plaintiffs argue that "Defendants make the erroneous claim that they

---

[19]     Count Five is also asserted against Davisson, Faust, and McKay, but those claims have now been dismissed for other reasons.

are entitled to qualified immunity for § 1983 claims." (Doc. 11 at 18.)  Plaintiffs also note that "determining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making."  (*Id.* at 19, cleaned up.)  Plaintiffs cite *Keates* in support of their argument that the challenged conduct violated clearly established law. (*Id.*)

In reply, Defendants contend that Plaintiffs "provide no additional clarity to support their position that [Defendants] adopted 'knowingly false information' and incorporated that information into the state court filings."  (Doc. 16 at 14.)  Defendants then elaborate upon some of the arguments raised in the motion to dismiss: "Essentially, Plaintiffs dispute the authenticity of the information provided to DCS by the source, and dispute this information should have been provided to the juvenile court; but no legal principle supports this position."  (*Id.* at 14-15.)

### 2.   Analysis

In light of the analysis set forth in earlier portions of this order, the only remaining § 1983 claims are (1) the claims in Counts One and Two asserted by L.J., K.J., K.A.J., and J.A.J. against Patchin and Del Fiacco; and (2) the claim in Count Two asserted by Jimenez-Bencebi and Zavaleta against Del Fiacco related to the January 2022 hearing.  The Court will confine its qualified-immunity analysis to those claims.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  As for the second prong, a government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Id.* at 741 (cleaned up).  Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all

reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (cleaned up); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . .   Except in the rare case of an 'obvious' instance of constitutional misconduct . . . , Plaintiffs must identify a case where an officer acting under similar circumstances as defendants was held to have violated the Fourth Amendment.   In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [defendants] in this case that their particular conduct was unlawful.") (cleaned up).   "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."   *Sharp*, 871 F.3d at 911 (citation omitted).   *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

Ninth Circuit law is not a model of clarity concerning who bears the burden of proof when the defense of qualified immunity has been raised.   Many Ninth Circuit opinions hold that "[o]nce the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'"   *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).   *See also Shafer*, 868 F.3d at 1118 ("Shafer argues that it is Deputy Padilla's burden to demonstrate that he did not violate Shafer's clearly established constitutional right.   Again, we disagree."); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted).   However, other Ninth Circuit opinions hold that "[q]ualified immunity

1   is an affirmative defense that the government has the burden of pleading and proving."

2   *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).  These opinions are difficult to

3   reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J.,

4   dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting

5   that Defendants bear the burden of proof on the disputed qualified-immunity issues

6   presented in this appeal. . . .   [T]he applicable—and well-settled—rule [in the Ninth

7   Circuit] is that the plaintiff bears the burden of proof that the right allegedly violated was

8   clearly established at the time of the alleged misconduct.") (cleaned up).  Acknowledging

9   the uncertainty in this area, the Court concludes—consistent with the most recent published

10  Ninth Circuit decisions on this topic—that the burden falls onto Plaintiffs to identify the

11  clearly established law supporting their § 1983 claims.  *See, e.g., Hart v. City of Redwood

12  City*, 99 F.4th 543, 557 (9th Cir. 2024) ("Plaintiffs have the burden of showing that the law

13  was clearly established.   None of the cases Plaintiffs have identified . . . put the

14  constitutional question beyond debate that the violative nature of Gomez's particular

15  conduct was clearly established.  As such, Plaintiffs have failed to show that Hart's rights

16  were clearly established.") (cleaned up); *Smith v. Agdeppa*, 81 F.4th 994, 1004 n.4 (9th

17  Cir. 2023) ("[T]he burden is not on the officers to prove they fit perfectly within the facts

18  of a case granting qualified immunity; the burden is on the plaintiff to show a violation of

19  a clearly established right in the specific circumstances at issue."); *Hughes v. Rodriguez*,

20  31 F.4th 1211, 1223 (9th Cir. 2022) ("The plaintiff bears the burden of pointing to prior

21  case law that articulates a constitutional rule specific enough to alert these officers in this

22  case that their particular conduct was unlawful.") (cleaned up).

23        "Determining claims of qualified immunity at the motion-to-dismiss stage raises

24  special problems for legal decision making.  On the one hand, we may not dismiss a

25  complaint making 'a claim to relief that is plausible on its face.'  But on the other hand,

26  defendants are entitled to qualified immunity so long as 'their conduct does not violate

27  clearly established statutory or constitutional rights of which a reasonable person would

28  have known.'  The Supreme Court has emphasized that this is a low bar, explaining that

'qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Keates*, 883 F.3d at 1234-35 (cleaned up).

### a.  **Count One**

In Count One, Plaintiffs allege that Patchin and Del Fiacco[20] violated Plaintiffs' rights to familial association by seizing and detaining K.J., J.M.J., J.A.J., and K.A.J. without conducting a reasonable investigation and through the use of false statements during the dependency and severance proceedings.  (Doc. 1-3 at 151-52 ¶¶ 121, 126-27.) As noted, Plaintiffs cite *Keates* as supplying the clearly established law supporting this claim.

In *Keates*, a mother (Keates) brought her 13-year-old daughter (A.K.) to a clinic to address A.K.'s depression and past expressions of suicidal ideation.  *Keates*, 883 F.3d at 1232.  The clinic made a same-day referral to PCH, where a social worker and other PCH personnel "informed Keates that the decision had been made to prevent A.K. from going home with Keates, and that she was required to go to a mental hospital for inpatient treatment."  *Id.*  After Keates expressed dissatisfaction with that decision, "'someone' from PCH called CPS to report that A.K. was suffering severe depression and had attempted a suicide by strangulation on May 20, 2013,"  that "inpatient care was necessary," and that "Keates was not able to enact a safety plan."  *Id.* at 1232-33 (cleaned up).  The following day, May 21, 2023, "Koile, a CPS case worker, interviewed A.K. without Keates present and without Keates's consent.  A.K. reported that her only complaint about her mother was that she 'yells, screams, and cusses.'  A.K. also told Koile that she had suicidal ideation in the past but had not attempted suicide on May 20."  *Id.* at 1233.  Nevertheless, later that day, Koile "issued a temporary custody notice (TCN) allowing him to take A.K. away from Keates and put her into CPS custody."  *Id.*  That same day, as A.K. was being discharged from PCH and transferred to a behavioral health facility, Koile "told the intake nurse that

---

[20]      Count One is also asserted against Davisson, but that claim has now been dismissed for other reasons.

A.K. had tried to commit suicide on May 20, 2013." *Id.* Despite that statement, "[t]he intake nurse . . . found A.K.'s suicide risk to be low." *Id.* The following day, May 22, 2023, "Koile interviewed Keates, who told him that A.K. did not attempt suicide on May 20." *Id.* Nevertheless, the following day, May 23, 2023, "Koile informed [the behavioral health facility] that he had concluded that Keates was unable to care for A.K. and that a dependency petition would be filed. The Arizona Department of Economic Security filed a dependency petition on behalf of CPS on May 24, 2013. The petition stated that A.K. attempted suicide on May 20, 2013." *Id.* A few days later, A.K. was discharged from the behavioral health facility and then placed in a foster home. *Id.* at 1234. Finally, in late 2013, A.K. returned home and the dependency petition was dismissed. *Id.*

In an ensuing lawsuit, Keates and A.K. asserted, among other things, a § 1983 claim alleging "that the defendants had violated Keates's and A.K.'s constitutional rights to familial association under the First, Fourth, and Fourteenth Amendments and the right to be free from deliberately falsified evidence in dependency proceedings." *Id.* The district court dismissed the § 1983 claim at the pleading stage based on qualified immunity but the Ninth Circuit reversed. *Id.* at 1234, 1240. As for the familial association theory of liability, the Ninth Circuit began by distilling the applicable legal standard: "Our case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue." *Id.* at 1237-38. Next, the Ninth Circuit concluded that, for several reasons, the factual allegations in the complaint were sufficient to establish a violation of that standard. The first was that the requirement of a "reasonable investigation, giving rise to a reasonable cause to believe that A.K. was in imminent danger of serious bodily injury" was "not met" in light of Koile's failure to "corroborate the PCH call to CPS or obtain other medical

opinions on whether A.K. was at risk," the fact that "both Keates and A.K. repeatedly informed Koile that A.K. was not actively suicidal," and the fact that "the intake nurse . . . determined that A.K. was 'low-risk' for suicide." *Id.* at 1238.  The second was that "[t]he complaint further alleges facts plausibly indicating that Koile had sufficient time to obtain a warrant," in part because "when Koile first talked to A.K., she was in a hospital and under medical supervision." *Id.* at 1238-39.  The third was that "the complaint plausibly indicates that Koile exceeded the scope of any intrusion necessary to protect A.K.," as "there was no basis for preventing Keates from having contact with A.K." and "no basis for requiring A.K. to be strapped to a gurney when she was transported to" the behavior health facility. *Id.* at 1239.  Finally, turning to the second prong of the qualified-immunity analysis, the Ninth Circuit concluded that Koile's arguments regarding the reasonableness of his conduct, including that "he acted reasonably because he was told by 'qualified medical providers' at PCH that A.K. was actively suicidal and needed inpatient treatment," were "not supported by the complaint."  *Id.* at 1239-40.  The court concluded: "[T]hus based solely on the facts alleged in the complaint construed in favor of Keates and A.K., a reasonable official in Koile's position would know the available information did not establish reasonable cause to believe that A.K. was in imminent danger of attempting to commit suicide, or that it was necessary to separate her from her mother, transfer her to [the behavioral health facility], and continue to detain her after medical professionals at [that facility] concluded she was a low suicide risk."  *Id.* at 1240.

At this summary makes clear, Plaintiffs' reliance on *Keates* is in large part factually misplaced.  There, the complaint alleged that the seizure of A.K. occurred on May 21, 2013 pursuant to a temporary custody notice ("TCN") issued by Koile, a CPS employee.  *Id.* at 1233.  The complaint further alleged that DCS did not initiate dependency proceedings until May 24, 2013.  *Id.*  This timeline was critical to the court's analysis because one of the elements of the underlying constitutional claim for familial association was that the challenged removal occurred "without a court order."  *Id.* at 1236-37.  Indeed, "[t]he TCN was central to the alleged constitutional violation, as it was the basis for Koile's seizure

- 53 -

1    and removal of A.K." *Id.* at 1242.

2        Here, in contrast, the FAC does not allege that the removal of any of the children

3    occurred without a court order.  Nor do the remaining allegations in the FAC raise a

4    plausible inference that the removals occurred without a court order.  Although the FAC is

5    very precise as to when each removal occurred—it alleges that K.J. and J.M.J. were

6    removed on September 14, 2018 (Doc. 1-3 at 141 ¶ 48), that K.A.J. was removed on March

7    5, 2019 (*id.* at 139 ¶ 38(d)), and that J.A.J. was removed on February 12, 2020 (*id.* at 139

8    ¶ 38(h))—the FAC vaguely alleges that dependency proceedings were first initiated in

9    "September 2018" (*id.* at 139 ¶ 38(b)), which is potentially before any of those removals

10   occurred.  The FAC also alludes to various proceedings in juvenile court in which Patchin

11   and Del Fiacco provided allegedly false testimony and implies that one of those

12   proceedings occurred before the September 14, 2018 removal of K.J. and J.M.J.  (*Id.* at 141

13   ¶ 48(e) [identifying, as one of the "events" that "led to this removal," the instance where

14   "[b]ased only on this hearsay from a witness who had a motive to lie, Caseworker Patchin

15   reported to the juvenile court that Bianca threatened a person with a knife at the Gift of

16   Mary Shelter, left J.M.J. in his car seat for extended times, prevented others from feeding

17   J.M.J., and only paid attention to K.J."].)  Defendants' reply brief also seems to argue—

18   albeit imprecisely—that qualified immunity is required as to Count One because that claim

19   is based on judicially authorized removals.  (Doc. 16 at 15 ["Essentially, Plaintiffs dispute

20   the authenticity of the information provided to DCS by the source, and dispute this

21   information should have been provided to the juvenile court; but no legal principle supports

22   this position."].)[21]

23       In a recent decision in a similar case, the Ninth Circuit affirmed the district court's

24   grant of qualified immunity, at the pleading stage, to a DCS worker who was alleged to

25   have violated the plaintiffs' right to familial association, emphasizing that because "[t]he

26   ───────────────

27   [21]    The Court also notes that Plaintiffs' pursuit of the judicial deception claim in Count
      Two seems to imply that at least some of the removals were judicially authorized.  As
28   discussed in later portions of this order, one of the elements of a judicial deception claim
      is materiality, *i.e.*, that the court would have declined to issue the order had the defendant
      been truthful.

state court accepted Burns' investigation as sufficient to issue a temporary dependency order . . . Burns was not on notice that her conduct was constitutionally deficient." *Fidler*, 2024 WL 1553703 at *2. For similar reasons, if Count One were based solely on Patchin's and Del Fiacco's efforts to cause the children to be removed from Jimenez-Bencebi, the Court would conclude they are entitled to qualified immunity, at least under the second prong of the qualified-immunity analysis. *See also Keates*, 883 F.3d at 1239 n.2 (noting the lack of established law as to whether state officials may be held liable for detention authorized by a juvenile court); *David v. Kaulukukui*, 38 F.4th 792, 803 (9th Cir. 2022) ("Turning to this case, David sufficiently alleges that Kaulukukui participated in removing B.D. from her custody *without a court order*, placed B.D. in Keahiolalo's custody, and prevented David from having contact with B.D. or regaining custody. These allegations, if true, violate a clearly established constitutional right to familial association.") (emphasis added).

But Count One is not limited in this fashion. In addition to challenging the decision to remove the children at various points in 2018, 2019, and 2020, Count One also challenges the timely failure to allow Jimenez-Bencebi and Zavaleta to resume visitation after, at a minimum, the juvenile court issued its May 2022 decision authorizing reunification. (Doc. 1-3 at 140 ¶¶ 38(k), 39-40 ["On 11 May 2022, the juvenile court . . . changed the case plan from severance to reunification for K.J, K.A.J., and J.A.J. The court ordered DCS to have a meeting with parents within 30 days of 11 May 2022 ruling to start the reunification process. For the first six weeks after the 11 May 2022 order, DCS cancelled all of Plaintiffs' supervised visits with their children. In direct violation of the 11 May 2022 order, DCS took no affirmative steps toward implementing the reunification case plan until more than five months later."].)

On the one hand, there is a strong argument that it would violate clearly established law for a DCS employee to interfere with parental visitation under these circumstances, *i.e.*, where the interference was not only unauthorized by court order, but directly contrary to a court order. *Keates*, 883 F.3d at 1239 ("[T]he complaint plausibly indicates that Koile

exceeded the scope of any intrusion necessary to protect A.K.  Based on the allegations in the complaint, there was no basis for preventing Keates from having contact with A.K.") (citation omitted); *David*, 38 F.4th at 804 ("Even if B.D.'s initial removal was supported by reasonable cause, David alleges facts plausibly indicating that the Defendants . . . exceeded the scope of any intrusion necessary to protect B.D.  The FAC states that David was not able to speak with or see B.D. for 21 days.  Nor was she informed of B.D.'s whereabouts.  With no indication that B.D. faced any past abuse by David or that B.D. was at risk of future abuse, there was no basis for preventing David from having contact with B.D. or for separating B.D. from David for 21 days.  Again, the FAC alleges that CWS itself had deemed David's home to be at the lowest risk level just days before B.D. was removed from her mother's care.  Based on these allegations, the 21-day separation was significantly longer than reasonably necessary to alleviate a threat of immediate harm.") (cleaned up).

On the other hand, the FAC does not allege who was responsible for these acts of interference.  Patchin was presumably not responsible, given that the challenged acts occurred after May 2022 yet Patchin ceased being assigned to Plaintiffs' case as of March or April 2021.  (Doc. 1-3 at 140 ¶¶ 42-43; *id.* at 147 ¶ 91.)  Thus, Patchin is entitled to qualified immunity as to this aspect of Count One.

As for Del Fiacco, although he was the assigned DCS worker from March 2021 onward, the FAC does not allege that he was responsible for the acts of interference—instead, it generically attributes them to "DCS."  (*Id.* at 140 ¶¶ 39-40, emphases added ["For the first six weeks after the 11 May 2022 order, *DCS* cancelled all of Plaintiffs' supervised visits with their children.  In direct violation of the 11 May 2022 order, *DCS* took no affirmative steps toward implementing the reunification case plan until more than five months later."].)  This is insufficient to overcome Del Fiacco's claim of qualified immunity as to this aspect of Count One.

For these reasons, the § 1983 claim in Count One against Patchin and Del Fiacco is dismissed.  The dismissal is with leave to amend, as Plaintiffs may be able to allege new

1   facts to cure the deficiencies identified above.

2                                 b.   **Count Two**

3          In Count Two, Plaintiffs assert a claim for judicial deception against Patchin and

4   Del Fiacco.[22]  "[A]s part of the right to familial association, parents and children have a

5   'right to be free from judicial deception' in child custody proceedings and removal orders."

6   *David*, 38 F.4th at 800 (citation omitted).  *See also Costanich v. Dep't of Soc. & Health*

7   *Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil

8   child abuse proceedings violates the Due Process clause of the Fourteenth Amendment

9   when a liberty or property interest is at stake . . . .").  "To state a violation of the

10  constitutional right to familial association through judicial deception, a plaintiff must allege

11  '(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for

12  the truth, that was (3) material to the judicial decision.'  A misrepresentation or omission

13  is 'material' if a court 'would have declined to issue the order had the defendant been

14  truthful.'"  *David*, 38 F.4th at 801 (cleaned up).

15                                i.   Patchin

16         Under the first prong of the qualified-immunity analysis, the Court must assess

17  whether the factual allegations in the FAC are sufficient to support a judicial deception

18  claim against Patchin.  As explained below, they are.

19         The FAC alleges that Patchin made the following "misrepresentations and/or

20  omissions to the court which were deliberate falsehoods and/or which demonstrated a

21  reckless disregard for the truth":

22         [A.] [Jimenez-Bencebi] was homeless for several months in 2018; b. J.M.J.
           was so severely malnourished he was feeble and could barely sit up; c. J.M.J.
23         had a flat head, distended stomach and non-accidental bruising all over his
           back; d. [Jimenez-Bencebi] did not like J.M.J. because [he] was a baby
24         conceived by rape; e. K.J. had scratches on her face evidencing abuse;
           f. [Jimenez-Bencebi] was aggressive; g. [Jimenez-Bencebi] had been
25         convicted of felonious child abuse in Missouri in 2017; h. on one occasion
           in July 2019 [Jimenez-Bencebi] shouted at her therapist, Dr. Hanley; i. on
26
27  _____

28  [22]    Count Two is also asserted against Davisson, but that claim has now been dismissed
        for other reasons.

one occasion, while in labor in the hospital, [Jimenez-Bencebi] stated she
would name J.A.J. "Motherfucker;" j. [Jimenez-Bencebi] has gender
dysmorphic disorder; and k. [Jimenez-Bencebi] willfully neglected J.M.J.
because she hates boys.

(Doc. 1-3 at 153-54; *id.* at 154-55 ¶ 147.)

The FAC also provides factual allegations specifying why these statements are false.
According to the FAC, Jimenez-Bencebi's "home instability was brief, measured in weeks
not months." (*Id.* at 143 ¶ 67(a).)  The FAC also alleges that Jimenez-Bencebi "loves"
J.M.J. as demonstrated by her "tak[ing] J.M.J. for his one-year checkup and vaccinations."
(*Id.* at 143 ¶ 67(b).)  At that appointment, the "medical professional and mandatory reporter
noted nothing unusual about J.M.J. and did not report [Jimenez-Bencebi]." (*Id.* at 138
¶ 37.)  Further, contrary to Patchin's statements regarding J.M.J.'s medical condition,
J.M.J.'s medical records from the day he was removed state that J.M.J. "was active,
crawling, playful and happy," had only one small scratch, one small bruise on his cheek,
and three small bruises on his thigh, and had a normal shaped head. (*Id.* at 142 ¶¶ 56-57.)
The FAC also alleges that J.M.J. lost weight after being in foster care and that his "mild or
moderate malnutrition in September 2018 was most likely attributable to this feeding issue
rather that any neglect on [Jimenez-Bencebi's] part." (*Id.* at 144 ¶ 67(g).)  The FAC also
alleges that Jimenez-Bencebi's previous conviction was a misdemeanor, not a felony. (*Id.*
at 137 ¶ 27.)  In a similar vein, the FAC alleges that Jimenez-Bencebi's therapist "Dr.
Hanley stated in a report dated 28 August 2019 that 'there is a good chance that [Jimenez-
Bencebi] has completed what she needs to do for DCS'" and "never stated in her notes that
[Jimenez-Bencebi] shouted at her or was aggressive towards her in any way." (*Id.* at 145
¶¶ 73-74.)  Additionally, the FAC alleges that "[r]eports from [Zavaleta's] service
providers were also positive, and contrary to DCS's 'too-passive to protect' narrative." (*Id.*
at 145 ¶ 76.)  The FAC also alleges that Jimenez-Bencebi "was never diagnosed by any
therapist with gender dysphoria." (*Id.* at 145 ¶ 81.)  These facts make it plausible that
Patchin's statements were misrepresentations.

The FAC also provides specific factual allegations in support of the second element

of the judicial deception test.  The FAC alleges that the "exculpatory evidence" referenced above regarding J.M.J.'s weight and medical status "was immediately evident to [Patchin], but she knowingly or recklessly ignored it."  (*Id.* at 142 ¶ 61.)  Further, information about Jimenez-Bencebi's homelessness and prior conviction was likely available to Patchin at the time that she made at least some of her challenged statements to the juvenile court.[23] These facts make it plausible that Patchin made the challenged statements with at least reckless disregard for the truth.  *Kastis v. Alvarado*, 2020 WL 2468389, *4 (E.D. Cal. 2020) ("Plaintiff has alleged facts—not merely conclusions—to show that defendant Alvarado made deliberately false statements or recklessly disregarded the truth in his search warrant affidavit and that those misrepresentations and omissions were material to the reviewing state court judge's probable cause determination.  Plaintiff's allegations specify which of the statements in defendant Alvarado's affidavit were false and why plaintiff believes those statements to be false.  Plaintiff also specifies the information that defendant Alvarado omitted from his affidavit and why those omissions were material to the probable cause determination.  Assuming the truth of these factual allegations, plaintiff has plausibly alleged that defendant Alvarado either acted deliberately or in reckless disregard for the truth in presenting his affidavit to the issuing state court judge.").  *Cf. Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 802 (9th Cir. 2024) ("[T]he details in Olarte's report confirm that the Parents had consulted with at least two doctors—one, a pediatrician who worked with them on K.X.'s autism, and the other, a board-certified anesthesiologist and pain management specialist who recommended cannabis oil to treat her autism—and were on an extended waiting list to see a third doctor who was known for treating autistic children with cannabis oil.  That simply cannot be squared with Olarte's recommendation that K.X. and G.X. be removed because the Parents 'had not consulted with a medical professional or a professional who deals with autism.'") (cleaned up).

---

[23]     Although Defendants correctly note that certain medical records would not have been available to Patchin at the time of the first removal on September 14, 2018 (Doc. 6 at 17 n.11), the claim of judicial deception is not limited to that timeframe and also encompasses Patchin's later statements.

The factual allegations in the FAC also make it plausible that but-for Patchin's statements, K.J., K.A.J., and J.A.J. would not have been removed from Jimenez-Bencebi's and Zavaleta's care.  The FAC alleges that "[t]he juvenile court finally recognized at the end of the second severance trial in May 2022, that the State, DCS and their agents' picture of [Jimenez-Bencebi] as an abuser and [Zavaleta] as a passive inept father was inaccurate." (Doc. 1-3 at 148 ¶ 103.)  Patchin is alleged to have submitted the false statements to the juvenile court to support removing the children and terminating Jimenez-Bencebi's parental rights.  (*Id.* at 142-43 ¶¶ 62-63; *id.* at 144-45 ¶ 71.)  Accepting the factual allegations in the FAC as true, it is plausible to infer that the removals would not have occurred had the juvenile court been aware those statements were false.  *David*, 38 F.4th at 802 ("Additionally, David alleges that 'had the presiding judge in the Family Court been informed of the Custody Order, Defendant Keahiolalo's application for a temporary restraining order would not have been granted as to B.D.'  In other words, she claims that but-for Kaulukukui's misrepresentation or omission, David would not have been deprived of custody over B.D., meaning that the omission was material.  Thus, we conclude that David has successfully stated a claim for violation of her and B.D.'s right to familial association based on judicial deception.") (cleaned up).

As for the second prong of the qualified-immunity test, although Plaintiffs' response brief does not identify any clearly established law supporting their judicial deception claim, the FAC identifies various cases, including *Hardwick v. County of Orange*, 844 F. 3d 1112 (9th Cir. 2017).  (Doc. 1-3 at 154 ¶ 145.)

*Hardwick* supplies the sort of clearly established law that is necessary to overcome Patchin's claim of qualified immunity as to Count Two.  There, the plaintiff sued the County of Orange and employees of its Social Services Agency under the theory "that the social worker employees acting under color of state law maliciously used perjured testimony and fabricated evidence to secure her removal from her mother, and that this abuse of state power violated her Fourth and Fourteenth Amendment constitutional rights to her familial relationship with her mother."  *Hardwick*, 844 F.3d at 1114.  More

specifically, the plaintiff alleged that the social workers (1) made false statements in reports submitted during the dependency proceeding; (2) made false statements on and off the record "to the commissioner overseeing the dependency proceeding, triggering [the plaintiff's] seizure"; (3) fabricated and suppressed evidence during the dependency proceeding; and (4) used false statements to keep the plaintiff separated from her mother "even though defendants allegedly knew they were lying to the court about the basis for the initial seizure and subsequent detention." *Id.* at 1115. The Ninth Circuit held that the defendants were on notice in February 2000, when they removed the plaintiff from her mother, that "the specific granular right to be free from deliberately fabricated evidence in *civil* child dependency proceedings where a parent's or child's protected familial liberty interest is at stake" is clearly established. *Id.* at 1117. *See also Scanlon*, 92 F.4th at 805 ("The right to be free from judicial deception was clearly established prior to 2016 and so before the events of this case."); *David*, 38 F.4th at 800-01 (stating that "the right to be free from judicial deception in matters of child custody 'is beyond debate'"); *Kohlmann*, 2023 WL 1782023 at *8 (same).

Accordingly, Patchin is not entitled to qualified immunity as to Count Two at this stage of the proceedings. *David*, 38 F.4th at 802-03 ("We conclude that any reasonable official would understand that the latter behavior—if proven—violates the law. As such, it is 'hardly conduct for which qualified immunity is either justified or appropriate.'") (citation omitted).

### ii.   Del Fiacco

Under the first prong of the qualified-immunity analysis, the Court must assess whether the factual allegations in the FAC are sufficient to support a judicial deception claim against Del Fiacco. As explained below, they are not.

The FAC provides only a few allegations to support that claim—that Del Fiacco "re-alleged Patchin's false narrative and allegations" when she took over for Patchin in March or April 2021 and that Del Fiacco "knew Patchin's allegations were false [and] recklessly disregarded the exculpatory facts that were evidenced in the record." (Doc. 1-3

at 147 ¶¶ 91-93.)  These statements merely parrot the language from case law that Del Fiacco acted with knowledge or indifference in "re-alleging" Patchin's statements and are insufficient to state a claim for judicial deception.  *Salvi v. Cnty. of San Diego*, 2019 WL 1671001, *7 (S.D. Cal. 2019) ("Plaintiffs have not alleged facts, but simply conclusory allegations that Defendants acted 'deliberately or recklessly.'  Absent facts to support this allegation, this claim must be dismissed.") (citation omitted); *Riveira v. Dresch*, 2019 WL 3238569, *5 (W.D. Wash. 2019) ("Even if Defendant's affidavit contained inaccuracies regarding this policy, Plaintiffs have not raised factual allegations that plausibly establish that Defendant knowingly or recklessly made false statements regarding that policy.").

The FAC also alleges that during testimony to the juvenile court on January 10, 2022, Del Fiacco "falsely alleged that [Jimenez-Bencebi] focused on the 'wrong things' during the visits."  (Doc. 1-3 at 147 ¶ 94.)  But this statement does not actually allege that Del Fiacco's testimony was *false*.  The FAC alleges that "[t]hese 'wrong things' were that [Jimenez-Bencebi] was concerned that her daughter had a very large bruise on her leg, red marks on her private parts, and tangled unkempt hair.  Del Fiacco was the only individual who considered [Jimenez-Bencebi's] concerns as 'wrong things.'"  (*Id.* at 147 ¶¶ 95-96.) Jimenez-Bencebi does not dispute that she focused on those things (*id.* at 147 ¶ 97 [alleging that Jimenez-Bencebi's "concerns about her daughter were accurate and reasonable"]), but rather disputes Del Fiacco's characterization of them as "wrong."  This is not an allegation of a false statement, but rather a critique of Del Fiacco's opinion regarding the propriety of Jimenez-Bencebi's concerns.  Regardless, there is no support in the FAC that Del Fiacco knew or disregarded that these statements were false or that Del Fiacco's testimony had an influence on the juvenile proceeding.  As noted, all of the challenged removals had already occurred by the time of the January 2022 hearing, and the FAC alleges that the juvenile court ruled in large part against DCS in its decision issued in May 2022.  *Schindler v. Contra Costa Cnty.*, 2023 WL 2414864, *3 (N.D. Cal. 2023) ("Regardless, even assuming these statements were false, Plaintiff has not alleged that but for these statements, the court's determination in the dependency proceedings would have been different.").

1   This determination makes it unnecessary to proceed to the second prong of the

2   qualified-immunity analysis as to Del Fiacco.  She is dismissed from Count Two.  The

3   dismissal is with leave to amend because it may be possible for Plaintiffs to cure the

4   aforementioned defects.

5   VI.   State-Law Claims

6        A.   **The Parties' Arguments**

7        Defendants argue that, under A.R.S. § 12-821, any claim against a public entity or

8   public employee must be brought within one year of accrual, meaning that "all state claims

9   are expired" because "the accrual date for these torts" is either "the removal dates for the

10  individual children—with the latest removal occurring on February 12, 2020" or at the

11  latest the filing date of each dependency and severance petition, the last of which "was

12  filed on May 20, 2021."  (Doc. 6 at 11-12.)  However, Defendants "concede that the state

13  claims of K.J., K.A.J., and J.A.J. are not time barred, due to their status as minors."  (*Id.* at

14  11 n.7.)  Defendants also argue that the notice of claim filed by Jimenez-Bencebi, Zavaleta,

15  and L.J. was untimely because it "is dated November 8, 2022, so it is undisputed that no

16  Defendant received the claim prior to that date."  (*Id.* at 13.)  Finally, Defendants note that

17  "[t]he other minors were not listed as claimants' within the notice of claim."  (*Id.* at 13

18  n.9.)

19       In response, Plaintiffs argue, in reliance on *Rogers v. Board of Regents of University*

20  *of Arizona*, 311 P.3d 1075 (Ariz. App. 2013), "that 'an analysis of the elements of the

21  underlying claim is necessary to determine when a cause of action accrues.'"  (Doc. 11 at

22  14, cleaned up.)  Plaintiffs argue "because [Jimenez-Bencebi's and Zavaleta's] state law

23  claims implicate the same concerns at issue in *McDonough*, the same accrual rule applies

24  too . . . .  Since the state court proceedings ended on May 23, 2023, with a dismissal of the

25  dependency, Plaintiffs had until . . . May 23, 2024 to file a lawsuit."  (*Id.* at 16, internal

26  citation omitted.)[24]   Plaintiffs argue that "[d]ependency and termination proceedings

27  regularly last much longer than one hundred eighty days, or even a year.  Thus, under any

28  _____

    [24]     The FAC alleges this date as May 25, 2023.  (Doc. 1-3 at 140 ¶ 41.)

other approach, parents with potential claims against state actors would face an untenable choice between letting their claims expire and filing suit against the very state actors who are seeking to have their children declared dependent or to have their parental rights permanently terminated.  Both options are undesirable and fraught with peril." (*Id.* at 15-16.)

In reply, Defendants accuse Plaintiffs of "seek[ing] to circumvent application of the codified discovery rule in A.R.S. § 12-821.01 by arguing the continuing tort doctrine extends the statute of limitations for the state claims; but this is erroneous." (Doc. 16 at 10.)  Defendants also contend that "Plaintiffs[] conflate two concepts in their reliance on *Rogers*.  Although *Rogers* does state[] that 'an analysis of the elements of the underlying claim is necessary to determine when a cause of action accrues'; and, it is true that certain torts may have different accrual dates due to the elements, this does not undercut application of the discovery rule applicable via the statute for most torts." (*Id.*, cleaned up.)  Defendants then elaborate on the arguments made in the motion to dismiss.  (*Id.* at 10-12.)

B.    **Analysis**

1.    Statute Of Limitations

Because Patchin, Del Fiacco, Davisson, Faust, and McKay are public employees and the State is a public entity, any state-law claims against those defendants "shall be brought within one year after the cause of action accrues and not afterward." A.R.S. § 12-821.  Arizona recognizes the discovery rule, which holds that "a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition that caused or contributed to the damage." A.R.S. § 12-821.01(B).  "Thus, 'the relevant inquiry is when did a plaintiff's knowledge, understanding, and acceptance in the aggregate provide sufficient facts to constitute a cause of action.'" *Thompson v. Pima Cnty.*, 243 P.3d 1024, 1028 (Ariz. Ct. App. 2010) (cleaned up).  Here, Plaintiffs filed the complaint on May 8, 2023.  Therefore, if any of Plaintiffs' state-law claims accrued before May 8, 2022, and are

1 | not subject to tolling, they are time-barred.

2 |              a.    **L.J., K.J., K.A.J., And J.A.J.**

As Defendants concede, the statute of limitations does not bar the state-law claims asserted by L.J., K.J., K.A.J., and J.A.J. because "[in] Arizona . . . the statute of limitations is tolled until [the plaintiff] turns eighteen." *Franco*, 2020 WL 7388489 at *3. *See also* A.R.S. § 12-502.

             b.    **Jimenez-Bencebi And Zavaleta: Counts Six, Nine, And Twelve**

The FAC demonstrates that Jimenez-Bencebi and Zavaleta were on notice to investigate the alleged injuries in Counts Six, Nine, and Twelve before May 8, 2022. Counts Six and Nine include allegations that Patchin, Del Fiacco, Davisson, Faust, and McKay failed to preserve Plaintiffs' familial relationship by removing K.J., J.M.J., J.A.J., and K.A.J. (Doc. 1-3 at 161-62, 164-67.)[25]  But all of those removals occurred between 2018 and 2020.  Count Twelve alleges that Plaintiffs suffered emotional distress because of Patchin, Del Fiacco, Davisson, Faust, and McKay's "unwarranted removal of a child from their loving parent and then wrongfully and falsely accusing the parent of neglect and abuse." (*Id.* at 171 ¶ 251.)  But once again, the actions giving rise to that claim are the removals that occurred between 2018 and 2020.

Because this time bar cannot be cured with amendment, these Counts are dismissed as to Jimenez-Bencebi and Zavaleta without leave to amend.

             c.    **Jimenez-Bencebi And Zavaleta: Counts Seven, Ten, And Thirteen**

Count Seven alleges three sets of abuse of process: (1) Patchin filing the dependency

---

[25]  Specifically, Count Six alleges that Patchin, Del Fiacco, Davisson, Faust, and McKay engaged in negligence per se by failing to protect L.J., K.J., J.M.J., K.A.J., and J.A.J., by engaging in judicial deception to remove the children from Jimenez-Bencebi's custody, and by not conducting a thorough investigation before their removals. (Doc. 1-3 at 161-62.)  Count Nine alleges that Patchin, Del Fiacco, Davisson, Faust, and McKay "acted with gross negligence and breached their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to complete a prompt and thorough investigation." (*Id.* at 166-67 ¶ 229.)

1    and severance petitions, and Davisson approving those petitions (*id.* at 163 ¶¶ 204, 207);

2    (2) Davisson and Del Fiacco continuing to "prosecut[e] . . . these petitions" (*id.* at 164

3    ¶ 210); and (3) "fail[ing] to initiate any meaningful steps [to reunite Plaintiffs] until five

4    months after being ordered to do so" (*id.* at 164 ¶ 212).[26]

5        The first two alleged abuses are time-barred for the same reasons as Counts Six,

6    Nine, and Twelve.  Because this time bar cannot be cured with amendment, those claims

7    are dismissed without leave to amend as to Jimenez-Bencebi and Zavaleta.

8        In contrast, the final alleged abuse underlying Count Seven—failing to initiate the

9    reunification process within 30 days of the juvenile court's May 11, 2022 order—occurred

10   within the limitations period.  (*Id.* at 164 ¶ 212.)  That portion of Jimenez-Bencebi's and

11   Zavaleta's claim in Count Seven is therefore not time-barred.

12       The analysis is largely the same regarding Counts Ten and Thirteen.  Count Ten

13   alleges that "Faust and McKay operated with gross negligence and breached the duties

14   described herein by failing to ensure that all the State and DCS investigators were properly

15   trained on their duty to protect the legal and due process rights of children and families

16   from the time of the initial contact through case closure."  (*Id.* at 168 ¶ 237.)  Count

17   Thirteen alleges that the State, DCS, Davisson, Faust, and McKay engaged in negligent

18   supervision, training, and retention that resulted in a breach of the duty to "make reasonable

19   efforts to reunite parents with their children" and "allowed . . . Patchin and Del Fiacco to

20

_____

21   [26]    Although paragraph 212 attributes this abuse to "the State and DCS," Count Seven
     is not asserted (or has been dismissed) against those entities for reasons discussed in earlier
22   portions of this order.  Also, although the Court harbors doubt as to whether the FAC
     contains sufficient factual allegations to show that Patchin, Del Fiacco, and Davisson were
23   personally responsible for this particular abuse—as discussed in earlier portions of this
     order, Patchin and Del Fiacco are entitled to qualified immunity as to the § 1983 claim
24   premised on this abuse due to the absence of factual allegations tying them to the alleged
     interference—the analysis here is limited to the statute-of-limitations argument raised by
25   Defendants.  *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("In our
     adversarial system of adjudication, we follow the principle of party presentation. . . . [A]s
26   a general rule, our system is designed around the premise that parties represented by
     competent counsel know what is best for them, and are responsible for advancing the facts
27   and argument entitling them to relief.  In short: Courts are essentially passive instruments
     of government.  They do not, or should not, sally forth each day looking for wrongs to
28   right.  They wait for cases to come to them, and when cases arise, courts normally decide
     only questions presented by the parties.") (cleaned up).

pursue a false narrative and allegations against [Jimenez-Bencebi] and allowed the unlawful seizure of her children and allowed them to continue their false narrative in Court filings and testimony." (*Id.* at 172; *id.* at 173 ¶¶ 263-66.) Liberally construed, those counts seem to sweep in both conduct related to the removals and conduct related to the failure to ensure reunification in a timely manner following the May 2022 order. Accordingly, to the extent Counts Ten and Thirteen are based on the removals, those portions of Counts Ten and Thirteen are dismissed without leave to amend as to Jimenez-Bencebi and Zavaleta, but to the extent Counts Ten and Thirteen are based on reunification failures, those portions of Counts Ten and Thirteen are not time-barred as to Jimenez-Bencebi and Zavaleta.

### d.   **Jimenez-Bencebi And Zavaleta: Count Eight**

Count Eight alleges that Patchin, Del Fiacco, Davisson, Faust, and McKay are liable for gross negligence and violating Plaintiffs' legal rights "when they failed to properly investigate whether the State and DCS should remove the children from their parent's care"; "fail[ed] to complete a prompt and thorough investigation"; and "made representations to the court that were false and/or demonstrated a reckless disregard for the truth." (*Id.* at 165 ¶¶ 218-19, 221.) As discussed above, all of the challenged conduct relating to the removals and the court statements occurred before May 2022, so any state-law claim by Jimenez-Bencebi and Zavaleta based on such conduct is time-barred.

However, Count Eight also alleges that Patchin, Del Fiacco, Davisson, Faust, and McKay "limit[ed], and at times forbid[], [Jimenez-Bencebi's and Zavaleta's] visits with the children" (*id.* at 165 ¶ 220)—conduct that occurred for six weeks following the juvenile court's May 2022 order. (*Id.* at 140 ¶ 39.) Thus, Jimenez-Bencebi's and Zavaleta's claims in Count Eight against Patchin, Del Fiacco, Davisson, Faust, and McKay regarding that challenged conduct is not time-barred.[27]

…

---

[27]   As noted in the previous footnote, the analysis here is limited to the issue of timeliness and does not address whether Count Eight properly attributes the visitation-interference claim to all of the named Defendants.

e.     ***McDonough* And The Continuing Tort Doctrine**

There is no merit to Plaintiffs' contention that the juvenile court's dismissal of the dependency action on May 25, 2023 sets the accrual date for their state-law claims.  As discussed in earlier portions of this order, *McDonough* does not alter the limitations calculations because the principles animating that decision are not present here, where the underlying proceeding was a civil dependency proceeding.

Nor does Arizona law suggest that the continuing tort doctrine delays the accrual of Plaintiffs' state-law claims.  First, Plaintiffs cite no legal authority—and the Court is aware of none—establishing that the continuing tort doctrine applies to the specific state-law claims asserted here.  *Lund v. Burch & Cracchiolo P.A.*, 2020 WL 6834539, *8 (Ariz. Ct. App. 2020) ("Further, Lund cites to no Arizona case that applies the continuing tort doctrine to claims for abuse of process and invasion of privacy, and given the facts of this case—much like the court in *Cruz*—we decline to do so now."); *Watkins v. Arpaio*, 367 P.3d 72, 77 (Ariz. Ct. App. 2016) ("The common-law 'continuing wrong' doctrine would enable such a victim to wait to sue until after the investigation is finished.  But the limitations rules that apply to Watkins's claim against Arpaio are creatures of statute, not the common law, and those statutes do not allow one in Watkins's situation to wait to bring suit until more than a year after acts sufficient to state a claim occur.").

Second, the Court doubts that applying the continuing tort doctrine would be appropriate in this instance, because the events giving rise to liability were sufficient to put Plaintiffs on notice of their claims, without any need for aggregation.  *Watkins*, 367 P.3d at 76 ("Watkins's intentional-infliction claim is unlike those in the cases he cites; in those cases, liability arose from a long series of cumulative acts, any one of which likely was insufficient by itself to support the claim.  Here, we do not have a situation in which the initial acts in a series of alleged wrongdoing are not sufficient by themselves to support a claim."); *Floyd v. Donahue*, 923 P.2d 875, 879 (Ariz. Ct. App. 1996) ("We agree that under certain conditions a tort is continuous, and in such cases the limitations period does not commence until the date of the last tortious act.  However, the continuing tort rule does not

1   apply here because each claimed act is a separate assault causing separate as well as

2   cumulative injury.") (citation omitted).   Here, each instance of challenged conduct is

3   separately cognizable.

4                                2.      Notice Of Claims

5              Under Arizona law, a party seeking to bring a claim against public entities and

6   employees must file a "notice of claim" within 180 days of the action accruing.  A.R.S.

7   § 12-821.01(A); *Walton v. Arizona*, 2017 WL 5997441, *3 (D. Ariz. 2017) ("The

8   requirement of filing a notice of claim is mandatory on claims against public entities and

9   individual public employees.").  "If a notice of claim is not properly filed within the

10  statutory time limit, a plaintiff's claim is barred by statute." *Falcon ex rel. Sandoval v.*

11  *Maricopa County*, 144 P.3d 1254, 1256 (Ariz. 2006) (en banc).  "Actual notice and

12  substantial compliance do not excuse failure to comply with the statutory requirements

13  . . . ." *Id.*  However, "[n]otwithstanding subsection A, a minor or an insane or incompetent

14  person may file a claim within one hundred eighty days after the disability ceases."  A.R.S.

15  § 12-821.01(D).

16             Both sides agree that the notice of claim at issue here, which was filed by Jimenez-

17  Bencebi, Zavaleta, and L.J., is dated November 8, 2022.  (Doc. 6-1; Doc. 11 at 16.)

18                                a.      **L.J.**

19             L.J. filed his notice of claim before filing the complaint and before his period of

20  disability ceased.  Accordingly, the notice-of-claim requirement does not bar L.J.'s state-

21  law claims.

22                                b.      **K.J., K.A.J., And J.A.J.**

23             The notice of claim does not list K.J., K.A.J., and J.A.J. as claimants.  (Doc. 6-1 at

24  1.)  Although Defendants seem to suggest this omission means the state-law claims of K.J.,

25  K.A.J., and J.A.J. must be dismissed (Doc. 6 at 13 n.9), any such argument is mistaken.

26  As noted, § 12-821.01(D) provides that "a minor . . . may file a claim within one hundred

27  eighty days after the disability ceases." *Id.*  Thus, the deadline for K.J., K.A.J., and J.A.J.

28  to file their respective notices of claim will not arrive until 180 days after each of their

1    eighteenth birthdays. *See also Estate of DeSela v. Prescott Unified Sch. Distr. No. 1*, 249

2    P.3d 767, 768 (Ariz. 2011) ("This statute generally requires persons having claims against

3    public entities or employees to file pre-litigation notices within 180 days after the claim

4    accrues, but minors may file such notices within 180 days after turning eighteen."); *Leibel*

5    *v. City of Buckeye*, 556 F. Supp. 3d 1042, 1078 (D. Ariz. 2021) (agreeing that "the 180-day

6    period does not begin to accrue until a minor reaches the age of eighteen").

7                         c.    **Jimenez-Bencebi And Zavaleta: Counts Seven, Ten, And**

8                               **Thirteen**

9           As noted, Count Seven is a claim that Patchin, Del Fiacco, and Davisson failed to

10   initiate the reunification process within 30 days of the juvenile court's May 11, 2022 order.

11   (Doc. 1-3 at 164 ¶ 212.)   Counts Ten and Thirteen also contain language that, when

12   liberally construed, sweeps in conduct related to the failure to ensure reunification in a

13   timely manner following the May 2022 order. (*Id.* at 168 ¶ 237 [Count Ten]; *id.* at 173

14   ¶ 263 [Count Thirteen].)   Jimenez-Bencebi and Zavaleta were therefore on notice to

15   investigate the alleged injuries as of June 10, 2022.   Their notice of claim filed on

16   November 8, 2022—*i.e.*, less than 180 days after June 10, 2022—was therefore timely.

17                         d.    **Jimenez-Bencebi And Zavaleta: Count Eight**

18          As noted, Count Eight is a claim that Patchin, Del Fiacco, Davisson, Faust, and

19   McKay "limit[ed], and at times forbid[], [Jimenez-Bencebi's and Zavaleta's] visits with

20   the children" for at least five weeks following the juvenile court's May 11, 2022 order. (*Id.*

21   at 140 ¶ 39; 165 ¶ 220.)   Jimenez-Bencebi and Zavaleta were therefore on notice to

22   investigate the alleged injuries as of June 22, 2022.   Their notice of claim filed on

23   November 8, 2022—*i.e.*, less than 180 days after June 22, 2022—was therefore timely.

24          …

25          …

26          …

27          …

28          …

Accordingly,

**IT IS ORDERED** that:

1.      Defendants' motion to dismiss (Doc. 6) is **granted in part and denied in part**.

2.      The remaining counts are (a) Count Two, which is asserted only against Patchin by L.J., K.J., K.A.J., and J.A.J.; (b) Count Six, which is asserted against Patchin, Del Fiacco, Davisson, Faust, and McKay by L.J., K.J., K.A.J., and J.A.J.; (c) Count Seven, which is asserted against Patchin, Del Fiacco, and Davisson by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta); (d) Count Eight, which is asserted against Patchin, Del Fiacco, Davisson, Faust, and McKay by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta); (e) Count Nine, which is asserted against Patchin, Del Fiacco, Davisson, Faust, and McKay by L.J., K.J., K.A.J., and J.A.J.; (f) Count Ten, which is asserted against Faust and McKay by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta); (g) Count Twelve, which is asserted against Patchin, Del Fiacco, Davisson, Faust, and McKay by L.J., K.J., K.A.J., and J.A.J.; and (h) Count Thirteen, which is asserted against the State, Davisson, Faust, and McKay by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta).

3.      Plaintiffs are granted leave to amend, with limitations as expressed in the body of this order.

4.      If Plaintiffs choose to attempt to amend their FAC, their Second Amended Complaint ("SAC") must be filed within 21 days of the entry date of this Order.  Plaintiffs must, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit. Although the Court appreciates that providing a redlined version may prove technically challenging, Plaintiffs must comply with this requirement in light of the length of the current complaint and the limited nature of the leave to amend that is being granted.

5.      Regardless of whether Plaintiffs file a SAC, Defendants are authorized to file a successive motion to dismiss within 21 days of the deadline for filing the SAC.  *Cf.*

*Hasbrouck v. Yavapai County*, 2021 WL 321894, *12 (D. Ariz. 2021) ("[E]ven though a party is ordinarily barred by Rule 12(g)(2) from filing a successive motion to dismiss on grounds that could have been raised in an earlier dismissal motion, the Court will permit the County to file another dismissal motion that addresses Count One.  This outcome is necessitated, in part, by the prolixity of Plaintiffs' complaint, which made it difficult for the County to raise all potential dismissal arguments in the initial motion it filed jointly with the other County Defendants.").

Dated this 10th day of June, 2024.

Dominic W. Lanza
United States District Judge