# EXHIBIT A



Thomas A. Connelly
DIRECT (480) 566-8322
E-Mail Address:  tconnelly@millsandwoods.com

2567-101

8 November 2022

## VIA PROCESS SERVER HAND DELIVERY

| State of Arizona<br>c/o Arizona Attorney General<br>The Honorable Mark Brnovich<br>2005 N. Central Ave.<br>Phoenix, AZ 85004 | Arizona Department of Child Safety<br>Phoenix Corporate Center<br>3003 N. Central Ave.<br>Phoenix, AZ 85012 |
|---|---|
| Mike Faust – Current Director<br>Gregory McKay – Former Director<br>c/o Arizona Department of Child Safety<br>Phoenix Corporate Center<br>3003 N. Central Ave.<br>Phoenix, AZ 85012 | Carin Patchin<br>Tracy Del Fiacco<br>Amanda Davisson<br>c/o Arizona Department of Child Safety<br>1717 W. Jefferson St.<br>Phoenix, AZ 85007 |

## NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01

**CLAIMANTS:**  Bianca Jimenez-Bencebi
Jiaro Abrego Zavaleta
L. J., a minor (DOB 06/27/2005)

**NATURE OF CLAIMS:** Violation of Constitutional Rights, Gross Negligence, Implementing Unconstitutional Policies and Practices, Negligent Training, Negligent Supervision, Negligence Per Se, and others

**SUM CERTAIN DEMANDED**: **$2,622,318.00** USD

Dear Addressees:

## BRIEF SUMMARY OF WHY YOU ARE RECEIVING THIS NOTICE

Bianca Jimenez-Bencebi is the mother of five minor children: L.J., K.J., J.M.J., K.A.J., and J.A.J. Bianca is married to Jiaro Abrego Zavaleta, who is the father of K.A.J. and J.A.J. At the time of DCS's interference with this family, L.J. was living with his father in Puerto Rico.

In September 2018, K.J. and J.M.J. were wrongfully removed from Bianca's loving care as the result of DCS Caseworker Patchin's failure to investigate and her false allegations of abuse and neglect. Subsequently, K.A.J. and J.A.J. were removed immediately upon birth from both Bianca and Jiaro. These removals were based on Patchin's steadfast adherence to a malicious and distorted view that



Bianca is an aggressive ex-felon who hates boys and that Jiaro is too passive to protect his children from this menace. Patchin served as the DCS Caseworker from October 2018 until March 2021. Thereafter, Tracey Del Fiacco picked up where Patchin left off. Del Fiacco fully supported Patchin's false narrative that Bianca is mentally deranged and Jiaro is inept. DCS employee Amanda Davidsson served as the supervisor for both Patchin and Del Fiacco.

The procedural history is extensive as it began over four years ago, involves four children, and is ongoing. The first dependency petition was filed in September 2018 as to K.J. and J.M.J. On 24 January 2019, DCS filed a petition to terminate Bianca's parental rights as to both children. During these dependency proceedings, K.A.J. (DOB 03/05/2019) was born and she was removed immediately at birth. Bianca's parental rights were severed as to K.J. and J.M.J in January 2020. The severance was successfully appealed on procedural grounds. However, on 14 December 2020, DCS filed another petition to terminate the parent-child relationship as to K.J., J.M.J., and K.A.J. During these proceedings, J.A.J. was born (DOB 02/12/2020) and immediately removed at birth. On 20 May 2021, DCS amended the December 2020 petition to also include J.A.J.

On 11 May 2022, the juvenile court ruled from the bench to sever Bianca's rights as to J.M.J, based on neglect under A.R.S. § 8-533(B)(2). The court also denied DCS's petition as to K.J., K.A.J. and J.A.J., and ordered DCS to have a meeting with parents within 30 days to start the reunification process. However, in direct violation of the 11 May 2022 order, DCS took no affirmative steps toward implementing the reunification case plan until more than five months later. In fact, for the first six weeks after the ruling, DCS abruptly ended all supervised visits with the children. To date, this family is still not reunified. Thus, the claims arguably have not yet accrued. Nevertheless, Claimants now serve this Notice of Claim which includes a sum certain for damages to settle this matter.

During all of court proceedings in this matter, DCS agents Patchin and Del Fiacco deceived the court by presenting information that they knew, or reasonably should have known, was false. DCS supervisor Amanda Davidsson directed or ratified Patchin and Del Fiacco's wrongful acts. Davidsson also signed Patchin and Del Fiacco's false reports filed with the juvenile court, in accordance with DCS policy. The actions of these DCS agents in seizing and detaining K.J., J.M.J., K.A.J, and J.A.J. violated the constitutional rights of all claimants and also was in violation of Arizona state law.

## WHO ARE THE CLAIMANTS?

Bianca Jimenez-Bencebi ("Bianca") is the mother of L.J. (DOB 06/27/2005), K.J. (DOB 05/16/2016), J.M.J. (DOB 08/25/2017), K.A.J. (DOB 03/05/2019), and J.A.J. (DOB 02/12/2020). Jiaro Abrego Zavaleta ("Jiaro") is married to Bianca and is the father of K.A.J. and J.A.J.

DCS seized J.M.J. and K.J. on 14 September 2018 under alleged exigent circumstances claiming Bianca had allegedly abused and neglected J.M.J. Upon removal by DCS, J.M.J. and K.J. were taken to Phoenix Children's Hospital ("PCH") for medical examination. PCH doctors found K.J. to be



completely healthy and normal. Still, she was not returned to her mother. The PCH medical staff found J.M.J. to be mildly or moderately malnourished and to have a few very tiny bruises and a small scratch on his leg and his cheek. The subsequent medical records show that J.M.J.'s mild malnutrition in September 2018 was most likely caused by an organic feeding issue, and *not* by Bianca neglecting to feed him. Nevertheless, Caseworker Patchin falsely alleged that J.M.J. was "severely" malnourished and had non-accidental bruising all over his back when he was removed. Patchin also erroneously concluded from her woefully inadequate investigation, that Bianca is an aggressive ex-felon who hates boys and is a danger to her children.

Within months of DCS involvement, just after Bianca successfully completed parent aid services, Patchin inexplicably changed the case plan from family reunification to severance. During the dependency proceedings, K.A.J. and J.A.J. were born and both were seized immediately at birth, based on Patchin's maliciously false narrative.

Patchin's animus toward Bianca is evidenced throughout the record in the tone and content of various emails and in her reports to the Court and to service providers. When Patchin retired, Del Fiacco took over the role of caseworker in March 2021, and continued to support Patchin's false and malicious narrative, notwithstanding the substantial evidence in the record to the contrary. DCS Supervisor Davidsson directed or ratified Patchin and Del Fiacco's wrongful conduct every step of the way.

This family has suffered dearly because of the unconstitutional and unlawful seizures and detentions of K.J., J.M.J., K.A.J., and J.A.J. Since September 2018, Bianca has had only limited and, at times, no access to K.J. and J.M.J. In addition, both Bianca and Jiaro were deprived of the joy of taking K.A.J. and J.A.J. home as newborns and watching them grow from birth. L.J. too has suffered, as he has lost his siblings, and has lived in fear of being taken into foster care if he were to visit his mother in Arizona. This irrevocable loss of time and emotional connection is unconscionable.

In May 2022, DCS's petition to terminate Bianca's rights to J.M.J. was granted. In this same minute entry, the Court changed the case plan from severance and adoption to reunification for K.J, K.A.J., and J.A.J. To date, the family is not reunified. Thus, the claims in this matter for some of the children have not yet accrued. Nevertheless, Claimants now serve this Notice of Claim which includes a sum certain for damages to settle this matter.

## ADDITIONAL FACTS UPON WHICH LIABLITY IS CLAIMED

### I.     The Claimants

Bianca is the mother of L.J., K.J., J.M.J., K.A.J. and J.A.J. Jiaro is the father of K.A.J. and J.A.J. At the time of DCS's first involvement with this family in 2018, L.J. was living with his father in Puerto Rico. L.J. has a close relationship with his mother and he wanted to return to live with her Arizona. However, during the dependency proceedings for K.J., J.M.J., K.A.J. and J.A.J., L.J. and Bianca



were both understandably afraid that he too would be unlawfully seized and detained by DCS. L.J. stayed with his biological father in Puerto Rico, and spoke to his mother by phone daily, and sometimes twice a day throughout this ordeal. When the final ruling was handed down in May 2022, L.J. finally was able to visit with his mother in person. L.J. now lives with Bianca in Arizona and has recently joined the military.

## II.   Background Facts

### A. While living in Missouri, Bianca conceives a child by rape and pleads guilty to a misdemeanor child abuse charge.

In 2016, Bianca was living in Missouri with L.J. and K.J. On or around 30 November 2016, Bianca was raped and J.M.J. was conceived. At the time of the rape, L.J. was 11 years old and K.J. was six months old. L.J. knew of the rape and was traumatized, but neither L.J. nor Bianca had any trauma therapy to deal with this violent crime. On 17 July 2017, when Bianca was eight months pregnant, L.J. was acting out and Bianca allegedly hit and bit him. L.J. called the police, and Bianca was arrested. There was no trial. Upon advice of counsel that it would be the quickest path to resolution, Bianca pled guilty to a misdemeanor charge of physically abusing L.J. Bianca served a 120-day jail sentence for this misdemeanor charge. It was her first, and only criminal offense. Until this time, there was no question if Bianca could parent her son and daughter. As a single mother, she alone clothed, housed, fed, educated, and cared for her children.

While Bianca served her sentence, J.M.J. was born on 25 August 2017. K.J. and J.M.J. (after his birth) were placed in foster care, and Bianca voluntarily let L.J. live with his father in Puerto Rico. After her release, Bianca allowed L.J. to stay with his father in Puerto Rico, believing this was in his best interest at that time. The State of Missouri returned K.J. and J.M.J. to Bianca in December 2017, a few weeks after she was released from jail. When the children were returned, the Missouri social workers wrote many positive things about Bianca's parenting, including the fact that L.J. was polite and well-educated and that K.J. was well-cared for and had a strong bond with her mother.

### B. Bianca moves to Arizona

In January 2018, Bianca moved from Missouri to Arizona to live with Jiaro, who she later married, and his sister. In late August 2018, Bianca was thrown out of the house by Jiaro's sister after a conflict arising over housekeeping. Bianca's standards for cleanliness were much higher than Jiaro's sister's. Bianca was pregnant with K.A.J. at the time. Because of the abrupt eviction, Bianca suffered a temporary period of housing instability which lasted only a few weeks. During this time, Bianca, K.A.J. and J.M.J. spent a few days in a homeless shelter, Gift of Mary Shelter. On 6 September 2018, when Bianca, K.A.J. and J.M.J. were homeless, Bianca brought J.M.J. to a medical appointment to keep his vaccinations up to date. This medical professional and mandatory reporter noted nothing unusual about



J.M.J. and did not report Bianca. This was a mere eight days before DCS seized K.J. and J.M.J. on false pretenses. Patchin failed to provide this exculpatory information in her reports to the Court.

### III.    DCS's Unconstitutional and Unlawful Acts Begin in September 2018.

    **A. DCS seizes K.A.J. and J.M.J.**

On 14 September 2018, DCS seized J.M.J. and K.J. The following events led to this seizure. While at the Gift of Mary Shelter, money was stolen from Bianca's purse. When she complained about the theft, Bianca was asked to leave. Later, a hotline call was made to DCS. Upon information and belief, the thief called DCS to blame-shift and to avoid also being removed from the shelter. DCS failed to investigate this incident thoroughly, and no eyewitnesses were produced to testify. Nevertheless, based only on this hearsay from a witness who had a motive to lie, Caseworker Patchin reported to the juvenile court that Bianca threatened a person with a knife at the Gift of Mary Shelter, left J.M.J. in his car seat for extended times, prevented others from feeding J.M.J., and only paid attention to K.J. This was highly misleading, at best. The truth was that Bianca never threatened anyone nor left J.M.J. in his car seat. It was true that she did not let strangers at the shelter feed anything at all to J.M.J. Any loving mother in this situation would have done the same, especially because J.M.J. was only 12 months old at the time and had some difficulties swallowing certain foods and digesting cow's milk.

Both J.M.J. and K.J. were taken to Phoenix Children's Hospital ("PCH") for physical examination upon removal by DCS. Even though there were no issues found with K.J., she was immediately taken into foster care and never returned to Bianca. J.M.J. was admitted to PCH and found to have mild to moderate malnutrition. J.M.J. was in-patient at PCH from 14 September 2018 to 20 September 2018. On the day of removal, the medical records note that J.M.J. could sit on his own, pull to stand, and was active, crawling, playful and happy, and that he had a total of one small fine scratch (~3/4 inch), one small bruise (~1/4 inch) on his cheek, and three small bruises (~1/4 to 3/8 inch) on his right thigh. Mongolian spots were found on his back and buttocks, as well as some areas of hyperpigmentation. He had no bruising *at all* on his back; and the shape of J.M.J.'s head was normal, and not noted as flat. After six days in the hospital, PCH, at the instruction of DCS, discharged J.M.J. to his "adoptive" mothers.

After one week in foster care, J.M.J. lost weight below his admission weight. J.M.J.'s body weight was 17.3 pounds when he was admitted to PCH on 14 September 2018, and was 17.1 pounds on 26 September 2018, after one week in foster care. That is, because of his organic feeding issue, J.M.J. became more malnourished while in DCS custody. This exculpatory evidence was immediately evident to Caseworker Patchin, but she knowingly or recklessly ignored it.



### B. DCS Caseworker Patchin distorts the records

On 24 January 2019, DCS filed a petition to terminate Bianca's parental rights as to K.J. and J.M.J. During these dependency proceedings, DCS Caseworker Patchin, under the supervision of Davidsson, perpetuated the following false narrative: (1) Bianca was homeless for several months in 2018; (2) J.M.J. was so severely malnourished he could barely sit up; (3) J.M.J. had a flat head, distended stomach, and non-accidental bruising all over his back; (4) Bianca did not like J.M.J. because he was conceived by rape; (5) K.J. had scratches on her face evidencing abuse; (6) Bianca was aggressive, as reported by a nameless witness at a homeless shelter; and (7) Bianca had been convicted of felonious child abuse in Missouri in 2017. None of these allegations are true. As above, Bianca's home instability was brief, measured in weeks, not months. Bianca's purported aggressiveness was the blame-shifting allegations of an unidentified thief at the Gift of Mary Shelter. J.M.J. was not severely malnourished or feeble in any way when in Bianca's care. In fact, J.M.J. lost weight one week *after* he was taken into DCS custody. Furthermore, the foster parents also noted that J.M.J. was "choking while eating" and he was evaluated by doctors for a feeding issue after six months in DCS care. Thus, J.M.J.'s mild or moderate malnutrition in September 2018 was most likely attributable to this feeding issue rather than any neglect on Bianca's part.

It is noteworthy that during the interval of housing instability, Bianca managed to take J.M.J. for his one-year checkup and vaccinations with the assistance of her now husband Jiaro. Bianca did this because she loves her son, and she was doing her best to take care of him. It is also significant that upon physical exam of J.M.J. the medical provider, a mandatory reporter, saw no reason to report Bianca to DCS. Still, Caseworker Patchin diligently documented her false narrative that J.M.J. was feeble and severely malnourished, due to his mother's neglect, throughout the DCS records. These records were shared with the Court and multiple serve providers.

### C. K.A.J. and J.A.J. are born during the dependency proceedings and both unlawfully removed immediately at birth at the behest of DCS Caseworker Patchin.

During the dependency proceedings, Patchin, under the supervision of Davidsson, continued to fabricate allegations to justify removing K.A.J. and J.A.J., both immediately at birth, and for keeping K.J. and J.M.J. in the State's care. The gravamen of the allegations were Bianca's general aggression and hatred of boys remained uncured, rendering her an unfit parent and that Jiaro was too passive to protect his children from Bianca.

Specifically, Patchin fabricated the following allegations to support removing K.A.J. and J.A.J. and to keep all of the children in State's care: (1) on one occasion in July 2019 Bianca allegedly shouted at her therapist, Dr. Hanley; (2) on one occasion, while in labor in the hospital, Bianca allegedly stated she would name J.A.J. "Motherfucker;" (3) Bianca allegedly has gender dysmorphic disorder; and (4) Bianca allegedly willfully neglected J.M.J. because she hates boys. When Caseworker Del Fiacco took over in March 2021, Del Fiacco re-alleged Patchin's false allegations and also added that Bianca



would focus on the "wrong things" when visiting with her children. None of these allegations are true. Del Fiacco knew the allegations were false, or recklessly disregarded the exculpatory facts evidenced in the record. Dr. Hanley never stated in her notes that Bianca shouted at her or was aggressive towards her in any way. In fact, Dr. Hanley stated in a report dated 28 August 2019 that "there is a good chance that [Bianca] has completed what she needs to do for DCS." Contrast this with what Patchin falsely reported in a Comprehensive Safety and Risk Assessment entry dated 8 October 2019: "[In] August 2019, Rossana [Hanley] was extremely discouraged with the lack of progress by Bianca." This is just one example of how Patchin took liberties with the truth to ensure her reporting on Bianca aligned with her false agenda. Reports from Jiaro's service providers were also positive, and contrary to DCS's "too-passive to protect" narrative. Still, Patchin ignored these positive reports.

Furthermore, Patchin's allegation that Bianca wanted to give J.A.J. a profane name while she labored at his birth is wholly unsubstantiated hearsay. Given the import of this allegation, it would be reasonable that the medical staff at the hospital would make a record of it. However, they made no such record. Nevertheless, Patchin included this highly prejudicial, salacious statement in her Court Reports and in her testimony, and it was the basis for DCS's unlawful seizure and detention of J.A.J.

Patchin also attributed Bianca's alleged hatred of boys to a made-up mental illness of "gender dysphoria." The undersigned counsel notes that "gender dysphoria" is a diagnosis in the DSM-5 which means a person has a strong desire to be another gender. However, when Patchin and other DCS agents used this term, it seems they intended to convey that Bianca hates male children because she was raped. Bianca was never diagnosed by any therapist with gender dysphoria. Furthermore, DCS failed to interview her oldest son, L.J. If they had, they would have learned that to this day, he loves Bianca very much. DCS also ignored the obvious fact that Bianca is married to Jiaro – a man. There is absolutely no credible evidence that Bianca hates boys and men, or ever held such a view.

Patchin ignored that Bianca was actually diagnosed by her PhD therapist, Dr. Hanley, with "adjustment disorder with depressed mood." According to the DMS-5, "adjustment disorder" means "[t]he development of emotional or behavioral symptoms *in response to an identifiable stressor(s)* occurring within 3 months of the onset of the stressor(s)." (*See* Table 3.19, DSM-IV to DSM-5 Adjustment Disorders Comparison - Impact of the DSM-IV to DSM-5 Changes on the National Survey on Drug Use and Health - NCBI Bookshelf (nih.gov)). This diagnosis makes sense given that Bianca's four children were unjustifiably taken from her by DCS – two of them within moments of their births.

In addition to the above, Patchin's animus toward Bianca is evident throughout the record. For example, in one email exchange, Bianca raised a concern that her daughter was wearing shoes that were too small at one of the supervised visits. Patchin passed along Bianca's concern to the foster mother, along with a scoffing, "HAHAHAHAHA!!" Patchin also wrote several insulting comments in emails to Bianca's service providers, such as accusing her of being a liar and making derogatory comments about her appearance (i.e., her choice of lipstick). Even in her testimony to the Court during the second



severance trial, Patchin's tone and body language demonstrated her tremendous personal scorn towards Bianca.

Furthermore, Patchin's aggressive and malicious prosecution was evident in how DCS handled Bianca's visits with her children during the first dependency and severance proceedings. For most of these proceedings, she did not visit with J.M.J.; however, she did have visits with K.J. When the Court severed Bianca's rights as to K.J. and J.M.J. in January 2020, Bianca appealed the severance on procedural grounds. The severance was reversed, and Bianca requested to have visits reinstated with her children. However, DCS refused to re-intestate visits pending the final ruling on their second severance petition. As a result, Bianca has not seen K.J. since January 2020 or J.M.J. since early November 2018.

### D. Caseworker Del Fiacco replaces Caseworker Patchin

In March or April of 2021, Del Fiacco took over as the DCS Caseworker. Davidsson was Del Fiacco's supervisor. At a 10 January 2022 hearing, Del Fiacco testified that she had met with Mother only twice in the 10 to 11 months she had been on the case, and that she had never observed the parents during a visit with their children. Still, Del Fiacco alleged that Bianca focused on the "wrong things" during visits. These "wrong things" included Bianca being concerned that her daughter had a very large bruise on her leg, red marks on her private parts, and tangled unkempt hair. Del Fiacco was the only individual who considered Bianca's concerns as "wrong things." In fact, Christina Martinez, the parent supervisor at Cradles to Crayons, testified at trial that Bianca's concerns about her daughter were accurate and reasonable. In addition, when Ms. Martinez supported Bianca's motion for increased visits with her children at trial, the State provided the following false statement in response:

> "While the current service provider with Cradles to Crayons stated during trial proceedings that they do not see an issue with increasing visitations, their report dated November 5, 2021 suggests otherwise. Christina Martinez and her Supervisor who both signed off on the report, stated, '*Ms. Jimenez is not self-aware of how her lack of impulse control is affecting her relationship with her children*.' This statement does not suggest Bianca has addressed the behavioral concerns that brought the children into departmental care."

However, both Ms. Martinez and her supervisor later stated that the italicized statement above (*Ms. Jimenez is not*…) was provided by DCS at intake and was not reflective of their assessment of Bianca on 5 November 2021. This distortion is further evidence that the State relied on DCS's false narrative to support their unsupportable position that Bianca is danger to her children. DCS and the State deliberately and maliciously refused to view Bianca as anything other than a dangerous aggressor. With this as the starting point, how could Bianca ever correct the circumstances that caused her children to come into DCS care, and how could Jiaro ever show that he was capable of protecting his children?



The juvenile court finally recognized at the end of the second severance trial that DCS's picture of Bianca as an abuser and Jiaro as a passive inept father was not accurate. In May 2022, DCS's petition as to K.J., J.A.J. and K.A.J. was denied. However, this family is still not reunified. K.A.J., is now three years old, and J.A.J. is now two. J.A.J. is now home but is still a ward of the state. K.A.J. and K.J. are still in foster care while the case plan of reunification plods slowly forth. K.J. is now six and anxiously awaits the day when she can finally live once again with her adoring mother. The court granted DCS's severance as to J.M.J. on the basis of neglect alone. Bianca never neglected J.M.J., and she is appealing this severance.

This family has suffered dearly as a result of Patchin's, Del Fiacco's, and Davidsson's wrongful conduct and the State's unconstitutional and unlawful interference with the familial relations. The claims for all the potential plaintiffs in this matter have not yet accrued. Nevertheless, Claimants here now serve this Notice of Claim and provide a sum certain to settle this matter in lieu of litigation.

## EXPLANATION OF CLAIMS AND DAMAGES

Agents of DCS failed to conduct a prompt and thorough investigation before they seized and detained K.J. and J.M.J. After the children were removed, DCS Caseworker Patchin insisted on a false narrative that J.M.J. was severely malnourished, unable to sit up, and badly bruised by Bianca. None of these allegations are true or supported by any of the records. Patchin continued with and embellished this false narrative to support keeping K.J. and J.M.J. in foster care and to also remove J.A.J. and K.A.J. immediately at birth.

When Patchin retired, Caseworker Del Fiacco doggedly pursued the same false narrative that Bianca was an aggressive mother who hates boys and was a danger to her children, and that Jiaro was too passive and inept to protect his children from Bianca's menace. Because of DCS's malicious prosecution of Bianca and Jiaro, L.J. was reasonably afraid to return to live with his mother. He stayed away for four long years, even though he missed her dearly. In short, agents of DCS violated the fundamental constitutional rights of all members of this family with their wrongful interference with parental rights and familial relations.

A. **Violations of First, Fourth, and Fourteenth Amendments**

The U.S. Constitution protects the fundamental right of parents to make decisions concerning the care, custody, upbringing, management, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). Fit parents are presumed to act in the best interests of their children. *Id*. at 68; *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003). The right to family association is sheltered against the government's unwarranted usurpation, disregard, or disrespect, *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996), and families have a well-established constitutional right to live together without governmental interference, *Arce v. Children's Hospital Los Angeles*, 211 Cal.App.4th 1455, 1473 (Cal. App. 2012).



Although the State has a legitimate interest in preventing the abuse of a child, in furthering this state interest, State actors are not permitted to ignore the dictates of the United States Constitution. *Wallis v. Spencer*, 202 F.3d 1126, 1130 (9th Cir. 1999). Any motive to protect a child from abuse does not override a parent's constitutional rights. *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999); *Franz v. Lytle*, 997 F.2d 784, 792-93 (10th Cir. 1993). The government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents. *Calabretta*, 189 F.3d at 820. As previously noted, fit parents are presumed to be acting in the best interests of their child. *Troxel*, 530 U.S. at 68. And, as the Arizona Supreme Court has held: "A parent is either fit or unfit—there is no middle ground—and when "[t]here has been no adjudication of the issue of ... fitness," a person "is presumed to be a fit [parent]." *In re Marriage of Friedman & Roels*, 244 Ariz. 111, 119 (2018). Until a court declares a parent unfit, the law requires State actors to presume that a parent is fit and acting in the best interest of their child.

Finally, each parent's conduct must be assessed separately – any implication against one parent does not constitute "specific, articulable evidence" to justify removal from the other parent. *Wallis*, 202 F.3d at 1140-41, 1142 n.14; *Fredenburg v. County of Santa Clara*, 407 Fed. Appx. 114, 115-16 (9th Cir. 2010).

At the time K.J., J.M.J, K.A.J., and J.A.J. were seized, it was well established that the First, Fourth, and Fourteenth Amendments to the United States Constitution that any infringement upon the right to familial association must be by the least intrusive means possible and only to the extent necessary to accomplish a compelling State interest. See, e.g., *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 1999). The Fourth Amendment protects the child from unlawful searches and seizures. A parent's right to continued custody of their child arises under the First and Fourteenth Amendments and is composed of both a substantive and procedural component. A child has corollary First and Fourteenth Amendment rights, equal and identical to those of his parents, in not being dislocated from the emotional attachments that derive from daily contact with family. *Anderson-Francois v. County of Sonoma*, 415 Fed.Appx. 6, 9 (9th Cir. 2011), citing Wallis, 202 F.3d at 1136.

A social worker, or other government agent, acts under color of state law while acting or purporting to act in his or her official capacity, or while exercising his or her responsibilities pursuant to state law. *McDade v. West*, 223 F.3d 1135, 1139-40 (9th Cir. 2000). Consequently, Claimants are entitled to relief under 42 U.S.C. § 1983. Given the facts of this case, the following claims exist unlawful seizure of K.J., J.M.J, K.A.J., and J.A.J.; judicial deception in the presentation of evidence;[1] unlawful custom, policy, practice, or training at DCS, and gross negligence.

---

[1] There is no absolute or qualified immunity for making false statements to a court, including signing a petition under penalty of perjury. *Kalina v. Fletcher*, 522 U.S. 118, 130-31 (1997); *Beltran v. Santa Clara County*, 514 F.3d 906, 908 (9th Cir. 2008); *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003); *Hardwick v. County of Orange*, 844 F.3d 1112, 1118 (9th Cir. 2017) (no qualified immunity).



B. **Negligence Per Se**

Under Arizona law, "[a] person who violates a legislative enactment that establishes the standard of care or that has been adopted by a court as the relevant standard of care is negligent per se and the violation is conclusive as to negligence." *St. George v. Plimpton*, 241 Ariz. 163, 166, 384 P.3d 1243, 1246 (Ct. App. 2016). The Arizona legislature has enacted laws which establish the standard of care for DCS and its employees and agents.

Pursuant to A.R.S. § 8-456(C)(1), Arizona's legislature has sought to protect the rights of parents by requiring DCS to "make a prompt and thorough investigation" of any condition "that would tend to support or refute the allegation that the child is a victim of abuse or neglect." Here, the overwhelming evidence, in DCS's possession, was counter to Patchin and Del Fiacco's false narrative. This evidence included the medical records from J.M.J.'s hospitalization at PCH in September 2018, which found J.M.J. to be playful, happy, but mildly to moderately malnourished. He was also found to have Mongolian spots on his back. Patchin distorted these records to report to the Court and Bianca's service providers that at removal, J.M.J. was so severely malnourished he could barely sit up and his back was badly bruised. This misrepresentation was permanently baked into the record and formed the basis for the juvenile court's severance of Bianca's rights as to J.M.J. in May 2022. DCS was also in possession of countless records from various parent aids, such as Christine Martinez, who held a positive view of Jiaro and Bianca. In addition, DCS knew that Bianca's therapist, Dr. Hadley, also held a positive view of Bianca. Reports from Jiaro's service providers were also positive, and contrary to DCS's invisible father narrative. Nevertheless, Patchin and Del Fiacco maliciously and falsely provided reports to the court and testimony that alleged Bianca was an aggressive and dangerous mother, while Jiaro was inept to protect his children from her. Thus, DCS and its agents are liable for negligence per se for violation of A.R.S. § 8-456(C)(1).

Under A.R.S § 8-456(A), DCS "shall train all investigators in forensic interviewing and processes and the protocols … [and] [t]he training must include…[t]he duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure." Here, as above, DCS agents engaged in judicial deception to violate Claimant's constitutional rights. Thus, DCS and its agents are liable for negligence per se for violation of A.R.S. § 8-456(A).

Finally, under A.R.S. § 8-451, "the primary purpose of the department is to protect children." Under A.R.S. § 8-453, the director of the DCS has the duty to "[f]ormulate policies, plans and programs to effectuate the … purposes of the department." Here, upon information and belief, DCS agents acted in accordance with the Department's policies, plans and programs in place at the time, which were not protective of children. For example, DCS has no policies, plans, or programs in place to ensure its agents comply with A.R.S. § 8-456, as above. As a result, minor children L.J., K.J., J.M.J., K.A.J., and J.A.J. were not protected; instead, they were irreparably harmed. Consequently, Claimants have claims



against the directors of DCS, Mr. Faust and Mr. McKay for negligence per se for violation of A.R.S. §§ 8-451 and 8-453.

### C. Abuse of Process

The elements of an abuse-of-process claim are "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (App.1982). A party can demonstrate the latter element by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed." *Id*. In the context of this tort, Arizona interprets "process" as encompassing "the entire range of procedures incident to the litigation process." *Id*. at 352.

As noted above, Caseworker Patchin filed two fraudulent dependency petitions and two fraudulent severance petitions. Patchin filed these fraudulent petitions under the negligent supervision of Amanda Davidsson. Davidsson knew, or should have known, the overwhelming evidence in the record did not support Patchin's false allegations. Filing a petition that is supported only by falsehoods is an abuse of the judicial process. Furthermore, Patchin was motivated by a personal dislike of Bianca. Patchin's animus toward Bianca is evidenced in various emails, where she engaged in unbridled ad hominin attacks; for example, characterizing Bianca as a crude liar and insulting her lipstick. Caseworker Del Fiacco continued with Patchin's crusade when Patchin retired. Del Fiacco either knew or should have known that the record did not support Patchin's false allegations. Despite the overwhelming evidence that Bianca and Jiaro are fit parents, Patchin and Del Fiacco, under the supervision of Davidsson, continued to press charges. Furthermore, even after the juvenile court denied the severance as to K.J., K.A.J., and J.A.J. on 11 May 2022, DCS defied court orders to meet within 30 days initiate the reunification process. Instead, DCS failed to initiate any meaningful steps until five months after being ordered to do so. This family still is not reunified. Thus, DCS and its agents are liable for abuse of process.

### D. Intentional Infliction of Emotional Distress

"The tort of intentional infliction of emotional distress requires proof of three elements: First, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g. Co. v. Miller*, 210 Ariz. 513, 516, ¶ 11, 115 P.3d 107, 110 (2005) (emphasis in original). What can be more extreme and outrageous than the unwarranted removal of a child from their loving parent and wrongfully accusing the parent of neglect and abuse? What's worse, is that DCS repeated this offense four times.

Bianca was suffering from a very brief interval of home instability at the time J.M.J. and K.J. were removed. Patchin accused her of abusing and starving her son, because she falsely claimed



the Mongolian spots on his back were bruises, and because she exaggerated his mild to moderate malnutrition, which was due to an organic feeding issue, as severe malnutrition. Further, there were absolutely no signs of abuse or neglect of K.J., but DCS removed her anyway and immediately placed her in a foster care, where she has remained for the past four years. J.A.J. and K.A.J. were removed immediately at birth from both Bianca and Jiaro, on the outrageous false allegation that Bianca was aggressive and hated boys and that Jiaro could not protect his children. The grief any loving parent would suffer in such circumstances– not being able to hold their newborn children, read them bedtime stories, watch them take their first steps, or hug them – is palpable and immeasurable.

Bianca and Jiaro have endured many sleepless nights, broken spirits, confusion, depression, headaches, and more due to the reckless indifference, gross negligence, and malicious acts of Patchin and Del Fiacco. DCS's outrageous conduct of pursuing a finding of dependency for years, when it was clear to any rational, unbiased observer that Bianca and Jiaro are loving, caring parents, is unquestionably extreme and outrageous.

E. **The Facts Support an Award of Punitive Damages**

Under Arizona law, punitive damages may be awarded when an act reflects an "evil mind." *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986); *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986). There can hardly be a more compelling set of facts to put before a trial court and jury in a request for punitive damages than those present here. Despite the overwhelming evidence in the medical records, parent aid records, and therapy records that Bianca and Jiaro are capable parents, DCS continued to insist on its false narrative that both were unfit to parent their children. Furthermore, agents of the State provided false information and deliberately failed to include exculpatory information in its dependency petitions. Such conduct not only constitutes a fraud upon the court but is also evidence of an evil mind. Patchin's hostility toward Bianca was also documented by her own hand in the emails she wrote to service providers throughout the dependencies. It is clear from the facts of the case that the State actors were not acting within the scope of their duties and thus are not immune from punitive damages.

## SUM CERTAIN TO SETTLE CLAIMS

As a result of the State's actions and failures to act, Bianca, Jiaro, and L.J., and each of them individually have, suffered substantial injury. Losing the custody of your children, or for L.J., access to his siblings, two of whom were taken immediately at birth, cannot be measured in dollars, but dollars are the only measure which exist to compensate this family for such an incomprehensible loss – they can never get that time back. Bianca, Jiaro, and L.J. **are willing to settle the claims outlined in this Notice for the sum certain of $2,622,318.00** in order to avoid litigation. If this attempt to amicably resolve this matter does not actually resolve the matter for this sum certain, Claimants will seek many multiples of this sum certain in damages in court.



If the matter were to be litigated in court, in front of a jury, in addition to the horrendous facts discussed herein, Claimants would also present the following witnesses at trial of any of these claims. Dr. Katheryn Menendez, PhD, currently counsels Bianca. Dr. Menendez is well-known to DCS since she has worked closely with DCS for many years. She will testify that Bianca is not, and never was, the horrible person DCS has portrayed her to be. Similarly, Annette Ruskin, MSW, a former DCS caseworker and now a therapeutic interventionist working with this family, will testify to a strong, loving bond with this family and that she sees not even a hint of danger by Bianca as has been alleged by DCS. Finally, Dr. Carlos Vega, PhD, who has worked closely with DCS for over thirty years, will testify that what DCS did in this case was "egregious" and unparalleled, and that the State should never have seized the three youngest children.

This Notice of Claim contains a specific amount for which the claims can be settled outside of court and facts supporting this amount. Bianca, Jiaro, and L.J. are amenable to providing any other documentation reasonably requested by the State in a good faith effort to settle this matter for this sum certain outside of court.

If for any reason the State deems this Notice insufficient pursuant to A.R.S. § 12-821.01(A), please notify undersigned counsel within ten (10) calendar days of the receipt of this Notice with the specific allegations of insufficiency so that the Notice may be amended. If the State fails to address any issues of claimed insufficiency within ten (10) calendar days of the receipt of this Notice, the Claimants will construe such failure as a waiver of any such claim or objection.

Do not hesitate to contact me if you wish to discuss this matter further in a good faith effort to resolve the matter outside of a lawsuit.

Regards,

**MILLS + WOODS LAW, PLLC**

Thomas A. Connelly

DISCLAIMER: Due to the unreasonably short time period provided under A.R.S. § 12-821.01, the Notice is being served before Claimants' investigation could be completed, before disclosure and discovery occurs, and before being able to obtain all relevant documentation from the State of Arizona, Arizona Department of Child Safety, all dependency trial transcripts, and all relevant medical records. This Notice of Claim does not constitute evidence, nor is it admissible evidence in any subsequent lawsuit. Claimants will object to any part of this Notice being read to the jury without a prior Court order allowing it, and if ordered, also without reading this disclaimer.