**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bianca Jimenez-Bencebi, et al., | No. CV-23-02075-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

On June 10, 2024, the Court granted in part, and denied in part, a motion to dismiss filed by the State of Arizona (the "State") and various state entities and employees (together, "Defendants"). (Doc. 17.) The Court also authorized Plaintiffs to file an amended pleading in an attempt to cure some of the deficiencies identified in the dismissal order. (*Id.*) Plaintiffs took advantage of that opportunity and filed a new pleading, the Second Amended Complaint ("SAC"). (Doc. 21.) Defendants have, in turn, filed another motion to dismiss. (Doc. 25.) The motion is now fully briefed (Docs. 28, 32) and neither side requested oral argument. For the reasons that follow, the motion to dismiss is granted in part and denied in part.

## RELEVANT BACKGROUND

### I.    Overview

Bianca Jimenez-Bencebi ("Jimenez-Bencebi") is the mother of L.J., K.J., K.A.J, and J.A.J., as well as non-party J.M.J., and Jiaro Abrego Zavaleta ("Zavaleta") is the father of K.A.J. and J.A.J. Over time, the Arizona Department of Child Services ("DCS") removed

K.J., J.M.J., K.A.J., and J.A.J. from Jimenez-Bencebi's care.  However, a juvenile court later ruled in part against DCS in a severance proceeding, ordering reunification as to K.J., K.A.J, and J.A.J. (but not as to J.M.J.).

These developments provide the backdrop for this case, in which Jimenez-Bencebi, Zavaleta, L.J, K.J., K.A.J, and J.A.J. (together, "Plaintiffs") have asserted a sprawling array of federal and state-law claims against Defendants.

II.    The June 10, 2024 Order

In the 72-page June 10, 2024 order, the Court dismissed some of those claims and Defendants.  (Doc. 17.)  More specifically, the Court (1) dismissed the Arizona Department of Child Services ("DCS") as a defendant, because it is a non-jural entity incapable of being sued (*id.* at 15-16); (2) dismissed all 42 U.S.C. § 1983 claims asserted against Faust and McKay in their official capacities, because such an official-capacity defendant is not a "person" under § 1983 (*id.* at 16-17); (3) dismissed Jimenez-Bencebi's and Zavaleta's claims in Counts One, Three, Four, and Five, because those claims are barred by the statute of limitations (*id.* at 29, 32-36); (4) dismissed Jimenez-Bencebi's and Zavaleta's claims in Count Two as to Patchin, because those claims are barred by the statute of limitations (*id.* at 29-36); (5) partially dismissed Jimenez-Bencebi's and Zavaleta's claims in Count Two as to Davisson, because those claims are partially barred by the statute of limitations (*id.* at 29-36); (6) dismissed Count One as to Davisson, for failure to state a claim (*id.* at 38-39); (7) dismissed Count Two as to Davisson, for failure to state a claim (*id.* at 39-40); (8) dismissed Count Three as to Davisson, for failure to state a claim (*id.* at 40-41); (9) dismissed Counts Four and Five as to Davisson, Faust, and McKay, for failure to state a claim (*id.* at 42); (10) dismissed Count Three, because it is a § 1983 claim premised on state-law violations (*id.* at 44-45); (11) dismissed Count Four as to Patchin and Del Fiacco, for failure to state a claim (*id.* at 45-46); (12) dismissed Count Five as to Patchin and Del Fiacco, for failure to state a claim (*id.* at 46-47); (13) dismissed Count One as to Patchin and Del Fiacco, based on the doctrine of qualified immunity (*id.* at 51-57); (14) dismissed Count Two as to Del Fiacco, based on the doctrine of qualified immunity (*id.* at 61-63);

1    (15) dismissed Jimenez-Bencebi's and Zavaleta's claims in Counts Six, Nine, and Twelve,

2    because those claims are barred by the statute of limitations (*id.* at 65); (16) partially

3    dismissed Jimenez-Bencebi's and Zavaleta's claims in Counts Seven, Nine, and Thirteen,

4    because those claims are partially barred by the statute of limitations (*id.* at 65-67); and

5    (17) partially dismissed Jimenez-Bencebi's and Zavaleta's claims in Count Eight, because

6    those claims are partially barred by the statute of limitations (*id.* at 67).[1]

7    III.    **The SAC**

8           In the SAC, filed on July 19, 2024, Plaintiffs add an array of new allegations

9    intended to cure some of the deficiencies identified in the dismissal order.  (Doc. 20-1

10   [redlined version]; Doc. 21 [clean version].)

11                                   **DISCUSSION**

12          Defendants advance the following six arguments in their motion to dismiss: "(1)

13   L.J. lacks standing, (2) Eleventh Amendment immunity, (3) absolute immunity for

14   testimony, (4) qualified immunity, and (5) failure to state a claim, and (6) failure to serve

15   a Notice of Claim ('NOC')."  (Doc. 25 at 2.)  Each argument is addressed below.

16   _____

17   [1]    The Court did not accept all of Defendants' dismissal arguments.  More specifically, the Court (1) declined to dismiss L.J. as a Plaintiff, because Defendants' dismissal arguments as to L.J. were insufficiently developed (*id.* at 12-15); (2) declined to dismiss the State as a Defendant in Count Thirteen, because Defendants' Eleventh Amendment argument was untimely raised (*id.* at 18-19); (3) declined to dismiss any claims or Defendants based on the doctrines of issue preclusion or claim preclusion (*id.* at 20-23, 24-26); (4) declined to dismiss the § 1983 claims asserted by L.J., K.J., K.A.J., and J.A.J. on untimeliness grounds, because those Plaintiffs are entitled to tolling as minors (*id.* at 28-29); (5) declined to dismiss Jimenez-Bencebi's and Zavaleta's claims in Count Two as to Del Fiacco on untimeliness grounds (*id.* at 31-32); (6) declined to fully dismiss Jimenez-Bencebi's and Zavaleta's claims in Count Two as to Davisson, because those claims are only partially barred by the statute of limitations (*id.* at 29-32); (7) declined to dismiss Count Two as to Patchin based on qualified immunity (*id.* at 57-61); (8) declined to dismiss the state-law claims asserted by L.J., K.J., K.A.J., and J.A.J. on untimeliness grounds (*id.* at 65); (9) declined to fully dismiss Jimenez-Bencebi's and Zavaleta's claims in Counts Seven, Nine, and Thirteen, because those claims are only partially barred by the statute of limitations (*id.* at 65-67); (10) declined to fully dismiss Jimenez-Bencebi's and Zavaleta's claims in Count Eight, because those claims are only partially barred by the statute of limitations (*id.* at 67); (11) declined to dismiss L.J.'s claims for non-compliance with the notice-of-claim statute (*id.* at 69); (12) declined to dismiss K.J.'s, K.A.J.'s, and J.A.J's claims for non-compliance with the notice-of-claim statute (*id.* at 69-70); (13) declined to dismiss Jimenez-Bencebi's and Zavaleta's claims in Counts Seven, Nine, and Thirteen for non-compliance with the notice-of-claim statute (*id.*); and (14) declined to dismiss Jimenez-Bencebi's and Zavaleta's claims in Count Eight for non-compliance with the notice-of-claim statute (*id.*).

18

19

20

21

22

23

24

25

26

27

28

I.      L.J.'s Standing

In the SAC, L.J. is named as a Plaintiff in Counts One, Two, Three, Six, Seven, Eight, Nine, Ten, Twelve, and Thirteen.  (Doc. 21 ¶¶ 151, 166, 177, 202, 206, 216, 230, 239, 248, 256, 267, 281.)

A.      **The Parties' Arguments**

Defendants move to dismiss all of L.J.'s claims under Rule 12(b)(6) for lack of standing.  (Doc. 25 at 2.)  Defendants clarify that they are not arguing that L.J. lacks Article III standing—rather, they contend he is not a proper plaintiff as to any of the claims he is asserting.  (*Id.*)  Defendants also offer a claim-by-claim discussion of why each of L.J.'s claims should be dismissed.  (*Id.* at 2-8.)

In response, Plaintiffs argue in somewhat conclusory fashion that Defendants are "clearly wrong."  (Doc. 28 at 3-4.)  In support, Plaintiffs cite cases discussing the First and Fourteenth Amendments.  (*Id.* at 3.)  Plaintiffs also contend that, under Arizona law, "State Defendants also had statutory and constitutional obligations to promptly achieve family reunification following a removal."  (*Id.* at 4.)

In reply, Defendants contend that "Plaintiffs' imprecise arguments provide no additional legal theories allowing this Court to confer standing on L.J. and dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate."  (Doc. 32 at 2.)  Defendants further contend that Plaintiffs' "focus on the parents' fundamental liberty interest in the companionship of his or her child" is misplaced because "this Court already dismissed Jimenez's and Zavaleta's claims as time-barred."  (*Id.*)  Next, Defendants argue that although "L.J.'s standing is premised on legal duties owed by state actors to make reasonable efforts to preserve the family after removal," "L.J. was never removed so the various cases cited by Plaintiffs are inapplicable and should be disregarded."  (*Id.*)  Next, Defendants accuse Plaintiffs of engaging in "a backdoor attempt to assert rights on behalf of Jimenez, not on behalf of L.J." and emphasize that "[n]either the State Defendants, nor the state court at the urging of State Defendants, took any steps against L.J."  (*Id.*)  Finally, Defendants argue that because Plaintiffs "did not address the remaining arguments

addressing L.J. as a potential Plaintiff—counts 2, 3, 6, 7, 8, 9, 10, 12, and 13," Plaintiffs should be deemed to "have waived those arguments." (*Id.* at 3.)

## B.    Analysis

The Court agrees with Defendants that all of L.J.'s claims are subject to dismissal.

L.J.'s first claim, in Count One, is a claim that Patchin, Del Fiacco, and Davisson "unlawfully seiz[ed] and detain[ed] K.J., J.M.J., K.A.J., and J.A.J." in violation of L.J.'s "Right to Freedom of Association under the First Amendment" and L.J.'s right to "Due Process under the Fourteenth and Fourth Amendments." (Doc. 21 at 25.) But under Ninth Circuit law, a sibling like L.J. does not appear to have a cognizable First or Fourteenth Amendment right to familial association with another sibling. *See, e.g., JP by and through Villanueva v. County of Alameda*, 803 F. App'x 106, 109 (9th Cir. 2020) ("No viable loss-of-familial-association claim exists for siblings under the First Amendment. A familial relationship grounds the loss of familial association claims under the First and Fourteenth Amendments. Thus far, that familial relationship has been limited to that between a parent and child. . . . [W]e [have] explicitly ruled that siblings do not possess a cognizable liberty interest to assert a loss of familial association claim under the Fourteenth Amendment. No basis exists to disregard this precedent simply because the claim is raised under the First Amendment rather than the Fourteenth Amendment.") (citations omitted); *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1991) (affirming the dismissal of § 1983 claims asserted by the "decedent's siblings," holding that the siblings did not "possess a cognizable liberty interest in their brother's companionship," declining to follow a contrary Tenth Circuit decision that "recognized a liberty interest in both parents and siblings," and emphasizing that "[n]either the legislative history nor Supreme Court precedent supports an interest for siblings consonant with that recognized for parents and children"). *See also Wright v. S. Ariz. Children's Advocacy Ctr.*, 2022 WL 4591827, *4 (D. Ariz. 2022) ("Binding precedent precludes Plaintiffs' argument that LAW's siblings have standing to assert familial association claims."); *Southern v. City of Sacramento*, 2022 WL 17822554, *2 (E.D. Cal. 2022) ("Defendants argue that because Plaintiff is Decedent's brother, he

does not have any association rights under the First or Fourteenth Amendments.  They are correct."); *Monterrosa v. City of Vallejo*, 2021 WL 516736, *11 (E.D. Cal. 2021) ("Defendants correctly argue the Ninth Circuit has held that siblings do not retain constitutionally protected rights to a familial relationship with each other. . . .  As Michelle and Ashley are adult siblings attempting to plead a § 1983 claim for violations of their right to familial association under the Fourteenth Amendment, their claim is foreclosed by the Ninth Circuit's holding in *Ward*.") (cleaned up).

The Court acknowledges that a recent unpublished decision by the Ninth Circuit, *Mann v. City of Sacramento*, 2022 WL 2128906 (9th Cir. 2022), suggests that a sibling may be able to assert a First Amendment-based familial association claim under § 1983 in at least some circumstances.  However, *Mann* ultimately rejected such a claim asserted by a "non-cohabiting sibling[]."  *Id.* at *1.  *See also id.* ("Neither plaintiffs nor the district court point to any authority that has applied the *Rotary Club* factors and held that non-cohabiting siblings have a First Amendment right to familial association.").  Here, the SAC alleges that L.J. "was living with his natural father in Puerto Rico when DCS began its wrongful interference with this family" and "remained living with his father in Puerto Rico" afterward.  (Doc. 21 ¶ 23.)  Thus, even under *Mann*, L.J.'s claim in Count One fails.

Turning to L.J.'s remaining claims, the Court notes as an initial matter that Plaintiffs make no effort to respond to Defendants' claim-by-claim analysis.  Instead, Plaintiffs merely cite a handful of cases that generally address the right of familial association, apparently with the hope that the Court will take it upon itself to identify the elements of each of L.J's claims and analyze how those elements intersect with Plaintiffs' cited cases.  On this record, the Court agrees with Defendants that Plaintiffs have forfeited any defense of the remaining claims.

The Court also agrees with Defendants that, on the merits, L.J. lacks standing to assert all of his remaining claims.  Beginning with L.J.'s federal claims, Count Two is a § 1983 claim against Patchin, Del Fiacco, and Davisson for making false statements during L.J.'s siblings' judicial proceedings.  (Doc. 21 ¶¶ 153-66.)  The only possible way such

conduct could have harmed L.J. is by interfering with L.J.'s familial-association rights, but as discussed in relation to Count One, L.J. does not have a cognizable constitutional right to familial association in this context.  For the same reasons, L.J.'s claim in Count Three, which is a § 1983 claim that Patchin, Del Fiacco, and Davisson interfered with L.J.'s Fourth and Fourteenth Amendment-based right to a preserved family relationship (Doc. 21 ¶¶ 167-79), necessarily fails.

L.J.'s claims in Counts Six, Eight, Nine, Ten, and Thirteen are all variants of state-law negligence claims.  As Defendants correctly note, one of the elements of such a claim is that the defendant owed a duty of care to the plaintiff.  (Doc. 25 at 6.)  The Court cannot see how such a duty could possibly exist here, where L.J. did not even reside in Arizona during the operative timeframe and had no contact with any Defendant.  *Cf. Lorenz v. State*, 364 P.3d 475, 478 (Ariz. Ct. App. 2015) ("Because Grandparents failed to establish the existence of a legal duty owed to them by DCS, the superior court properly dismissed their negligence claims.").  None of Plaintiffs' cited cases recognizes a duty of care in this scenario.

As for Count Seven, which is a claim for abuse of process, the Court agrees with Defendants that L.J. cannot assert such a claim where he "was never part of the judicial process" and "no dependency or severance petitions were filed regarding him."  (Doc. 25 at 8.)  Once again, Plaintiffs cite no case holding otherwise.  Finally, as for Count Twelve, which is a claim for intentional infliction of emotional distress, the Court agrees with Defendants that "L.J. cannot meet the elements of this claim because there was no underlying 'conduct' that could be characterized as extreme and outrageous or that any State Defendant intended to cause L.J. emotional distress."  (*Id.*)  None of Plaintiffs' cited cases holds otherwise.

II.    Eleventh Amendment Immunity

Count Six of the SAC is a claim for negligence *per se*.  (Doc. 21 ¶¶ 195-217.)  Two of the Defendants named in Count Six are Faust and McKay.  (*Id.* ¶¶ 198-203.)  Count Thirteen of the SAC is a claim for negligent supervision, training, and retention.  (*Id.*

¶¶ 269-82.)  Three of the Defendants named in Count Thirteen are the State, Faust, and McKay.  (*Id.* ¶ 270.)  Although the previous iteration of the complaint alleged that Faust and McKay were being sued in both their official and individual capacities, the SAC clarifies that they are only being sued in their individual capacities.  (Doc. 20-1 at 5; Doc. 21 ¶¶ 17-18.)

### A.    **The Parties' Arguments**

Defendants "urge dismissal of Count Thirteen against the three State Defendants—the State, Faust, and McKay—under principles of Eleventh Amendment immunity."  (Doc. 25 at 8.)  Defendants also contend that the State, Faust, and McKay did not "waive[] their Eleventh Amendment immunity by removing [this] action from state court to federal court."  (*Id.* at 8-9.)  According to Defendants, this is because "[s]tates, their agencies, and their officials in their official capacities are immune from damage suits under state or federal law by private parties in federal court unless there is a valid abrogation of that immunity or an unequivocal express waiver by the state."  (*Id.* at 9, citation omitted.)

In response, Plaintiffs argue that "State Defendants['] removal of this action from the state Superior Court to the federal District Court constitutes a waiver of any alleged Eleventh Amendment immunity from suit."  (Doc. 28 at 5.)  Plaintiffs add: "State Defendants are attempting to gain an unfair litigation advantage by removing this matter from the state court and then seeking dismissal on Eleventh Amendment immunity grounds for all state law claims.  The tactic is contrary to state and federal law, including as articulated by the Supreme Court, and cannot be countenanced."  (*Id.* at 5-6.)

In reply, Defendants argue that "[t]he act of removing this matter to federal court is not clearly dispositive on application of Eleventh Amendment immunity to the state law claims" and that "if the State's sovereign immunity has not been waived or abrogated in state court, then Eleventh Amendment immunity is not necessarily precluded in the federal matter."  (Doc. 32 at 3-4.)

### B.    **Analysis**

Defendants' Eleventh Amendment-based dismissal request lacks merit.  As an

initial matter, Defendants overlook that Faust and McKay are no longer being sued in their official capacities—as clarified in the SAC, Faust and McKay are now only being sued in their individual capacities.  (Doc. 20-1 at 5; Doc. 21 ¶¶ 17-18.)  It follows that Plaintiffs' claims against Faust and McKay are not barred by the Eleventh Amendment.  *Pena v. Gardner*, 976 F.2d 469, 474 (9th Cir. 1992) ("[T]he eleventh amendment will not bar pendent state claims by Pena against state officials acting in their individual capacities."); *Eaglesmith v. Ward*, 573 F.3d 857, 859 (9th Cir. 1995) ("The threshold question in this case is whether Eaglesmith brought this suit against Ward in his individual or official capacity.  Ward is entitled to Eleventh Amendment immunity only if the suit was brought against him in his official capacity.").  It may be that Plaintiffs' individual-capacity claims against Faust and McKay will ultimately fail for other reasons, but the Court limits its analysis here to the narrow Eleventh Amendment argument raised by Defendants.  *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020).

This leaves Plaintiffs' claim against the State in Count Thirteen.  Although "[t]he Eleventh Amendment grants a State immunity from suit in federal court by citizens of other states and by its own citizens as well, . . . [a] State's decision voluntarily to invoke the jurisdiction of a federal court by removing an action from state court to federal court can waive Eleventh Amendment immunity." *Walden v. Nevada*, 945 F.3d 1088, 1092 (9th Cir. 2019) (citations omitted).  However, "this general 'voluntary invocation' principle does not apply in all circumstances.  Many states statutorily waive their immunity from suit on state-law claims in state court.  The Supreme Court has held that, when a State that has enacted one of these statutes voluntarily removes a suit on state-law claims from state court to federal court, that State waives its Eleventh Amendment immunity from suit." *Id.* (citations omitted).  In contrast, "courts are divided on whether . . . a State defendant's removal to federal court waives its Eleventh Amendment immunity if the State has not waived its immunity to suit in state court." *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1019 (9th Cir. 2016).  *See also id.* at 1019 n. 11 ("Although, in *Embury* [*v. King*, 361 F.3d 562, 566 (9th Cir. 2004)], we characterized *Lapides* broadly as setting forth

a straightforward, easy-to-administer rule that removal waives Eleventh Amendment immunity, we did not explicitly consider whether it applied when a State defendant retained its immunity from suit in state court, as it appears the State defendants there had not done. We have since observed that the question whether *Lapides*'s rule applies when a State defendant has not consented to suit in its own courts remains unresolved in this circuit.") (cleaned up); *Kendrick v. Conduent State & Local Solutions, Inc.*, 910 F.3d 1255, 1260 (9th Cir. 2018) ("[T]he Supreme Court's holding in *Lapides*[] was limited. A state waives Eleventh Amendment immunity by removal only for state-law claims 'in respect to which the State has explicitly waived immunity from state-court proceedings.' Here, the record does not reflect that Conduent waived immunity in state court. Accordingly, *Lapides* is not dispositive.") (citation omitted).

The parties disagree over whether the State has waived its immunity from suit in state court with respect to Count Thirteen (which, again, is a claim for negligent supervision, training, and retention). Defendants emphasize that, under Arizona law, "a public official performing a discretionary act encompassed within her public duties is shielded from liability for simple negligence" under the doctrine of "[c]ommon law qualified immunity." *Spooner v. City of Phoenix*, 435 P.3d 462, 466-67 (Ariz. Ct. App. 2018). Meanwhile, Plaintiffs emphasize that "[g]overnment liability is the rule in Arizona and immunity is the exception." *Doe ex rel. Doe v. State*, 24 P.3d 1269, 1271 (Ariz. 2001).

The Court concludes that Plaintiffs have the better side of this complicated issue. As background, the Arizona Supreme Court "abolished the doctrine of sovereign immunity for tort liability in 1963, concluding that the government and its employees should generally be responsible for injuries they negligently cause. . . . The legislature responded in 1984 by enacting the Actions Against Public Entities or Public Employees Act (the 'Act'), which specifies circumstances in which governmental entities and public employees are immune from tort liability. The Act leaves intact the common-law rule that the government is liable for its tortious conduct unless immunity applies." *Glazer v. State*, 347 P.3d 1141, 1144 (Ariz. 2015). *See also Fleming v. State Dept. of Public Safety*, 352

P.3d 446, 448 (Ariz. 2015) ("Since this Court abolished sovereign immunity in 1963, public entities . . . generally have been liable for injuries they negligently cause."). Notably, the Arizona Supreme Court has indicated, in a decision issued following the enactment of the Actions Against Public Entities or Public Employees Act, that a plaintiff may bring an action for negligent supervision against the State. *Pritchard v. State*, 788 P.2d 1178, 1179 (Ariz. 1990) (reversing the trial court's dismissal of "an action against the state alleging that the state was liable to him by reason of negligent supervision of the burglar, who was on parole"). Meanwhile, although *Spooner* holds that a public official may be entitled to common-law qualified immunity if sued for the negligent performance of a discretionary official act, *Spooner* also recognizes that such immunity is unavailable if the public official "knew or should have known that she was acting in violation of established law or acted in reckless disregard of whether her activities would deprive another person of their rights." *Spooner*, 435 P.3d at 467 (citation omitted).

These authorities indicate that the State has not categorically immunized itself from any state-court lawsuit involving a claim of negligent supervision. To the contrary, Arizona has "abolished the doctrine of sovereign immunity for tort liability" and follows the rule "that the government and its employees should generally be responsible for injuries they negligently cause." *Glazer*, 347 P.3d at 1144. True, the State may attempt to avoid liability in a negligence-based lawsuit in state court by invoking the doctrine of common law qualified immunity, but applicability of that doctrine turns on the particular facts of the case. *Spooner*, 435 P.3d at 467. It follows, in the Court's view, that the State cannot invoke the Eleventh Amendment as the basis for seeking dismissal of Count Thirteen. Because the State has consented, at least on a limited basis, to being sued in state court on a negligent supervision theory, that limited consent applies with equal force here now that the State has chosen to remove this action to federal court. The State remains free to defend itself against Count Thirteen by invoking the doctrine of qualified immunity, but it may not rely on the Eleventh Amendment as its basis for seeking dismissal. *Walden*, 945 F.3d at 1092 (when a state has "waive[d] [its] immunity from suit on state-law claims in state

court" and then "voluntarily removes a suit on state-law claims from state court to federal court, that State waives its Eleventh Amendment immunity from suit").[2]

III.    <u>Absolute Immunity For Testimony</u>

    A.    **The Parties' Arguments**

Defendants argue that "[b]oth private individuals and government officials who serve as witnesses have absolute immunity from civil damages under § 1983 with respect to their testimony" and that "this immunity applies even where the witness commits perjury." (Doc. 25 at 10.)  Defendants also contend that some of the factual allegations underlying Counts One, Two, Six, and Seven refer to alleged false testimony by Patchin and Del Fiacco. (*Id.* at 11, citing Doc. 21 ¶¶ 140, 159-61, 215, 225.)  Defendants conclude: "The controlling law is clear that State Defendants Patchin, Del Fiacco, and Davisson are granted absolute immunity for any testimony in the juvenile court proceedings so those claims should be stricken from the SAC." (*Id.*)

In response, Plaintiffs contend that, in *Rieman v. Vazquez*, 96 F.4th 1085 (9th Cir. 2024), the Ninth Circuit "rejected absolute immunity for child protective service workers or social workers who fabricate evidence." (Doc. 28 at 6.)  Plaintiffs conclude: "Like the defendants in *Rieman*, State Defendants here are not entitled to absolute immunity for providing false information or false testimony to the juvenile court." (*Id.* at 7.)

In reply, Defendants argue that "Plaintiffs conflate the 'act of testifying' with the 'act of fabricating evidence' to support the idea that State Defendants do not enjoy absolute immunity.  This misstates the law.  The cases cited by Plaintiffs focus on the provision of false information in documentation provided to the court.  State Defendants never asserted the defense of absolute immunity connected to alleged false information provided to the court (count two); instead their argument is application of immunity when government officials serve as witnesses." (Doc. 32 at 5.)

    B.    **Analysis**

Defendants are not entitled to relief, at least at this juncture of the case, based on

---

[2]    This conclusion makes it unnecessary to delve into the complicated issue of how to apply *Lapides* when a state defendant has not consented to suit in its own courts.

their "absolute immunity for testimony" argument.  In Counts One, Two, Six, and Seven, Plaintiffs challenge a wide array of conduct by Patchin, Del Fiacco, and others.  Those counts do not turn solely on Patchin's and Del Fiacco's alleged false testimony during juvenile-court proceedings.  Thus, even assuming Defendants are correct that Patchin and Del Fiacco are entitled to absolute immunity with respect to any allegations premised on such testimony, it doesn't follow that Counts One, Two, Six, or Seven are subject to dismissal.  Defendants seem to acknowledge this point, as their only request for relief in relation to their "absolute immunity for testimony" argument is that any testimony-related allegations "be stricken from the SAC."  (Doc. 25 at 11.)  This is not a proper request for relief in a Rule 12(b)(6) motion to dismiss.  *Cf. Cooper v. Scripps Media, Inc.*, 2018 WL 8131235, *3-4 (W.D. Mo. 2018) ("Defendant contends that Paragraph 43 of the Second Amended Complaint should be dismissed or struck . . . because it is vague, 'runs counter to the intentional discrimination standards at issue in this case . . . and once again conflates and confuses the legal standards at issue.'  However, paragraph 43 is not a claim that can be evaluated under Rule 12(b)(6), and there is no basis for striking the paragraph under Rule 12(f).  Defendant's objection seems to be evidentiary in nature, and the Rules of Evidence do not apply to allegations in a complaint."); *Pinson v. Prieto*, 2011 WL 6370465, *4 (C.D. Cal. 2011) ("Defendants are not seeking to dismiss this entire claim, but rather only a single allegation regarding an assault prior to April 9, 2008. . . .  There may come a later procedural point in this case at which it may be appropriate for defendants to again seek to strike certain allegations from the FAC.  But at this point, defendants have failed to meet their burden to . . . warrant granting their motion for partial dismissal.").

IV.    <u>Qualified Immunity</u>

    A.    **Legal Standard**

        The legal standard governing a claim of qualified immunity is set forth in the June 10, 2024 order.  (Doc. 17 at 48-51.)

    …

    …

### B. **Count One**

#### 1. The June 10, 2024 Order

In Count One of the FAC, Plaintiffs asserted a § 1983 claim against Patchin, Del Fiacco, and Davisson "for violating Plaintiffs' Right to Freedom of Association under the First Amendment and Due Process under the Fourteenth and Fourth Amendments to the U.S. Constitution for unlawfully seizing and detaining K.J., J.M.J., J.A.J. and K.A.J." (Doc. 1-3 at 151.)

In the June 10, 2024 order, the Court concluded that Plaintiffs failed to state a claim against Davisson in Count One because the FAC contained only "unsupported and conclusory allegations" regarding her role as a supervisor and thus failed to "plausibly allege that Davisson personally participated in the deprivation of Plaintiffs' First, Fourth, and Fourteenth Amendment rights, set in motion the acts that led to the deprivation, or was aware of the deprivation and failed to act." (Doc. 17 at 38-39.) In a separate portion of the order, the Court concluded that Patchin and Del Fiacco were entitled to qualified immunity with respect to Count One. (*Id.* at 51-57.)

#### 2. The Parties' Arguments

Defendants argue that "Count One should be dismissed in its entirety as to Patchin and for all acts except post-May 11, 2022, for Del Fiacco and Davisson on the basis of qualified immunity." (Doc. 25 at 11-12.)

Plaintiffs do not differentiate between Counts One and Two in their responsive argument on qualified immunity. (Doc. 28 at 7-10.) Instead, Plaintiffs generally argue that qualified immunity should be denied because (1) "without a reasonable investigation, DCS and its agents removed K.J. and J.M.J. with a Temporary Custody Notice ('TCN') in the absence of a court order or exigent circumstances"; (2) "without a reasonable investigation, contrary to reports received from others, . . . Patchin, Del Fiacco, and Davisson moved to sever the parents' parental rights to the minor Plaintiffs based on State Defendants' false narrative"; and (3) the new factual allegations in the SAC establish that Davisson "[n]ot only . . . set in motion the false narrative about this family, but . . . also knowingly refused

1    to terminate the subsequent series of DCS actions, which she knew were false or not
2    justified, and which she knew or should have known would cause . . . Patchin and Del
3    Fiacco to inflict a constitutional injury on this family to the determent of the minor
4    Plaintiffs." (*Id.*)

5        In reply, Defendants argue that Davisson is entitled to qualified immunity as to
6    Count One because the allegations regarding her role in issuing the TCNs are unsupported
7    and conclusory. (Doc. 32 at 6.) As for Patchin and Del Fiacco, Defendants contend that
8    "[t]his case is identical to" *Fidler v. State of Arizona*, 2024 WL 1553703 (9th Cir. 2024),
9    in which "the Ninth Circuit found the DCS investigation to be reasonable by relying on the
10   state court's issuance of the temporary order." (*Id.* at 6-7.) Defendants continue: "The
11   seizure of all four children was affirmed by the state court, thereby, providing the same
12   determination of reasonableness as seen in the *Fidler* matter. . . . Because of these findings
13   in state court, Minor Plaintiffs cannot now establish that State Defendants' conduct during
14   the investigation was not ultimately reasonable." (*Id.* at 8.)

15                  3.    Analysis

16       As discussed in the June 10, 2024 order, Count One is best construed as challenging
17   both (1) the removal of the children from Jimenez-Bencebi; and (2) the subsequent failure
18   to reunite the children with Jimenez-Bencebi.

19                  a.    **Removal**

20       The June 10, 2024 order explained that the FAC was insufficient to overcome
21   Defendants' invocation of qualified immunity because it did "not allege that the removal
22   of any of the children occurred without a court order" and the applicable liability standard
23   under *Keates v. Koile*, 883 F. 3d 1228 (9th Cir. 2018), turns in part on whether a challenged
24   removal occurred without a court order. (Doc. 17 at 54.)

25       In an effort to remedy this deficiency, the SAC alleges that the first act of removal
26   on September 14, 2018 (K.J. and J.M.J.) was accomplished without any "warrant, court
27   authorized removal order, or any other court order" and was instead accomplished pursuant
28   to a TCN. (Doc. 21 ¶¶ 39(a), 57.) As for the second act of removal on March 7, 2019

(K.A.J.), the SAC alleges it was accomplished "via a [TCN]" and was carried out by DCS agents who were acting "at the direction and orchestraction [sic] of Patchin and Davisson." (*Id.* ¶ 39(f).)  As for the third act of removal on February 13, 2020 (J.A.J.), the SAC alleges it was accomplished when "Patchin served the parents with a post-hoc TCN."  (*Id.* ¶ 39(m).)

These new allegations require reevaluation of the earlier qualified-immunity analysis.  In *Keates*, the Ninth Circuit explained that "our case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue." *Keates*, 883 F.3d at 1237-38.  *See also Fidler*, 2024 WL 1553703 at *2 ("The right to familial association is violated when a defendant removes a child from his parents' custody without their consent or a court order and absent reasonable cause to believe that the seizure is necessary to avert imminent, serious bodily harm.").  Although the FAC did not allege that the first part of this test (*i.e.*, the challenged removals occurred "without a court order") was satisfied, the SAC now alleges that each challenged removal occurred without a court order—as in *Keates*, the SAC alleges that each removal was premised on a TCN.  *Keates,* 883 F.3d at 1242 ("The TCN was central to the alleged constitutional violation, as it was the basis for Koile's seizure and removal of A.K. . . . .").

Notwithstanding all of this, Defendants argue that "[t]his Court can infer from the" presence of ongoing dependency proceedings between 2018 and 2023 "that court orders were entered for each child continuing the child in DCS custody until May 25, 2023." (Doc. 32 at 8 n.3.)  This argument is unavailing.  The SAC's only allegations regarding judicial orders are that (1) in January 2020, the juvenile court issued an order severing Jimenez-Bencebi's parental rights as to K.J. and J.M.J.; and (2) in May 2022, the juvenile

court issued an order upholding the severance of Jimenez-Bencebi's parental rights as to J.M.J. but reversing the severance as to K.J. and denying severance as to K.A.J. and J.A.J. (Doc. 21 ¶¶ 39(j), 39(q).)  The SAC does not allege that any additional judicial orders were issued and the Court does not possess enough independent familiarity with the state-court dependency process to presume they were issued.  The Court also notes that, if such additional orders existed, Defendants could have attached them to their motion and asked that they be considered pursuant to the judicial-notice doctrine, but Defendants did not do so.  Thus, on this record and at this stage of the case, the Court must accept the SAC's allegation that the removal of K.J. and J.M.J. in September 2018 occurred without a court order (the only court orders regarding their status were issued in 2020 and 2022) and that no court ever approved the removal of K.A.J. in March 2019 or the removal of J.A.J. in February 2020.

The remaining part of the *Keates* liability standard is that the "information at the time of the seizure" did not "establish[] reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue."  *Keates,* 883 F.3d at 1237-38.  Defendants argue that reasonable cause necessarily existed for each seizure here because "[t]he seizure of all four children was affirmed by the state court, thereby, providing the same determination of reasonableness . . . ."  (Doc. 32 at 8.  *See also id.* at 6 ["[R]easonableness is confirmed by the state court's act in approving the three removals."].)  This argument is easily rejected as to K.A.J. and J.A.J.—as discussed, the Court must accept at this stage of the case that no court ever affirmed or approved those removals.

The analysis is more complicated as to K.J. and J.M.J. because, as the SAC acknowledges, the juvenile court issued an order in January 2020 severing Jimenez-Bencebi's parental rights as to them.  Defendants ask the Court to view this order as conclusive proof that the earlier removal of K.J. and J.M.J. from Jimenez-Bencebi's custody in September 2018 was reasonable (and, thus, not actionable under *Keates*).  An

1    initial problem with this approach is that the juvenile court later reversed the severance

2    decision as to K.J.  Defendants do not explain why this chronology establishes that the

3    initial decision to remove K.J. without a court order was necessarily supported by

4    reasonable cause to believe K.J. was in imminent danger of serious bodily injury.

5      That leaves J.M.J.  Although the January 2020 severance order as to J.M.J. was later

6    affirmed in May 2022, Defendants overlook that, under *Keates*, the propriety of the

7    September 2018 removal must be assessed based on the information that was available at

8    that time.  *Keates*, 833 F.3d at 1237-38 (authorizing liability for removals without a court

9    order "unless *information at the time of the seizure*, after reasonable investigation,

10   establishes reasonable cause to believe that the child is in imminent danger of serious

11   bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary

12   to avert the specific injury at issue") (emphasis added).  See also Wallis v. Spencer, 202

13   F.3d 1126, 1138 (9th Cir. 2000) ("Officials may remove a child from the custody of its

14   parent without prior judicial authorization only if the information they possess at the time

15   of the seizure is such as provides reasonable cause to believe that the child is in imminent

16   danger of serious bodily injury and that the scope of the intrusion is reasonably necessary

17   to avert that specific injury.").  On this record, the Court cannot determine whether the

18   January 2020 and May 2022 severance decisions relating to J.M.J. were based on new

19   information that came to light following the September 2018 removal of J.M.J.  Thus, those

20   orders do not necessarily establish that the September 2018 decision to remove J.M.J.

21   without a court order was supported by reasonable cause to believe J.M.J. was in imminent

22   danger of serious bodily injury.[3]

23     For these reasons, it may be possible for Plaintiffs to state a valid familial

24   association claim under *Keates* based on the removals of K.J., J.M.J., K.A.J., and J.A.J.

---

[3]    These details also distinguish this case from *Fidler,* which held that "Burns was not on notice that her conduct was constitutionally deficient" because "the state court accepted Burns' investigation as sufficient to issue a temporary dependency order."  2024 WL 1553703 at *2.  Here, there is no allegation or evidence that a state court ever issued a temporary dependency order—instead, there is merely an allegation that a state court issued a severance order as to two of the four children at issue more than a year after their removals and subsequently reversed that order as to one of the children.

The next question is whether Plaintiffs have stated such a claim, sufficient to survive Defendants' invocation of qualified immunity, as to the three specific Defendants named in Count One—Patchin, Del Fiacco, and Davisson.  Beginning with Patchin, the relevant allegations are that she directed and orchestrated the removal (via a TCN) of K.A.J. in March 2019, personally served the TCN related to J.A.J.'s removal in February 2020, and "served as the DCS caseworker [related to Plaintiffs] at all times relevant between October 2018 to March 2021."  (Doc. 21 ¶¶ 39(f), 39(m), 44.)  These allegations are sufficient to overcome Patchin's claim of qualified immunity as to the removal of K.A.J. in March 2019 and the removal of J.A.J. in February 2020.  They are insufficient, however, to overcome Patchin's claim of qualified immunity as to the removal of K.J. and J.M.J. in September 2018 because there is no allegation that Patchin had anything to do with that removal (which occurred before she began serving as Plaintiffs' DCS caseworker).  Turning to Del Fiacco, there is no allegation that she had any involvement in any of the removals and the SAC alleges that she did not even begin serving as Plaintiffs' DCS caseworker until "after March 2021" (*id.* ¶ 45), which is more than a year after the final removal occurred.  Thus, Del Fiacco is entitled to qualified immunity as to any familial association claim premised on the removals.  Finally, although the SAC alleges that Davisson was involved in some of the challenged removals by virtue of her status as Patchin's supervisor (*id.* ¶¶ 39(f), 39(i), 39(p)), those allegations are too conclusory to support liability and overcome Davisson's claim of qualified immunity.  *Cf. Fidler*, 2024 WL 1553703 at *2 ("The third amended complaint contains no allegations that Quigley personally participated in E.F.'s removal or placement with a foster family beyond supervising Burns.  And the nonconclusory allegations demonstrate only that Kaplan-Siekmann reviewed some documents and submitted a report to the Arizona Department of Child Safety.  This conduct does not constitute a plausible constitutional violation.").

### b.     Failure To Reunite

The June 10, 2024 order explained that, to the extent Count One of the FAC was based on Defendants' "failure to allow Jimenez-Bencebi and Zavaleta to resume visitation

after, at a minimum, the juvenile court issued its May 2022 decision authorizing reunification," although there was "a strong argument that it would violate clearly established law for a DCS employee to interfere with parental visitation under these circumstances, *i.e.,* where the interference was not only unauthorized by court order, but directly contrary to a court order," the claim failed because the FAC did "not allege who was responsible for these acts of interference" and instead "generically attribute[d] them to 'DCS.'" (Doc. 17 at 55-56.)

In an effort to remedy this deficiency, the SAC contains various new allegations regarding Del Fiacco's and Davisson's responsibility for the alleged failure to comply with the May 11, 2022 order. (Doc. 20-1 ¶¶ 40-41.) However, there are no new allegations on this issue regarding Patchin (which is unsurprising given that, as discussed above, Patchin ceased being Plaintiffs' assigned DCS caseworker in March 2021). Notably, Defendants do not argue in their motion that Del Fiacco and Davisson are entitled to qualified immunity with respect to this portion of Count One—they only seek a qualified immunity-based dismissal as to Patchin. (Doc. 25 at 12 ["Count One should be dismissed in its entirety as to Patchin and for all acts except post-May 11, 2022, for Del Fiacco and Davisson on the basis of qualified immunity."].)[4] The Court agrees that Patchin is entitled to qualified immunity as to this portion of Count One because there is no allegation that she was personally involved in the alleged violation. And because Defendants do not seek a qualified immunity-based dismissal of this portion of Count One as to Del Fiacco and Davisson, the qualified-immunity analysis need not go any further.

### c.   **Qualified-Immunity Summary As To Count One**

To the extent Count One is based on the wrongful removal of K.J., J.M.J., K.A.J., and J.A.J., it is dismissed in its entirety on the basis of qualified immunity as to Del Fiacco and Davisson and is dismissed in part (only as to K.J. and J.M.J.) on the basis of qualified immunity as to Patchin. To the extent Count One is based on the wrongful failure to reunite

---

[4]   The Court notes that, later in their motion, Defendants seek the dismissal of this portion of Count One as to Del Fiacco and Davisson for failure to state a claim. (Doc. 25 at 16.) That argument is addressed *infra.*

K.J., K.A.J., and J.A.J. with their family following the issuance of the May 11, 2022 order, it is dismissed as to Patchin (but not as to Del Fiacco and Davisson) on the basis of qualified immunity.

### C.    Count Two

#### 1.    The June 10, 2024 Order

In Count Two of the FAC, Plaintiffs asserted a § 1983 claim against Patchin, Del Fiacco, and Davisson "for violating Plaintiffs' right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth." (Doc. 1-3 at 153-54.)

In the June 10, 2024 order, the Court concluded that Plaintiffs failed to state a claim against Davisson in Count Two because the FAC merely "parrot[ted] legally conclusory language" and failed to "plausibly establish that Davisson was personally involved in the alleged constitutional deprivations or had knowledge of the wrongfulness of the acts that would lead to those deprivations." (Doc. 17 at 39-40.)

As for the other defendants named in Count Two, the Court concluded that Del Fiacco was entitled to qualified immunity because the FAC "merely parrot[ted] the language from case law that Del Fiacco acted with knowledge or indifference in 're-alleging' Patchin's statements" and failed to allege that Del Fiacco's testimony to the juvenile court on January 10, 2022 was false. (*Id.* at 61-63.)  In contrast, the Court concluded that "Patchin is not entitled to qualified immunity as to Count Two at this stage of the proceedings." (*Id.* at 57-61.)

#### 2.    The Parties' Arguments

Defendants argue that "the Court should affirm the prior dismissal of Del Fiacco on Count Two . . . under qualified immunity protections and extend those same protections to Davisson" because "[a]gain lacking . . . are any allegations that Davisson knew the allegations were false." (Doc. 25 at 12.)  Defendants add: "Minor Plaintiffs seek to pin all the alleged damages on State Defendants, but they are only one piece of a complicated

puzzle.  Even assuming Minor Plaintiffs' allegations about an incomplete investigation and false reporting to the court are accurate, the juvenile court still had a duty to weigh the evidence and render its own orders.  State Defendants may have initially removed custody, but that removal was reviewed by a court and due process was invoked." (*Id.* at 14.)

As noted, Plaintiffs do not differentiate between Counts One and Two in their responsive argument on qualified immunity.  (Doc. 28 at 7-10.)  With that said, they appear to argue that qualified immunity should be denied as to Count Two because (1) "Patchin, Del Fiacco, and Davisson moved" for severance "without a reasonable investigation [and] contrary to reports received from others"; and (2) Davisson both "set in motion the false narrative about this family" and also "knowingly refused to terminate the subsequent series of DCS actions, which she knew were false or not justified." (*Id.*)

In reply, Defendants argue: "Plaintiffs were specifically instructed to incorporate allegations in the SAC supporting the proposition that Davisson knew the information being conveyed to the state court was false to adequately plead judicial deception. Plaintiffs' amended assertions that 'Davisson directed, recommended, and authorized Patchin to make . . .  false statements . . .  in reports to the juvenile court . . . .' remains factually insufficient to establish judicial deception.  Plaintiffs still do not explain (1) that the statements were actually false, (2) how Davisson knew the reports were false, or (3) how she authorized the statement." (Doc. 32 at 9.)  As for Del Fiacco, Defendants argue: "Plaintiffs cannot establish that Del Fiacco knew any of the allegations were false, and their allegations remain focused on Del Fiacco 'continuing the false narrative.'  This Court already stated that is insufficient." (*Id.* at 10.)

3.    Analysis

The Court agrees with Defendants that Davisson and Del Fiacco are entitled to qualified immunity with respect to Count Two.  As in the FAC, the SAC only offers conclusory assertions regarding Davisson's and Del Fiacco's knowledge of the falsity of the assertions at issue.

…

V.     Failure To State A Claim

     A.     **Legal Standard**

The legal standard governing a request to dismiss for failure to state a claim is set forth in the June 10, 2024 order.  (Doc. 17 at 11-12.)

     B.     **Counts Six, Eight, And Ten**

          1.     The Parties' Arguments

In Counts Six, Eight, and Ten of the SAC, Plaintiffs assert various negligence-based tort claims (negligence per se, gross negligence, and gross negligence) against a host of Defendants, including Faust and McKay.   (Doc. 21 ¶¶ 195-217, 232-40, 249-57.) Defendants contend that Faust and McKay should be dismissed from these counts because "the SAC is devoid of specific details regarding Faust or McKay or their respective knowledge or oversight of the juvenile dependency court case.  In essence, the language of the SAC reads as a failure to properly hire, train, and/or supervise the DCS employees but fails to identify specific training, policy, or statutes that were violated by Faust or McKay, with the exception of an alleged violation of A.R.S. § 8-456 previously discussed [in relation to L.J.].  The language is vague and does not point to any specific knowledge or involvement by Faust or McKay."  (Doc. 25 at 14-15.)

In response, Plaintiffs argue that Defendants' dismissal arguments regarding Counts Six, Eight, and Ten are "disingenuous[]" because Arizona state courts follow a notice-pleading standard.  (Doc. 28 at 10-11.)  In the alternative, Plaintiffs contend that if the SAC "does not adequately provide fair notice of the nature and basis of Plaintiffs' claims, then an opportunity to correct any such deficiency by amendment should be allowed."  (*Id.* at 11.)  Plaintiffs also contend that Count Six "clearly state[s] the laws McKay and Faust violated and why they were negligent per se."  (*Id.* at 12.)

In reply, Defendants argue that the SAC's "vague assertions that these State Defendants violated A.R.S. §§ 8-451,-453 are not sufficient.  Plaintiffs identified no specific policies or statutes that either Faust or McKay violated, with the exception of failing to properly train under A.R.S. § 8-802(D)(1).  The SAC contains no allegations that

Faust or McKay had any involvement whatsoever with Plaintiffs. They were not alleged to have (1) provided oversight to any acts by other State Defendants, (2) participated in the investigation or removal of any of the children, (3) drafted or supplied documentation to the state court, (4) interfered in Jimenez or Zavaleta's visits with the children, (5) testified during the state court proceedings, or (6) participated in reunification decisions regarding the family. Even incorporating by reference all the previous allegations does not salvage their claims against State Defendants Faust and McKay." (Doc. 32 at 12.)

> 2. <u>Analysis</u>

The Court agrees with Defendants that the SAC fails to state a claim in Counts Six, Eight, or Ten against McKay and Faust. Although the SAC alleges that McKay and Faust each served as the Director of DCS during some of the relevant timeframes in this case (Doc. 21 ¶¶ 17-18), it does not contain a single non-conclusory allegation regarding their conduct or involvement in any of the challenged conduct. To the extent Plaintiffs contend that such details are unnecessary in state court, the Court must apply federal pleading standards here.

> C. **Counts Four And Five**

>> 1. <u>The June 10, 2024 Order</u>

In Count Four of the FAC, Plaintiffs asserted a § 1983 claim against Patchin, Del Fiacco, Davisson, Faust, and McKay for "interfer[ing] with [Jimenez-Bencebi's and Zavaleta's] constitutional right to make medical decisions for their seized and detained children disallowing them from attending medical appointments while they were in State's care." (Doc. 1-3 ¶ 170.) Similarly, in Count Five of the FAC, Plaintiffs asserted a § 1983 claim against the same five Defendants for "interfer[ing] with [Jimenez-Bencebi's and Zavaleta's] constitutional right to be present during their seized and detained children's medical appointments." (*Id.* ¶ 175.)

In the June 10, 2024 order, the Court concluded that Counts Four and Five failed to state a claim against Davisson, Faust, and McKay because it did not "allege that Davisson, Faust, and McKay were personally involved in interfering with, or aware of interference

with, Jimenez-Bencebi's and Zavaleta's right to make medical decisions for their children or ability to be present during their children's medical appointments." (Doc. 17 at 42.) In a separate portion of the order, that Court noted that "[t]he only [specific] references to medical decisions in the FAC are that K.J. and J.M.J. received physical examinations at PCH after their removal on September 14, 2018, and that J.M.J. remained at PCH until September 20, 2018. . . . Because the FAC does not offer any allegation that Patchin and Del Fiacco participated in the decision to prevent Jimenez-Bencebi and Zavaleta from making medical decisions for K.J. and J.M.J., or even that any medical decisions were made on behalf of L.J., K.A.J., and J.A.J, Plaintiffs have failed to state a claim against Patchin and Del Fiacco in Count Four." (*Id.* at 45-46.) Likewise, as for Count Five, the Court stated that "the totality of the FAC's factual allegations on this topic are that J.M.J. and K.J. received physical examinations on September 14, 2018 and that J.M.J. received treatment for malnutrition. Although it is plausible, based on those facts, to infer that Jimenez-Bencebi and Zavaleta were not present during K.J.'s and J.M.J.'s treatments, the FAC is silent on who (if anyone) prevented Jimenez-Bencebi and Zavaleta from being present and whether L.J., K.A.J., and J.A.J. underwent any medical treatments without their parents present. Accordingly, Plaintiffs have failed to state a claim against Patchin and Del Fiacco in Count Five." (*Id.* at 47.)

### 2. The Parties' Arguments

Defendants argue that Counts Four and Five remain subject to dismissal because the SAC does "not incorporate[] any additional facts that State Defendants were responsible for (1) Minor Plaintiffs receiving any medical examinations, (2) without notice to Jimenez and Zavaleta, and (3) without permission for Jimenez and Zavaleta to be present." (Doc. 25 at 15.) Defendants also argue, in the alternative, that Counts Four and Five are subject to dismissal on statute-of-limitations grounds. (*Id.* at 16.)

In response, Plaintiffs purport to identify many missed medical appointments and unconsented-to medical treatment: "For example, following J.A.J.'s seizure immediately after birth on February 13, 2020, neither [parent was] notified about, and both were

prevented from attending, J.A.J.'s numerous doctor visits, including the following: well-baby examination 3-5 days after birth; well-baby examination one month after birth; well-baby examination and vaccinations two-months after birth; well-baby examination and vaccinations four-months after birth; well-baby examination and vaccinations six-months after birth; nine-month checkup; 12-month checkup; 15-month checkup and vaccinations; 18-month checkup and vaccinations; 24-month checkup; 30-month checkup; and 36-month checkup." (Doc. 28 at 14.) Plaintiffs also contend that both parents were "prevented . . . from knowing about and being present for K.A.J.'s doctor visits after his removal on March 17, 2019." (*Id.*) Plaintiffs conclude: "Because the minor Plaintiffs' vaccinations, well-baby checks, and physical examinations were neither required by exigent circumstances and the parents' parental rights were not severed, all Plaintiffs retained their full rights to notice, consent, and opportunity for parents to be present at all these medical events." (*Id.* at 15.)

In reply, Defendants argue that "[t]he general proposition that parents have a constitutional right to make medical decisions and attend medical appointments does not transform the deficiencies contained in the SAC because they have not alleged an actual 'interference' or facts supporting that State Defendants infringed on these rights. Plaintiffs assert they were not allowed to attend well-baby checks and incorporate a long list of potential appointments in the Response, but do not provide any factual substance such as the actual date of the appointment, who attended the appointment, whether they were specifically notified about the appointment, and any potential reason why they failed to attend the appointment. Without these details, State Defendants cannot plausibly defend the cursory allegations." (Doc. 32 at 12-13.) Defendants also reiterate their statute-of-limitations argument. (*Id.* at 13.)

### 3.   Analysis

The Court dismissed Counts Four and Five of the FAC in large part due to the absence of concrete details regarding the medical appointments that Jimenez-Bencebi and Zavaleta did not consent to or attend. In an effort to address this deficiency, the SAC adds

the following new details: (1) "[a]fter K.A.J. was removed, [Jimenez-Bencebi and Zavaleta] were prohibited by Patchin and Davisson from attending any medical appointments for K.A.J., including well-baby examinations" (Doc. 20-1 ¶ 39(h); (2) "[o]nce J.A.J. was seized and removed, [Jimenez-Bencebi and Zavaleta] were prohibited from attending any of J.A.J.'s medical appointments, including all well-baby appointments, immunizations, and other appointments" (*id.* ¶ 39(n)); (3) Jimenez-Bencebi and Zavaleta were prevented from "attending all [of K.J.'s and J.A.J.'s] baby wellness examinations, and be[ing] present for any immunizations . . . under the mismanagement of Supervisor Davisson" (*id.* ¶ 116); (4) "Patchin, Del Fiacco, and Davisson interfered with [Jimenez-Bencebi's and Zavaleta's] constitutional right to make medical decisions for their seized and detained children by prohibiting them from attending their annual check-ups, well-baby examinations, and any other medical treatment needed while in DCS custody" (*id.* ¶ 186); and (5) "Patchin, Del Fiaccco, and Davisson interfered with [Jimenez-Bencebi's and Zavaleta's] constitution[al] right to consent to medical treatment for their seized and detained children by disallowing them from attending their annual check-ups, well-baby examinations, annual immunizations, and any other medical treatment needed while in DCS custody" (*id.* ¶ 192).

Although the Court appreciates Plaintiffs' attempt to add these new details, they remain insufficient to state a claim. Beginning with Count Four, it is true that "physical examinations of [a] child may not be undertaken *for investigative purposes* at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances*." Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (emphasis added). Thus, "[b]arring a reasonable concern that material physical evidence might dissipate, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to *investigatory* physical examinations." *Id.* (emphasis added) This rule is not implicated by the new details alleged

in the SAC because there is no allegation that any of the medical appointments at issue—annual check-ups, well-baby examinations, and annual immunizations—were undertaken for investigative purposes at the behest of any state official (let alone at the behest of any of the named Defendants).[5]

As for Count Five, although *Wallis* holds that "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention" and "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures," *id.* at 1142, a plaintiff asserting a § 1983 claim based on those principles must establish that the particular defendant being sued was responsible for the parent's absence. The SAC is deficient as to this issue. Although the SAC contains conclusory assertions that Patchin and Davisson "prohibited" Jimenez-Bencebi and Zavaleta from attending K.A.J.'s well-baby examinations and other medical appointments (Doc. 21 ¶ 39(h), that unspecified DCS employees "prohibited" Jimenez-Bencebi and Zavaleta from attending J.A.J.'s well-baby examinations and other medical appointments (*id.* ¶ 39(n), that Davisson's "mismanagement" resulted in Jimenez-Bencebi and Zavaleta being prevented from attending K.J.'s and J.A.J.'s wellness examinations and immunizations (*id.* ¶ 116), and that Patchin, Del Fiacco, and Davisson "prohibit[ed]" and/or "disallow[ed]" Jimenez-Bencebi and Zavaleta from attending various medical appointments (*id.* ¶¶ 186, 192), there are no facts alleged in the SAC to support those conclusions. *Cf. Fidler*, 2024 WL 1553703 at *3 ("The third amended complaint includes no factual allegations that, if taken as true, show

---

[5]        *Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021), contains passages that can be read as suggesting that a Fourth and Fourteenth Amendment occurs whenever a child undergoes any sort of medical examination "without the Parents' notice, consent, or an opportunity to be present." *Id.* at 1149. However, the examinations at issue in *Benavidez*, similar to the examination at issue in *Wallis*, were court-ordered "medical examinations [that] included a full body inspection including the children's genital and/or anal areas, obtaining urine to test, and drawing blood and/or vaccinations." *Id.* at 1141 (internal quotation marks omitted). At any rate, there is no allegation in the SAC that any of the named Defendants was responsible for scheduling the annual check-ups, well-baby examinations, and annual immunizations at issue here. Thus, even if it might be theoretically possible to assert a constitutional claim against some state official for causing such non-investigatory medical appointments to occur without parental consent, the SAC fails to state such a claim against Patchin, Del Fiacco, Davisson, Faust, or McKay.

that Burns, Quigley, Manjarrez, Saenz, or Edwards were responsible for (1) E.F. receiving medical examinations (2) without notice to Fidler and (3) without permission for her to be present.  Fidler therefore did not state a plausible entitlement to relief in Claims Six and Seven.").[6]

D.    **Count One**

1.    The Parties' Arguments

As discussed above in Part IV.B.3, following the qualified-immunity analysis, the only remaining portions of Count One are (1) the wrongful-removal claim against Patchin, but only as to K.A.J. and J.A.J.; and (2) the failure-to-reunite claim against Del Fiacco and Davisson.

Defendants move to dismiss the failure-to-reunite claim "for failure to state a claim in violation of Fed. R. Civ. P. 8."  (Doc. 25 at 16.)  Defendants elaborate:

> The facts are suspect because the exact language in the May 11, 2022, order as outlined in the SAC only required 'DCS to have a meeting with parents within 30 days to start the reunification process.'  (Doc. 21 ¶ 39(q).)  The SAC does not state this meeting failed to occur.  The second allegation [is that] 'For the first six weeks . . . Del Fiacco and Davisson cancelled all of the parent's supervised visits with their children.' (*Id.* ¶ 40.) Again this does not explain if or how this may have been connected to the reunification process.  Next, the allegation is that 'Del Fiacco and Davisson waited for more than five months to take any affirmative steps towards implementing the reunification case plan' (*Id.* ¶ 41) but, nevertheless, fails to explain the language in the original court order that was specifically violated.  The final allegation is that 'DCS's heavy-handed involvement with this family continued until May 25, 2023, when the juvenile court dismissed the dependency action.'  (*Id.* ¶ 42.) Again, this demonstrates that the juvenile court remained involved with this family for one year after the May 11, 2022, order, so all orders regarding placement, visitation, and reunification services were being controlled by the juvenile court.

(*Id.*)

In response, Plaintiffs argue that the facts alleged in the SAC establish that "State Defendants clearly violated a court order for reunification" because "after the May 11,

---

[6]    Given these conclusions, it is unnecessary to resolve Defendants' alternative statute-of-limitations challenge to Counts Four and Five.

2022, hearing the juvenile court changed the case plan to reunification and ordered DCS to have a meeting with the parents within thirty days of the May 11, 2022, ruling to start the reunification process" but "Del Fiacco and Davisson failed to follow the juvenile court's order for reunification" because "[f]or the first six weeks after the 11 May 2022 order, DCS, through its agents Del Fiacco and Davisson, cancelled all the parents' supervised visits with their children."  (Doc. 28 at 15.)  Plaintiffs further contend that "[i]n direct violation of the juvenile court's order, Del Fiacco and Davisson failed to take affirmative steps toward implementing the reunification case plan for five months."  (*Id.* at 15-16.)

In reply, Defendants argue that "[t]he Response imprecisely alleges that State Defendants violated an order for reunification entered on May 11, 2022, but a detailed review of the actual court language is not consistent with this claim.  The order does not mandate State Defendants to reunify the Minor Plaintiffs in any set timeframe; instead it states they were required to conduct a meeting. . . .  There are no allegations State Defendants failed to hold this meeting and even if it did allege this failure, nothing supports a potential constitutional violation simply because a meeting was not held in violation of a state court order."  (Doc. 32 at 8-9.)[7]

### 2.    Analysis

The Court agrees with Defendants that, to the extent Plaintiffs' claim in Count One against Del Fiacco and Davisson is premised on a failure-to-reunite theory, it is subject to dismissal for failure to state a claim.  Although it remains true, as noted in the June 10, 2024 order, that "there is a strong argument that it would violate clearly established law for a DCS employee to interfere with parental visitation . . . where the interference was . . . directly contrary to a court order" (Doc. 17 at 55), the only specific allegations in the SAC regarding the juvenile court's May 11, 2022 order are that it "changed the case plan from severance to reunification for K.J, K.A.J., and J.A.J." and "ordered DCS to have a meeting

---

[7]    Defendants also argue that "[b]ecause Plaintiffs were afforded due process through the state court proceedings, any alleged violations occurring after the state court took jurisdiction cannot equal a Fourteenth Amendment violation unless State Defendants took affirmative steps and failed to provide notice to Minor Plaintiffs and/or failed to provide them with the opportunity to be heard."  (Doc. 32 at 10.)  This argument is forfeited because it was raised for the first time in a reply brief.

with parents within 30 days of the May 11, 2022, ruling to start the reunification process." (Doc. 21 ¶ 39(q).)  However, there is no allegation in the SAC that DCS failed to participate in this court-ordered meeting within 30 days (let alone that Del Fiacco or Davisson were personally responsible for the failure to participate).

As for the allegation that "DCS through Del Fiacco and Davisson, cancelled all of the parents' supervised visits with their children" during "the first six weeks after the May 11, 2022, order" (*id.* ¶ 40), the problem is that the SAC does not explain why this conduct violated the May 11, 2022 order.  As noted, the SAC only identifies one specific directive in the May 11, 2022 order—that DCS meet with the parents within 30 days of the issuance of the order.  Cancelling all supervised visits between the parents and children for the first six weeks following the issuance of the order would not violate that directive.  Nor can the Court infer, on this record, that cancelling such visits would violate the May 11, 2022 order's broader directive to pursue "reunification."

Finally, as for the allegation that "[i]n direct violation of the May 11, 2022, order, DCS and its agents Del Fiacco and Davisson waited more than five months to take any affirmative steps toward implementing the reunification case plan" (*id.* ¶ 41), the problem is that the SAC does not identify any provision in the May 11, 2022 order that required DCS to begin taking "affirmative steps toward implementing the reunification case plan" on any particular timeframe.  Given this omission, the Court need not credit Plaintiffs' conclusory assertion that a five-month period of delay constituted a "direct violation" of the order.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

For these reasons, Count One is dismissed as to Del Fiacco and Davisson.  The only portion of Count One that remains is the wrongful-removal claim against Patchin, but only as to K.A.J. and J.A.J.

…

- 31 -

1    E.    **Count Two**

2        As discussed above in Part IV.C.3, following the qualified-immunity analysis, the

3    sole remaining Defendant in Count Two is Patchin.

4        In the portion of their motion seeking dismissal of Count Two under Rule 12(b)(6),

5    Defendants only address the sufficiency of the allegations as to Del Fiacco and Davisson.

6    (Doc. 25 at 17.)  Because those Defendants have already been dismissed from Count Two

7    based on qualified immunity, it is unnecessary to address Defendants' additional dismissal

8    arguments.

9    F.    **Count Three**

10        1.    The June 10, 2024 Order

11        In Count Three of the FAC, Plaintiffs asserted a § 1983 claim against Patchin, Del

12    Fiacco, and Davisson "for violating Plaintiffs['] right to Due Process under the Fourth and

13    Fourteenth Amendments for failing to make reasonable efforts to preserve the family

14    relationship."  (Doc. 1-3 at 156.)  However, in the body of Count Three, Patchin, Del

15    Fiacco, and Davisson were only accused of violating the Arizona constitution and various

16    Arizona statutes.  (*Id.* ¶¶ 154-64.)  Accordingly, the Court concluded that Count Three of

17    the FAC was subject to dismissal because "[t]o state a claim under § 1983, a plaintiff must

18    allege the violation of a right secured by the Constitution and laws of the United States."

19    (Doc. 17 at 44, citation omitted.)  The Court continued: "Additionally, to the extent Count

20    Three actually was—notwithstanding the FAC's references to violations of Arizona law—

21    an attempt to hold [Defendants] responsible for federal constitutional violations related to

22    the preservation of 'the family relationship,' any such claim would be duplicative of

23    Plaintiffs' § 1983 claim . . . in Count One."  (*Id.* at 45.)

24        2.    The Parties' Arguments

25        Defendants contend that Count Three should be dismissed because "[a] review of

26    the red-lined version of the SAC easily demonstrates that Plaintiffs did not fix the

27    deficiencies noted by this Court.  This Court specifically articulated that Count Three

28    referenced violations of state law and not violations of the U.S. Constitution and there are

1    no amendments to the body of Count Three that addresses this concern." (Doc. 25 at 17.)

2    In the alternative, Defendants argue that Count Three should be dismissed because, to the

3    extent it is premised on the theory that the minor children had a constitutional right to be

4    kept together in the same foster home, the Ninth Circuit's decision in *Lipscomb by and*

5    *Through DeFehr v. Simmons*, 962 F.2d 1374 (9th Cir. 1992), establishes that there is no

6    such clearly established constitutional right (and, thus, Defendants are entitled to qualified

7    immunity). (*Id.* at 17-18.)

8         In response, Plaintiffs argue as follows:

9
10         Federal and state laws require child welfare agencies to make 'reasonable
           efforts' to preserve the family and prevent the child's removal. *E.g.*, 42
11         U.S.C. § 671(a)(15); A.R.S. §8-846 (2018); see also abundant case law cited
           herein. State Defendants' have an affirmative duty to make reasonable
12         efforts to preserve families. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9
           (2019) (citing *Marina P. v. ADES*, 214 Ariz. 326, 333, ¶ 37 (App. 2007));
13         *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186 ¶ 1 (1999).
           State Defendants had long-standing, clearly established statutory and
14         constitutional obligations to quickly reunify this family. *See, e.g., Marian P.
           v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 236 ¶ 37 (App. 2007). Reasonable
15         efforts include determining and placing the children in the best placement for
           working towards reunification. State Defendants foreclosed all efforts to
16         reunite the children with their parents by the wrongful actions alleged in the
           complaint. As shown above, State Defendants' actions clearly violated
17         Plaintiffs' constitutional rights, as painfully set forth in the complaint.

18
19
20    (Doc. 28 at 17.)

21         In reply, Defendants argue that (1) "[t]he Response does not provide any

22    clarification or legal authority establishing that failing to provide 'reasonable efforts'

23    equates to a violation of the Constitution"; (2) "[t]he only court order Plaintiffs claim State

24    Defendants failed to comply with is the May 11, 2022 order," so ""[a]ny other assertions

25    for violations of 'reasonable efforts' are protected by immunity"; and (3) "because there is

26    no constitutionally protected right for siblings to be placed together, nor to be placed in a

27    specific placement, as a matter of law, count three fails." (Doc. 32 at 11-12.)

28         …

- 33 -

3.    Analysis

The Court agrees with Defendants that Count Three remains subject to dismissal. Once again, Plaintiffs seem to operate from the mistaken premise that a § 1983 claim may be based on alleged violations of state law. At any rate, Plaintiffs fail to identify any clearly established federal law establishing that any Defendant wrongfully interfered with any Plaintiff's family relationship in a manner that is distinct from the familial-interference claim asserted in Count One.

## VI.    Notice Of Claim

### A.    **The June 10, 2024 Order**

During the last round of motion-to-dismiss briefing, Defendants raised various arguments related to Arizona's notice-of-claim statute, A.R.S. § 12-821.01(A). When analyzing those arguments, the Court stated that "the notice of claim at issue here, which was filed by Jimenez-Bencebi, Zavaleta, and L.J., is dated November 8, 2022" and that "[t]he notice of claim does not list K.J., K.A.J., and J.A.J. as claimants." (Doc. 17 at 69.) The Court further concluded that "[a]lthough Defendants seem to suggest this omission means the state-law claims of K.J., K.A.J., and J.A.J. must be dismissed" on untimeliness grounds, "any such argument is mistaken" because "§ 12-821.01(D) provides that 'a minor . . . may file a claim within one hundred eighty days after the disability ceases'" and thus "the deadline for K.J., K.A.J., and J.A.J. to file their respective notices of claim will not arrive until 180 days after each of their eighteenth birthdays." (*Id.* at 69-70.)

### B.    **The Parties' Arguments**

Defendants clarify that they "wish[] to preserve any arguments pertaining to the lack of serving a Notice of Claim ('NOC') by any Minor Plaintiffs prior to commencement of the lawsuit." (Doc. 25 at 18.) Defendants argue that "Plaintiffs cannot cure their failure by filing a notice of claim after filing this suit because Arizona law requires a notice of claim be filed before filing suit" but "recognize the impact for the failure to serve a NOC is for Minor Plaintiffs to dismiss the lawsuit, serve a NOC, and refile." (*Id.*)

In response, Plaintiffs begin by disputing the Court's earlier determination that their

notice of claim was only filed by Jimenez-Bencebi, Zavaleta, and L.J. and failed to identify K.J., K.A.J., and J.A.J. as separate claimants.  (Doc. 28 at 17-18.)  According to Plaintiffs, the notice of claim's identification of Jimenez-Bencebi as "the mother of L.J., K.J., J.M.J., K.A.J. and J.A.J." and provision of "detailed allegations concerning all five minor Plaintiffs" was sufficient to identify K.J., K.A.J., and J.A.J. as separate claimants.  (*Id.*)  In the alternative, Plaintiffs argue that "even if the [notice of claim] was not properly served, which it was, the minor Plaintiffs should have the opportunity to reserve a NOC and then pursue those claims here, as alleged, or refile their state law claims in a separate action." (*Id.* at 18.)

In reply, Defendants argue: "This Court can review the plain language of the notice of claim and easily ascertain that it was only filed naming Jimenez and Zavaleta as claimants.  Simply stating that Jimenez and Zavaleta are parents to the children does not change the plain language.  The requirements to comply with the notice of claim statute are not complex so strict compliance is required."  (Doc. 32 at 13.)

C.    **Analysis**

As an initial matter, the Court stands by its earlier determination that the only claimants identified in the notice of claim are Jimenez-Bencebi, Zavaleta, and L.J. Although K.J., J.M.J., K.A.J. and J.A.J. happen to be mentioned in the notice of claim, they are only identified as Jimenez-Bencebi's minor children and are not identified as separate claimants.  Indeed, the very first portion of the document includes the following:

**NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01**

**CLAIMANTS**:    Bianca Jimenez-Bencebi

Jiaro Abrego Zavaleta

L. J., a minor (DOB 06/27/2005)

(Doc. 28-1 at 2.)  The omission of K.J., K.A.J., and J.A.J. from this official listing of the "CLAIMANTS" is telling and dispositive.

As for how to proceed, both sides seem to agree that one solution would be to dismiss K.J.'s, K.A.J.'s, and J.A.J.'s current state-law claims without prejudice.  If K.J.,

K.A.J., and J.A.J. later serve a timely notice of claim, this will unlock their ability to file a new action reasserting the state-law claims being dismissed here. Although this outcome is undoubtedly inefficient, it is compelled by Arizona's strict rule that "[b]efore initiating an action for damages against a public entity, a claimant must provide a notice of claim to the entity in compliance with [§] 12-821.01." *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 152 P.3d 490, 491 (Ariz. 2007).

Accordingly, the Court will dismiss, without prejudice, all of the state-law claims in the SAC asserted by K.J., K.A.J., and J.A.J.

VII.    Leave To Amend

In their response, Plaintiffs request leave to amend in the event of dismissal only as to their claims in Counts Six, Eight, and Ten against Faust and McKay. (Doc. 28 at 11.) In reply, Defendants argue that "[d]ismissal without leave to amend is proper as Plaintiffs failed to comply with the specific Court directives and prior amendment has been allowed." (Doc. 32 at 1-2.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon*, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

Applying these standards, Plaintiffs' amendment request is denied. First, amendment would be futile here because Plaintiffs still have not provided any non-conclusory allegations regarding Faust's and McKay's conduct or involvement in any of the challenged conduct in this case. Nor have Plaintiffs purported to identify any new facts

that they could allege in a future pleading in an attempt to cure the deficiencies identified by Defendants.  Second, in a related vein, allowing further amendment would produce an undue delay in the litigation.  This action was initiated in state court in May 2023 (Doc. 1-3 at 5), so it is already more than a year-and-a-half old.  Additionally, this case has now generated two voluminous rounds of motion-to-dismiss briefing, and the Court is concerned that authorizing Plaintiffs to file yet another amended complaint—while will likely spur yet another round of motion-to-dismiss briefing—will inject even more delay into this case, such that it will remain stuck at the pleading stage more than two years after it was filed.  Plaintiffs have had a full and fair opportunity to plead their claims and the time has come for this case to proceed to the next stage of litigation.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 25) is **granted in part and denied in part** as set forth herein.

Dated this 9th day of December, 2024.

Dominic W. Lanza
United States District Judge