Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bianca Jimenez-Bencebi, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> State of Arizona, *et al.*, <br><br> Defendants. | Case No.: CV-23-2075-PHX-DWL <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> (Honorable Dominic W. Lanza) |

## I.   INTRODUCTION

Plaintiffs agree with Defendants that the remaining claims are those of K.A.J. and J.A.J. against Defendant Carin Patchin with respect to wrongful seizure and judicial deception. Further, in reviewing the documents submitted by Defendant Patchin with her motion for judgment on the pleadings, Plaintiffs K.A.J. and J.A.J. (hereinafter, "Plaintiffs")

agree that the warrant for their seizure was executed prior to the actual seizures (albeit by minutes) and, as such, do not contest judgment as to Count One.

However, as to Count Two, as set forth herein, Plaintiffs' complaint contains more than adequate allegations of judicial deception by Defendant Patchin (hereinafter, "Defendant") and, as such, Plaintiffs respectfully request that this Court deny Defendant's motion on this Count.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) authorizes the timely filing of a motion for judgment on the pleadings. "In reviewing a motion under Rule 12(c), the court must assume that the facts alleged by the nonmoving party are true and must construe all inferences drawn from those facts in favor of the nonmoving party." *Fortinet, Inc. v. Forescout Techs., Inc.*, 730 F. Supp. 3d 958, 963 (N.D. Cal. 2024).

## III.    BACKGROUND

The following facts are taken from Plaintiffs' Second Amended Complaint ("SAC") (Doc. 21), as well as the relevant documents attached to Defendant's motion (Doc. 44, including exhibits).

Plaintiffs K.A.J. and J.A.J. are siblings whose parents are Bianca Jimenez-Bencebi ("Bianca") and Jiaro Abrego Zavaleta ("Jiaro"). SAC ¶¶ 21-22. K.A.J. and J.A.J. were born in 2019 and 2020, respectively.

They have several older half-siblings through their mother, including L.J. (born in 2006), K.J. (born in 2016), and J.M.J. (born in 2017). *Id*. ¶ 21.

In 2016, Bianca was living in Missouri with L.J. and K.J. *Id*. ¶ 24. She was a single mother providing for all their needs. *Id*. ¶ 28.

In late 2016, she was raped. *Id*. She became pregnant with J.M.J. as a result of this rape. *Id*. ¶ 24.

2

While pregnant, when L.J began acting out, Bianca hit and bit LJ. *Id*. ¶ 26. She pled guilty to a misdemeanor charge of abuse for this incident, and served a 120-day jail term. *Id*. ¶ 27. She gave birth to J.M.J. while incarcerated. *Id*. ¶ 29.

Following her release, the State of Missouri returned custody of J.M.J. and K.J. to her. *Id*. ¶ 31. The Missouri social workers who monitored the family wrote positive things about Bianca and her parenting. *Id*. ¶ 32.

In January of 2018, Bianca moved to Arizona to live with Jiaro, who she subsequently married. *Id*. ¶ 33. They initially lived in Jiaro's sister's home. *Id*.

On September 14, 2018, the Department of Child Safety removed K.J. and J.M.J. from Bianca's care, alleging neglect. *Id*. ¶ 39(a).

Within a month, Defendant Patchin became the assigned DCS caseworker for the case. *Id*. ¶ 44.

Within a few months of Patchin's reign as assigned caseworker, on January 24, 2019, the Department filed a petition to terminate Bianca's parental rights to K.J. and J.M.J. *Id*. ¶¶ 39(d), 66. Leading up to this petition, Patchin wrote reports that falsely stated the following:

    a.    Bianca was homeless for several months in 2018;

    b.    J.M.J. was so severely malnourished he was feeble and could barely sit up;

    c.    J.M.J. had a flat head, distended stomach, and non-accidental bruising all over his back;

    d.    Bianca did not like J.M.J. because he was a baby conceived by rape;

    e.    K.J. had scratches on her face evidencing abuse;

    f.    Bianca had been convicted of felonious child abuse in Missouri in 2017.

*Id*. ¶ 67. In addition, Patchin (falsely) claimed that Bianca was aggressive, reportedly based on an anonymous source from a homeless shelter. *Id*. ¶ 67(f).

These claims were not true. *Id*. ¶ 68. Biana had only spent a few weeks in a homeless shelter after the dispute with her sister-in-law. *Id*. ¶ 71(a). Bianca was not convicted of a felony, but a misdemeanor, a significant difference. *Id*. ¶ 27. J.M.J. was not severely malnourished; and any even slight malnourishment was likely the result of a feeding issue while in foster care. *Id*. ¶¶ 71(b), (d), (e), (f).

Nonetheless, these claims formed key allegations in the January 24, 2019, dependency petition. *Id*. ¶¶ 67, 69.

Patchin also claimed that J.M.J. was covered in non-accidental bruises. *Id*. ¶ 69. Although untrue, these claims were also shared with the stakeholders and court. *Id*.

Meanwhile, in March of 2019, K.A.J. was born. *Id*. ¶ 39(e). The Department, under Patchin's direction, removed K.A.J. from her parents' care. *Id*.

In January 2020, the juvenile court severed Bianca's parental rights as to K.J. and J.M.J., but the severance was later overturned on procedural grounds. *Id*. ¶ 39(j).

In February 2020, Plaintiff J.A.J. was born. *Id*. ¶ 39(l). DCS, with Defendant Patchin still as the assigned caseworker, removed J.A.J. from his parents. *Id*. ¶¶ 39(l), (m).

Defendant Patchin made similar statements and claims as those set forth above as grounds to keep J.A.J. and K.A.J. from their parents. *Id*. ¶ 74. Specifically, Defendant Patchin made additional false claims, including:

 a. On one occasion in July 2019, Bianca allegedly shouted at her therapist, Dr. Hanley;

 b. On another occasion, while in labor in the hospital, Bianca allegedly stated she would name J.A.J. "Motherfucker;"

 c. Bianca allegedly has gender dysmorphic disorder; and

 d. Bianca allegedly willfully neglected J.M.J. because she hates boys.

*Id*. ¶ 77.

As with her Patchin's allegations, none of these were true. Dr. Hanley made no such allegations. *Id*. ¶¶ 78-80, 82. Bianca denies such statements, and nothing in the hospital records support such a startling allegation. *Id*. ¶ 85. "Gender dysphoria" is a DSM-5

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

4

diagnosis which means a person has a strong desire to be another gender. *Id*. ¶ 88. Bianca was never diagnosed by any therapist with gender dysphoria, nor has anyone presented any other evidence to suggest this. *Id*. ¶ 89.

Patchin's claims ensured that not only were K.A.J. and J.A.J. removed from their parents immediately at birth but were kept from their parents for years. *Id*. ¶¶ 73, 146.

On December 14, 2020, DCS filed another petition to terminate the parent-child relationship, this time as to K.J., J.M.J., and K.A.J. *Id*. ¶ 39(k).

Defendant Patchin was removed from the matter as the assigned caseworker in March 2021. *Id*. ¶ 44. On May 20, 2021, only a few weeks later, DCS amended the December 2020 severance petition to include J.A.J. *Id*. ¶ 39(o). The severance petition then included all four siblings other than L.J. *Id*.

Ultimately—and after Patchin's removal—on May 11, 2022, the juvenile court ruled from the bench to severe Bianca's rights as to J.M.J., based on neglect. *Id*. ¶ 39(q). The court denied the severance of K.J., K.A. J., and J.A.J. *Id*. At the same time, the juvenile court changed the case plan from severance to reunification for K.J, K.A.J., and J.A.J. *Id.*

Although it took months following the trial court's denial of severance and reinstatement of reunification as the case plan, K.A.J. and J.A.J. were finally returned to the parents and the dependency dismissed in May 2023. *Id*. ¶ 42.

Both K.A.J. and J.A.J. spent years in foster care before finally being returned to their biological parents. During discovery, Plaintiffs will demonstrate the severe psychological trauma to these two children from this prolonged separation. *See generally* Shanta Trivedi, *The Harm of Child Removal*, 43 NEW YORK UNIVERSITY REVIEW OF LAW & SOCIAL CHANGE 523 (2019) (describing the litany of harms from a child's forced removal from parents, including special harms to minority children). The needless removal of K.A.J. and J.A.J. from their parents for many months may have resulted in psychological harm that could extend into adulthood and impact their relationships for their entire lives. *See generally* "How Mother-Child Separation Causes Neurobiological Vulnerability Into Adulthood," Observer (Association for

Psychological Science), June 20, 2018 ("The evidence from psychological research is clear: When children are separated from their parents, it can have traumatic repercussions for kids' lives down the line").

## IV. DISCUSSION

### A. Plaintiffs More than Adequately Alleged that Defendant Patchin Violated their Constitutional Right to Familial Association and Due Process.

"It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that 'the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir.1985)). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Id*. (quotation omitted).

This right extends not only to parents, but children as well. For example, in *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), the Ninth Circuit stated that a "child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Id*. at 325. Children have a similar interest in associating with their parents, free from official deprivation. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) ("Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct."); *see also Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 624 (C.D. Cal. 2021) (same). In *Santosky v. Kramer*, 455 U.S. 745 (1982), the United States Supreme Court noted the interests of the *child* in a severance proceeding:

> Until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures.

Id. at 760-61 (footnote omitted); *accord In re Carla C.*, 143 A.3d 677, 688 (Conn.App. 2016) ("A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship").

And, as part of this fundamental right to familial relationship, this Court has recognized "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021). "[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake ...." *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101,1108 (9th Cir. 2010).

To successfully allege a violation of the constitutional right to be free from judicial deception, the plaintiff must allege, for purposes of a Rule 12 motion, (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision. *Benavidez*, 993 F.3d at 1147. Plaintiffs have adequately alleged all three elements.

### 1. **Misrepresentations or omissions.**

Ms. Patchin's numerous misrepresentations and omissions are set forth in detail above, including allegations about the children's physical health, their purported homelessness, her misrepresentation of the nature of Bianca's single prior incident of physical abuse (followed by favorable reports from the Missouri child protective workers), her repeated claims that Bianca "hated boys," and false claims of injuries to J.M.J. and K.J. As the matter progressed, Patchin also made false claims about Bianca's psychological prognosis and relationship with her therapist, Dr. Hanley.

Indeed, Dr. Hanley stated in a report dated August 28, 2019, that "there is a good chance that [Bianca] has completed what she needs to do for DCS." SAC ¶ 79. Yet, in a report dated October 8, 2019, *less than two months later*, Patchin incorrectly told the juvenile court that "[in] August 2019, [Dr.] Rossana [Hanley] was extremely discouraged

with the lack of progress by Bianca." *Id*. Ultimately, Dr Hanley was pleased with Bianca's progress but noted Patchin's dislike of and anger towards Bianca. *Id*. ¶¶ 80, 97, 213.

### 2. **Patchin made these statements deliberately or with reckless disregard for their truth.**

Plaintiffs' complaint more than adequately alleges that Patchin made these numerous misrepresentations deliberately or with reckless disregard for their truth. Of course, "deliberateness" and "reckless disregard" are states of mind that can rarely be shown by direct evidence and may be shown by circumstantial evidence. *See*, *e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) (under defamation law, noting that "actual malice may be shown by circumstantial evidence"); *Sifredo Salguero v. Sullivan*, No. CV 19-07414-CJC (AS), 2020 WL 3087401, at *15 (C.D. Cal. May 5, 2020) (quoting *People v. Bloom*, 48 Cal. 3d 1194, 1208 (1989) ("Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"), report adopted, 2020 WL 3086232 (C.D. Cal. June 10, 2020)).

Plaintiffs' complaint alleges numerous grounds to show that Patchin's many false statements were made either deliberately or with reckless disregard, including:

- The false statements were made in reports to a court where fundamental constitutional rights were at stake, a setting where the need for truth and accuracy were paramount;

- There was no factual basis for the false claims, or could be easily checked and shown to be false;

- The sheer number of false claims suggests deliberateness or reckless disregard; and

- Dr. Hanley's observations of Patchin's hostility and anger toward Bianca.

Defendant Patchin suggests that she cannot be responsible for many of the falsehoods, claiming that "the record demonstrates the vast majority of these

statements originated from the DCS investigator assigned in 2018, Ricardo Camacho-Gutierrez." *Defendant's Motion*, at 9. But that these claims may have "originated" with someone else does ***not*** insulate Patchin from responsibility for her ***repeated repetition*** of these statements. "The term 'deliberate fabrication' encompasses both statements that the official knew were false and those the official would have known were false had he not recklessly disregarded the truth." *Schindler v. Contra Costa County.*, No. 21-CV-02984-JSW, 2023 WL 2414864, at *2 (N.D. Cal. Mar. 8, 2023) (citing *Keates v. Koile*, 883 F.3d 1228, 1240 (9th Cir. 2018)). Regardless of the origination of the claims, Patchin may be liable for repeating them with "reckless disregard for the truth." *Keates*, 883 F.3d at 1240.

The initial case manager made these statements in September 2018, when this matter had just begun, and the Department's investigation was still at its infancy. But Defendant Patchin assumed responsibility for the case in October 2018, and was the assigned case manager until March 2021, more than 2½ years. SAC ¶ 44. During this time, she not only repeated these earlier claims over and over again in her court reports, but built on them with more falsehoods. The medical records of the children did not support Patchin's claims. *Id*. ¶¶ 59, 62-65, 173, 210.

Plaintiffs more than adequately pled a factual basis as to Patchin's *mens rea* in making the numerous false claims.

### 3. Material to the judge's decisions.

DCS took custody of both K.A.J. and J.A.J. immediately following their births. SAC ¶¶ 39(e), (l). Patchin's misrepresentations were material to both the initial removal decisions, as well as the numerous decisions that kept the two children in out-of-home custody for several years.

As a threshold matter, here's a little background regarding Arizona juvenile dependency proceedings. *First*, Arizona rules mandate that (1) a case manager such as Ms. Patchin ***must*** prepare a report for the court before every hearing, (2) the court ***must*** review the report, and (3) the reports are generally admissible (and not hearsay) if the author is

9

available to testify. *See* **Ariz.R.Juv.Ct.P. 104(d)(2)** (current iteration) ("In any dependency, Title 8 guardianship, or termination hearing, the court must review a child safety worker's report and may admit the report into evidence if the worker or workers who prepared or approved the report are available for cross-examination and the report was disclosed to the parties …."). Thus, every report drafted by Defendant Patchin was necessarily reviewed by the juvenile court.

*Second*, the juvenile dependency process is a fluid process. There is not a "single" ruling by the juvenile court in either the dependency or severance portion of the proceedings. Rather, throughout a dependency proceeding (such as this matter), there are numerous hearings and court proceedings where the trial court must consider the Department's continued custody of the child; in a case of this duration (September 2018 to May 2023), there were literally dozens of court hearings. In addition to the procedure for the court authorized removal, *see* **Ariz.R.Juv.Ct.P. 327**, there was the preliminary protective conference, **Ariz.R.Juv.Ct.P. 331**, preliminary protective hearing, **Ariz.R.Juv.Ct.P. 332**, contesting review of temporary custody, **Ariz.R.Juv.Ct.P. 333**, initial dependency hearing, **Ariz.R.Juv.Ct.P. 334,** pretrial conference, **Ariz.R.Juv.Ct.P. 337,** dependency adjudication hearing, **Ariz.R.Juv.Ct.P. 338**, disposition hearing, **Ariz.R.Juv.Ct.P. 339**, multiple review hearings, **Ariz.R.Juv.Ct.P. 341**, permanency hearing, **Ariz.R.Juv.Ct.P. 343**, and hearings on any motions for the return of the child, **Ariz.R.Juv.Ct.P. 342**. Where, as here, there was also a pending request for severance, there were also initial termination hearings, **Ariz.R.Juv.Ct.P. 352**, and termination adjudication hearings, **Ariz.R.Juv.Ct.P. 353** (held here in May 2022).

*Third*, the neglect or abuse of one child can be extrapolated to other children of the parent at issue. *See, e.g.,* **A.R.S. § 8-533(B)(2);** *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 230, ¶ 27 (2020).

So here, in her 2½ years of managing the juvenile case, Defendant Patchin authored dozens of court reports, most (or all) of which were provided to the juvenile court, who was required to review them. And in those reports, Patchin stated, repeated, and added to

10

the misrepresentations that led to J.A.J.'s and K.A.J.'s years of out-of-home custody. Plaintiffs have adequately alleged the third element of a claim for judicial deception.[1]

## V. CONCLUSION

For the reasons set forth herein, Plaintiffs K.A.J. and J.A.J. respectfully request that this Court deny Defendant Patchin's motion for judgment on the pleadings with respect to Count Two, Judicial Deception.

**RESPECTFULLY SUBMITTED** this 14th day of June 2024.

**MILLS + WOODS LAW PLLC**

By   */s/ Thomas A. Connelly*
   Thomas A. Connelly
   Robert T. Mills
   Sean A. Woods
   5055 North 12th Street, Suite 101
   Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**

   DeeAn Gillespie Strub
   Jenny D. Jansch
   7319 North 16th Street
   Phoenix, AZ 85020

   *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June 2025, I electronically transmitted the foregoing document to be filed electronically with the Clerk of the Court using the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

 */s/  Thomas A. Connelly*

---

[1] Because of the self-evident *mens rea* element of a judicial deception claim, the Ninth Circuit has held that "governmental employees are not entitled to qualified immunity on judicial deception claims." *Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011).

11