**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Bianca Jimenez-Bencebi, et al.,

Plaintiffs,

v.

State of Arizona, et al.,

Defendants.

No. CV-23-02075-PHX-DWL

**ORDER**

Pending before the Court is a motion for judgment on the pleadings filed by Defendant Carin Patchin ("Patchin"), a case manager employed by the Arizona Department of Child Safety ("DCS"). (Doc. 44.) The motion is fully briefed (Docs. 47, 48) and neither side requested oral argument. For the reasons that follow, the motion is granted in part (as to Count One) and denied in part (as to Count Two).

**RELEVANT BACKGROUND**

Although this case previously involved six plaintiffs (Jimenez-Bencebi, Zavaleta, L.J., K.J., K.A.J., and J.A.J.), six defendants (Patchin, Davisson, Del Fiacco, Faust, McKay, and the State of Arizona), and a sprawling array of federal and state-law claims, the parties contend it has now been narrowed—following removal from state court and two rounds of motion-to-dismiss briefing—to a pair of § 1983 claims asserted by two plaintiffs, K.A.J. and J.A.J. (together, "Plaintiffs"), against a single defendant, Patchin. The two remaining § 1983 claims identified by the parties are Count One, which is a claim for

wrongful removal, and Count Two, which is a claim for judicial deception.[1]

As an initial matter, it is unclear how the parties arrived at the conclusion that the case has been narrowed in this fashion. The order resolving the first motion to dismiss clarified that the "[t]he remaining counts" included (1) "Count Two, which is asserted only against Patchin by L.J., K.J., K.A.J., and J.A.J."; (2) "Count Eight, which is asserted against Patchin, Del Fiacco, Davisson, Faust, and McKay by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta)"; and (3) "Count Thirteen, which is asserted against the State, Davisson, Faust, and McKay by all Plaintiffs (although it is time-barred in part as to Jimenez-Bencebi and Zavaleta)." (Doc. 17 at 71.) Meanwhile, in the order resolving the second motion to dismiss, the only further narrowing of Count Two was that L.J. was dismissed as a plaintiff. (Doc. 34 at 6-7.) It is therefore unclear why the parties believe K.J. no longer has a claim against Patchin in Count Two.[2] Turning to Count Eight, the only further narrowing of that claim in the order resolving the second motion to dismiss was to dismiss L.J. as a plaintiff for lack of standing (*id.* at 7), to dismiss McKay and Faust (but not the other named defendants) for failure to state a claim (*id.* at 24), and to order dismissal as to all of the minor plaintiffs (but not Jimenez-Bencebi and Zavaleta) for failure to file a notice of claim (*id.* at 35-36). It is therefore unclear why the parties believe Jimenez-Bencebi and Zavaleta no longer have a partially timely claim against Patchin, Del Fiacco, and Davisson in Count Eight. Finally, turning to Count Thirteen, the

---

[1] The parties have repeatedly expressed their view that the case is now limited in this fashion. (Doc. 38 at 1-2, 5 [Rule 26(f) report]; Doc. 44 at 2 ["This Court already decided two Motions to Dismiss (docs. 6, 17, 25, 34). The remaining parties are Plaintiffs K.A.J. and J.A.J., and Defendant Patchin. The two remaining counts are Count One—alleged wrongful removal of K.A.J. and J.A.J. and Count Two—alleged judicial deception."]; Doc. 47 at 1 ["Plaintiffs agree with Defendants that the remaining claims are those of K.A.J. and J.A.J. against Defendant Carin Patchin with respect to wrongful seizure and judicial deception."].)

[2] The order resolving the second motion to dismiss did conclude that Patchin is entitled to qualified immunity as to the portion of Count *One* premised on "the removal of K.J. and J.M.J. in September 2018 because there is no allegation that Patchin had anything to do with that removal (which occurred before she began serving as Plaintiffs' DCS caseworker)." (Doc. 34 at 19.) Although that logic may suggest that K.J.'s judicial deception claim against Patchin in Count Two will meet a similar fate, no dismissal request as to that claim has been made.

only further narrowing of that claim in the order resolving the second motion to dismiss was to dismiss L.J. as a plaintiff for lack of standing (*id.* at 7) and to order dismissal as to all of the minor plaintiffs (but not Jimenez-Bencebi and Zavaleta) for failure to file a notice of claim (*id.* at 35-36). In contrast, the Court rejected the request of Faust, McKay, and the State to dismiss Count Thirteen under principles of Eleventh Amendment immunity. (*Id.* 7-12.) It is therefore unclear why the parties believe Jimenez-Bencebi and Zavaleta no longer have a partially timely claim against the State, Davisson, Faust, and McKay in Count Thirteen.

At any rate, turning back to Plaintiffs' § 1983 claims against Patchin in Counts One and Two, the most recent dismissal order acknowledged that Patchin would be entitled to qualified immunity with respect to Count One if the challenged removals occurred pursuant to a court order but held that Patchin was not entitled to qualified immunity "on this record and at this stage of the case" because she had not supplied proof that such court orders existed or sought judicial notice of them. (*Id.* at 17.) In her motion for judgment on the pleadings, Patchin now includes the relevant court orders and argues she is entitled to judgment on Count One as a result of them. (Doc. 44.) Patchin also argues that, for other reasons, she is entitled to judgment on the pleadings on Count Two. (*Id.*) Plaintiffs, in turn, concede that Patchin is entitled to judgment on the pleadings as to Count One but defend the sufficiency of Count Two. (Doc. 47.) The Court will thus limit its analysis to Plaintiffs' claims against Patchin in Count Two.

## DISCUSSION

### I. Legal Standard

A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a Rule 12(b)(6) motion to dismiss. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (citations omitted). *See also Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) ("*Iqbal* applies to Rule 12(c) motions.") (citation omitted). Therefore, a motion for judgment on the pleadings "is properly granted when, taking all the allegations in the non-moving party's pleadings as

true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999). *See also Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004) (when ruling on a Rule 12(c) motion, the court must "accept as true all allegations in [the plaintiff's] complaint and treat as false those allegations in the answer that contradict [the plaintiff's] allegations"). Ordinarily, if a district court considers evidence outside the pleadings in ruling on a motion for judgment on the pleadings, it must convert the motion into a motion for summary judgment and give the nonmovant an opportunity to respond. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). A district court may, however, consider "[c]ertain written instruments attached to pleadings" in ruling on such a motion, as well as "matters of judicial notice." *Id.* at 908.

II. Judicial Notice

Patchin seeks judicial notice of various documents. (Doc. 44 at 2 n.2.)[3] Plaintiffs do not object to this request and, indeed, seek to rely on certain facts from the "documents attached to Defendant's motion." (Doc. 47 at 2.)

Exhibit 44-1 and Exhibit 44-2 both contain an "Application and Declaration for Ex-Parte Removal of Child" filed in the Superior Court of Arizona for Maricopa County ("Superior Court"), as well as an order granting the request for removal issued by the Superior Court. Exhibit 44-10 contains a Dependency Petition filed by DCS and includes a sworn verification signed by non-party DCS case manager Ricardo Camacho-Gutierrez ("Camacho-Gutierrez").[4] Exhibit 44-11 contains a "Team Decision Making (TDM) Summary Report" ("TDM") issued by DCS, with the DCS case manager in participation listed as Camacho-Gutierrez.

At the request of Patchin, and without objection by Plaintiffs, the Court takes judicial notice of the exhibits specified above. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,

---

[3] The Court need not take judicial notice of all the attached documents because some are unnecessary for ruling on the motion for judgment on the pleadings. The Court will address those that are necessary.

[4] Exhibit 44-10 also contains a Temporary Custody Notice ("TCN") for K.J. and J.M.J. (Doc. 44-10 at 20.) The Court does not find the TCN necessary in resolving the motion for judgment on the pleadings.

442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record. . . . While some of these documents are filed under seal, they nonetheless are readily verifiable and, therefore, the proper subject of judicial notice."). The only limitation, at least at this stage, is that the Court may not take judicial notice of any disputed facts contained within such records. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."). Thus, to the extent Plaintiffs dispute facts contained within these exhibits, the Court may not take judicial notice of those facts.

III. Count Two

As noted, Count Two is a § 1983 claim against Patchin for judicial deception. "[A]s part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders." *David v. Kaulukukui*, 38 F.4th 792, 800 (9th Cir. 2022) (citation omitted). *See also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake . . . ."). "To state a violation of the constitutional right to familial association through judicial deception, a plaintiff must allege (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision. A misrepresentation or omission is material if a court would have declined to issue the order had the defendant been truthful." *David*, 38 F.4th at 801 (cleaned up).

A. **The Two Motion-To-Dismiss Orders**

In the June 10, 2024 order, the Court concluded that Plaintiffs failed to state a claim against Davisson in Count Two because the then-operative complaint failed to "plausibly establish that Davisson was personally involved in the alleged constitutional deprivations or had knowledge of the wrongfulness of the acts that would lead to those deprivations." (Doc. 17 at 39-40.) The Court also concluded that Del Fiacco was entitled to qualified

immunity as to Count Two. (*Id.* at 61-63.) In contrast, the Court concluded that Patchin was "not entitled to qualified immunity as to Count Two at this stage of the proceedings." (*Id.* at 57-61.) Specifically, the Court held that the alleged false statements identified by Plaintiffs "make it plausible that but-for Patchin's statements, K.J., K.A.J., and J.A.J. would not have been removed from Jimenez-Bencebi's and Zavaleta's care." (*Id.* at 60.)

In the December 9, 2024 order, the Court affirmed the dismissal of Davisson and Del Fiacco with respect to Count Two based on qualified immunity. (Doc. 34 at 22.) The Court went on to note that "[i]n the portion of [Defendants'] motion seeking dismissal of Count Two under Rule 12(b)(6), Defendants only address the sufficiency of the allegations as to Del Fiacco and Davisson." (*Id.* at 32.) The Court also found, in relation to Count One, that "there is no allegation that Patchin had anything to do with [the] removal [of K.J. and J.M.J.] (which occurred before she began serving as Plaintiffs' DCS caseworker)." (*Id.* at 19.)

B. **The Parties' Arguments**

Patchin argues that Plaintiffs "do not state a claim for judicial deception against [her]." (Doc. 44 at 9.) More specifically, Patchin argues that Count Two "fails because Plaintiffs cannot demonstrate that the alleged misrepresentations made during [her] testimony and in court filings were material to any judicial decision for three reasons. First, most of the statements originated from a prior DCS investigator and are not attributed to [her]. Second, the juvenile court did not terminate the parents' parental rights to K.A.J. or J.A.J. Third, [Jimenez-Bencebi] stipulated to the dependency of J.A.J. and [Zavaleta] entered a no contest plea to the dependency." (*Id.* at 2, cleaned up.)

In response, Plaintiffs argue that Patchin made "numerous misrepresentations deliberately or with reckless disregard for their truth" and "that these claims may have 'originated' with someone else does *not* insulate Patchin from responsibility for her *repeated repetition* of these statements." (Doc. 47 at 8-9.) Plaintiffs assert that "[t]here was no factual basis for the false claims, or [the claims] could be easily checked and shown to be false." (*Id.* at 8.) Plaintiffs also argue that Patchin "not only repeated these earlier

claims over and over again in her court reports, but built on them with more falsehoods." (*Id.* at 9.) Finally, Plaintiffs contend that "Patchin's misrepresentations were material to both the initial removal decisions, as well as the numerous decisions that kept the two children in out-of-home custody for several years." (*Id.* at 9-10.)

In reply, Patchin argues that "[n]o constitutional violation occurred because Patchin was not reckless in relying on information supplied to her . . . and she cannot be found to have deliberately fabricated a statement that she was simply repeating." (Doc. 48 at 5.) As for the statements "[o]riginating with Patchin," Patchin argues that "Plaintiffs incorporate insufficient facts to demonstrate that these statements are false," that the statements "resulted in a constitutional violation," or "that any of them were material to any Court decision." (*Id.*)[5]

C. **Analysis**

Plaintiffs allege that Patchin made the following "misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth":

a. [Jimenez-Bencebi] was homeless for several months in 2018;

b. J.M.J. was so severely malnourished he was feeble and could barely sit up;

c. J.M.J. had a flat head, distended stomach and non-accidental bruising all over his back;

d. [Jimenez-Bencebi] did not like J.M.J. because [he] was a baby conceived by rape;

e. K.J. had scratches on her face evidencing abuse;

f. [Jimenez-Bencebi] was aggressive;

g. [Jimenez-Bencebi] had been convicted of felonious child abuse in

---

[5] Patchin also argues that judicial deception claims are subject to a heightened pleading standard under Fed. R. Civ. P. 9(b) (Doc. 48 at 6), but arguments raised for the first time in a reply brief are forfeited. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Missouri in 2017;

h. on one occasion in July 2019 [Jimenez-Bencebi] shouted at her therapist, Dr. Hanley;

i. on one occasion, while in labor in the hospital, [Jimenez-Bencebi] stated she would name J.A.J. "Motherfucker;"

j. [Jimenez-Bencebi] has gender dysmorphic disorder;[6] and

k. [Jimenez-Bencebi] willfully neglected J.M.J. because she hates boys.

(Doc. 21 ¶ 160.)

Patchin relies on judicially noticeable documents to assert, and Plaintiffs do not appear to dispute, that a subset of these alleged misrepresentations—statements [a] through [f]—originated from another DCS employee, Camacho-Gutierrez. Exhibit 44-10, the Dependency Petition, includes the following passage:

> At the time of removal, [Jimenez-Bencebi] was with [J.M.J.] at an adoption agency. [Jimenez-Bencebi] admitted to not wanting to parent child, [J.M.J.], and wanted to put him up for adoption. There were clear and observable signs of malnourishment, underdevelopment, and the baby having a 2 cm scar on his left [of his] cheek to which [Jimenez-Bencebi] said he did it himself. DCS took the child to Phoenix Child[ren's] Hospital. Medical staff found [J.M.J.] to be underweight, malnourished, failure to thrive with bruising and scratches. There were scratches to his neck and lower face; a small .75 cm bruise to left lateral cheek; bruising to his chest, body, and right posterior thigh with 3 bruises. [J.M.J.] was found to be in the 1% for development and weight. He is currently hospitalized. [Jimenez-Bencebi] does not have stable housing. [Jimenez-Bencebi] was asked to leave the homeless shelter due to her behaviors. [Jimenez-Bencebi] left the shelter and at the time of the removal refused to give DCS a current address. . . . [Jimenez-Bencebi] was asked to leave the homeless shelter due to her rude and aggressive behavior.

(Doc. 44-10 at 5-6.) Exhibit 44-11, the TDM, includes the statements "J.M.J.] . . . also had an inflated stomach and a flat head in the back" and "[Jimenez-Bencebi] states that she is

6 Patchin asserts that "[t]he Application completed by Patchin states that . . . [Jimenez-Bencebi] had a gender *preference* disorder," not a gender dysmorphic disorder. (Doc. 44 at 10 n.5.) The outcome here does not turn on this alleged discrepancy.

looking at an adoptive plan for [J.M.J.] due to her feelings toward him. There is no bond." (Doc. 44-11 at 1-2.) Finally, as for the remaining statements attributable to her—statements [g] through [k]—Patchin contends they were accurate and/or immaterial.

Patchin is not entitled to judgment on the pleadings on this basis. First, Patchin's position with respect to statements [a] through [f] seems to be that she could not have acted with the requisite knowing or reckless mindset because she was simply repeating facts she learned from Camacho-Gutierrez. But the law on this topic is more nuanced. True, the Ninth Circuit has held, in the context of intra-agency reliance, that "[a]bsent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent." *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (citation omitted), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). But that principle only applies when "[t]here is no evidence in the record that [the defendant] knew or had any reason to believe that the investigation . . . was inadequate or incompetent." *Id.* *See also Daschke v. Hartenstein*, 420 F. Supp. 3d 919, 944 (D. Ariz. 2019) (granting summary judgment to DCS caseworkers accused of judicial deception for "reiterat[ing] false statements provided by" a police detective but emphasizing that there was no evidence that "the DCS Defendants would have had any cause to doubt the veracity of the information provided by law enforcement"). Here, Plaintiffs allege that "exculpatory evidence" regarding J.M.J.'s weight and medical status, which was contained in "hospital records available to DCS" and contradicted Camacho-Gutierrez's factual representations on those topics, was "immediately evident to [Patchin], but she knowingly or recklessly ignored it." (Doc. 21 ¶¶ 64, 134.) For example, Plaintiffs allege that J.M.J.'s medical records from the day of his removal in September 2018 "note that J.M.J. could sit on his own, pull to stand, and was active, crawling, playful, and happy"; that J.M.J. had only one small scratch, one small bruise on his cheek, and three small bruises on his right thigh; and that J.M.J. had a normal, not flat, shaped head. (*Id.* ¶¶ 59, 60.) Plaintiffs further allege that

"J.M.J. lost weight one week *after* he was taken into DCS custody" and that his "mild or moderate malnutrition in September 2018 was most likely attributable to this feeding issue." (*Id.* ¶¶ 71(e), 71(g).) Plaintiffs have thus sufficiently alleged that Patchin had reason to believe, at the time she repeated Camacho-Gutierrez's factual assertions in her various submissions to the juvenile court, that the investigation by Camacho-Gutierrez was inadequate or incompetent. As a result, Patchin cannot escape responsibility (at least at this stage of the case) for the falsity of statements [a] through [f] by claiming she was just repeating facts she heard from Camacho-Gutierrez.

Second, turning to statements [g] through [k]—which Patchin does not seek to attribute to Camacho-Gutierrez—Plaintiffs have plausibly alleged that Patchin knew at least some of those statements were false. As for statement [g], which falsely attributed a felony conviction to Jimenez-Bencebi, Patchin does not advance any explanation for how she could have reasonably believed that statement to be true. (Doc. 44 at 11 ["Except for confusing 'felony' and 'misdemeanor,' the statement is accurate."].) Patchin also fails to explain why statement [i], which was that Jimenez-Bencebi threatened to name one of her children "Motherfucker," or statement [j], which was that Jimenez-Bencebi had gender dysmorphic disorder, cannot be viewed as knowingly or recklessly false—instead, Patchin largely focuses on those statements' materiality. (*Id.*)

Third, given this backdrop, Plaintiffs have done enough at this early stage of the case to plausibly allege that Patchin's knowingly or recklessly false statements were material. Although Patchin raises a fair point that "[t]he facts, as plead," are "unclear . . . [as to] when the misrepresentations were first offered to the Court" (Doc. 48 at 8), the judicially noticeable materials establish that Patchin signed and filed the removal application regarding J.A.J. on February 13, 2020. (Doc. 44-2.)[7] That document contains many of the alleged false statements. (*Id.*) Additionally, Patchin acknowledges that she would have been required to file periodic written reports with the juvenile court between

---

[7] In contrast, the judicially noticeable materials establish that Patchin did not sign and file the removal application regarding K.A.J. on March 17, 2019—that document was signed by a different DCS employee. (Doc. 44-1.)

October 2018 and March 2021 due to her status as the DCS case specialist. (Doc. 48 at 3 n.3, 5.) Plaintiffs allege, albeit with less than ideal precision, that those filings also contained the alleged false statements. (Doc. 21 ¶ 67, emphasis added ["Patchin . . . perpetuated the following false narrative in the DCS petition, *reports to the juvenile court*, and in sworn testimony . . . ."].)

Patchin nevertheless contends that her challenged statements could not have had a material effect on the proceedings because the juvenile court ultimately decided, in May 2022, "not [to] terminate the parents' parental rights to K.A.J. or J.A.J." (Doc. 44 at 2.) But this argument overlooks Plaintiffs' theory of liability. Plaintiffs argue that "Patchin's claims ensured that not only were K.A.J. and J.A.J. removed from their parents immediately after birth but were kept from their parents for years. . . . The needless removal of K.A.J. and J.A.J. from their parents for many months may have resulted in psychological harm that could extend into adulthood and impact their relationships for their entire lives." (Doc. 47 at 5.)

In the alternative, Patchin contends that her challenged statements could not have had a material effect on the proceedings because J.A.J.'s parents either stipulated to, or did not oppose, the dependency petition. (Doc. 44 at 2.) Although this argument has surface appeal, Plaintiffs persuasively explain in their response that it ignores that "the juvenile dependency process is a fluid process. There is not a 'single' ruling by the juvenile court in either the dependency or severance portion of the proceedings. Rather, throughout a dependency proceeding (such as this matter), there are numerous hearings and court proceedings where the trial court must consider [DCS's] continued custody of the child; in a case of this duration (September 2018 to May 2023), there were literally dozens of court hearings. . . . So here, in her 2½ years of managing the juvenile case, Defendant Patchin authored dozens of court reports, most (or all) of which were provided to the juvenile court, who was required to review them." (Doc. 47 at 10.) Under these circumstances, it is plausible that Patchin's alleged false statements, repeated many times over the course of a multi-year proceeding, had a material effect in that they were the but-for cause of K.A.J.

and J.A.J. remaining out of their parents' custody for longer than they otherwise would have been. *Cf. David*, 38 F.4th at 802 ("Additionally, David alleges that 'had the presiding judge in the Family Court been informed of the Custody Order, Defendant Keahiolalo's application for a temporary restraining order would not have been granted as to B.D.' In other words, she claims that but-for Kaulukukui's misrepresentation or omission, David would not have been deprived of custody over B.D., meaning that the omission was material. Thus, we conclude that David has successfully stated a claim for violation of her and B.D.'s right to familial association based on judicial deception.") (cleaned up).

Accordingly,

**IT IS ORDERED** that Defendant's motion for judgment on the pleadings (Doc. 44) is **granted in part and denied in part** as set forth above.

Dated this 20th day of November, 2025.

Dominic W. Lanza
United States District Judge